UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

       - v. -

LINDA SUN,
   a/k/a "Wen Sun," "Ling Da Sun," and
   "Linda Hu," and

CHRIS HU,

                  *Defendants*.

S1 24 Cr. 346 (BMC) (TAM)


# REPLY MEMORANDUM IN FURTHER SUPPORT
# OF LINDA SUN'S MOTION TO SUPPRESS


ABELL ESKEW LANDAU LLP

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman
256 Fifth Avenue, 5th Floor
New York, NY 10001

*Counsel for Linda Sun*

## Table of Contents

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT ........................................................................................................................ 2

I.   Conducting New Searches Years After Fully Executing a Warrant Is Unlawful ................... 2

   A.   The government's 2024 searches violated the Fourth Amendment. ........................... 2

   B.   The government's arguments rely on factual assertions that would require an
        evidentiary hearing. ................................................................................... 6

II.  The Government's Inevitable Discovery Arguments Fail While Underscoring the
     Gravity of this Constitutional Violation ................................................................ 10

   A.   The inevitable discovery doctrine does not apply. .................................................. 11

   B.   The government's arguments highlight its reliance on unlawfully obtained
        material that contaminates later warrants. ................................................ 12

III. Good Faith Does Not Excuse Unlawfully Resuscitating a Two-Year-Old Warrant ............. 17

   A.   The government's attempts to reframe and minimize its conduct are unavailing. .... 17

   B.   Even if the government could demonstrate good faith, its arguments are
        predicated on factual assertions that require a hearing. ............................. 20

CONCLUSION .................................................................................................................... 21

## Table of Authorities

### Cases

*California v. Trombetta*,
    467 U.S. 479 (1984) ..................................................................................... 7

*Davis v. United States*,
    564 U.S. 229 (2011) ................................................................................... 20

*Delaware v. Prouse*,
    440 U.S. 648 (1979) ..................................................................................... 1

*Giglio v. United States*,
    405 U.S. 150 (1972) ..................................................................................... 9

*Herring v. United States*,
    555 U.S. 135 (2009) ............................................................... 18–19, 20, 21

*Johnson v. United States*,
    333 U.S. 10 (1948) ..................................................................................... 2

*Kyles v. Whitley*,
    514 U.S. 419 (1995) .................................................................................. 8, 9

*Lauro v. Charles*,
    219 F.3d 202 (2d Cir. 2000) ..................................................................... 4

*Massachusetts v. Sheppard*,
    468 U.S. 981 (1984) ................................................................................... 20

*McPhaul v. United States*,
    364 U.S. 372 (1960) ..................................................................................... 1

*Phaneuf v. Fraikin*,
    448 F.3d 591 (2d Cir. 2006) ..................................................................... 1

*United States v. Agurs*,
    427 U.S. 97 (1976) ..................................................................................... 7

*United States v. Allard*,
    634 F.2d 1182 (9th Cir. 1980) ................................................................. 10

*United States v. Almaleh*,
    No. 17-CR-25, 2022 WL 602069 (S.D.N.Y. Feb. 28, 2022) .................... 3

*United States v. Avellino*,
    136 F.3d 249 (2d Cir. 1998) ..................................................................... 8

*United States v. Bershchansky*,
    788 F.3d 102 (2d Cir. 2015) ..................................................................... 20

*United States v. Burns*,
No. 07-CR-556, 2008 WL 4542990 (N.D. Ill. Apr. 29, 2008)...........................................4

*United States v. Cabassa*,
62 F.3d 470 (2d Cir. 1995) ..............................................................................................11–12

*United States v. Collins*,
409 F. Supp. 3d 228 (S.D.N.Y. 2019) ...........................................................................5, 18

*United States v. Estime*,
No. 19-CR-711, 2020 WL 6075554 (S.D.N.Y. Oct. 14, 2020)......................................3–4

*United States v. Ganias*,
824 F.3d 199 (2d Cir. 2016) ....................................................................................................2

*United States v. Gorrell*,
360 F. Supp. 2d 48 (D.D.C. 2004) .........................................................................................4

*United States v. Hadden*,
No. 20-CR-468, 2022 WL 1409600 (S.D.N.Y. May 4, 2022) ............................................3

*United States v. Heath*,
455 F.3d 52 (2d Cir. 2006) ....................................................................................................11

*United States v. Jacobsen*,
466 U.S. 109 (1984)...........................................................................................................4, 18

*United States v. Jarman*,
847 F.3d 259 (5th Cir. 2017) ..................................................................................................4

*United States v. Leon*,
468 U.S. 897 (1984) ...............................................................................................................18

*United States v. Matias*,
836 F.2d 744 (2d Cir. 1988) .................................................................................................10

*United States v. Metter*,
860 F. Supp. 2d 205 (E.D.N.Y. 2012) ...............................................................................5, 6

*United States v. Nejad*,
436 F. Supp. 3d 707 (S.D.N.Y. 2020) ..........................................................4, 5, 10, 17, 18

*United States v. Oztemel*,
3:23-CR-00026 (KAD), 2024 WL 3090251 (D. Conn. 2024).........................................3

*United States v. Pena*,
961 F.2d 333 (2d Cir. 1992) ...................................................................................................7

*United States v. Roberts*,
852 F.2d 671 (2d Cir. 1988) .................................................................................................18

*United States v. Robinson*,
153 F. Supp. 2d 188 (E.D.N.Y. 2001) ...................................................................................7

*United States v. Romero*,
    692 F.2d 699 (10th Cir. 1982) ........................................................................ 11

*United States v. Rosa*,
    626 F.3d 56 (2d Cir. 2010) ............................................................................. 21

*United States v. Silva*,
    No. 23 CR. 204 (PGG), 2024 WL 3488305 (S.D.N.Y. July 19, 2024) ............ 14

*United States v. Smith*,
    673 F. Supp. 3d 381 (S.D.N.Y. 2023) ........................................................... 16

*United States v. Sosa*,
    379 F. Supp. 3d 217 (S.D.N.Y. 2019) ............................................................. 4

*United States v. Stokes*,
    733 F.3d 438 (2d Cir. 2013) ...................................................................... 11–12

*United States v. Voustianiouk*,
    685 F.3d 206 (2d Cir. 2012) .................................................................... 5, 20

*United States v. Wey*,
    256 F. Supp. 3d 355 (S.D.N.Y. 2017) .................................................... 6–7, 9

*United States v. Whitehorn*,
    No. 86 CR. 644 (WCC), 1986 WL 13809 (S.D.N.Y. Nov. 26, 1986) ............... 9

## PRELIMINARY STATEMENT

Is the government entitled to conduct a new Fourth Amendment intrusion two years after fully executing the warrant on which it purports to rely?  No matter the angle from which that question is scrutinized, the answer is and should be no.  Accepting the government's arguments would disregard well-reasoned precedent and risk unfettered government searches through troves of personal data whenever agents can point to some lapsed warrant issued years earlier.  That would undermine "[t]he essential purpose of the Fourth Amendment," which "is . . . to safeguard individual privacy against arbitrary governmental intrusions." *Phaneuf v. Fraikin*, 448 F.3d 591, 595 (2d Cir. 2006) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979)).

Nothing justifies the corners cut here.  The government could have followed the rules governing reviews of electronic information, but it chose instead to bypass the courts and conduct new searches of bulk data.  The government knows how to seek a new warrant when another becomes stale; indeed, it did so in this case shortly after the defense sought to file this motion.  Yet it chose not to in 2024.  That decision was deliberate, reckless, or at least grossly negligent.  *Cf. McPhaul v. United States*, 364 U.S. 372, 387 (1960) (Douglas, J. dissenting) ("[W]hen it comes to criminal prosecutions, the Government must turn square corners.").  And it took months of inquiries by the defense to even bring that fact to light.  The exclusionary rule was intended to deter such conduct.

Far from providing any legitimate justification for its actions, the government's opposition (*see* Dkt. 90 ("Opp.")) mostly tries to rewrite history and the rules.[1]  The facts and the law confirm, however, that the government's unilateral resuscitation of an already-executed, two-year-old

---

[1]    For the Court's convenience, wherever possible this reply adopts the abbreviations and naming conventions employed in Ms. Sun's opening brief and the government's opposition.

warrant in a changed investigation was unlawful.  And thanks to the government's opposition, it is clear that conduct infected later warrants.[2]  Particularly as Americans' lives become more digital every day, the Court should not reward shrugging at constitutional protections designed to safeguard electronic privacy.  All material traceable to the government's illegal searches should be suppressed.

## ARGUMENT

### I.    Conducting New Searches Years After Fully Executing a Warrant Is Unlawful

The Second Circuit has recognized the serious "privacy concerns implicated" when the government retains "possession of a vast trove of personal information about the person to whom the [data] belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure."  *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016).  The warrant requirement serves to protect those interests.  *See, e.g.*, *Johnson v. United States*, 333 U.S. 10, 14 (1948) (observing that "[a]ny assumption that evidence sufficient to support a magistrate's disinterested determination to issue a search warrant will justify [] officers in making a search without a warrant would reduce the Amendment to a nullity" and renders searches subject "only [to] the discretion of police officers").  The warrant requirement was violated here.

#### A.    *The government's 2024 searches violated the Fourth Amendment.*

The government's primary contention—that agents' new searches in 2024, admittedly completed "approximately two years after the date of the warrant," were nonetheless "temporally

---

[2]    Ms. Sun previously observed that "[o]ther warrants may become relevant if they, too, yielded information or evidence traceable to the government's constitutional violation" and "[i]dentifying all such information or evidence may well require a hearing . . . ." (Dkt. 78 ("Mot.") at 2 n.2.)  As discussed more fully *infra*, the government's opposition shortcuts some of that work by showing how the Residence Warrant expressly relied on illegally obtained material.

2

reasonable with respect to the underlying warrant"—is completely unmoored from the law and this record.  (Opp. 16.)

First, attempting to reframe the new 2024 searches as an innocent continuation of the prior review is disingenuous.  The government previously admitted that its review pursuant to the 2022 Gmail Warrant was completed in 2022, lasted "approximately two months," and culminated in "the reviewing agents' responsiveness report," which was then stored on the FBI's system.  (Dkt. 62 at 2.)  Implying now that the review was ongoing all along—something the government never expressly says (*see* Opp. 16–18), and rightly so—strains credulity since it took *two years* for anyone to notice that "the reviewing agents' responsiveness report" had been "inadvertently expunged from FBI computers."  (Dkt. 62 at 2.)  Surely someone would have caught that earlier if, as the government now implies, it was still "finaliz[ing]" its review during those years.  (Opp. 17.)  The new searches plainly constituted a separate review.

For that reason, almost all of the cases cited by the government as endorsing "reviews of seized electronic data . . . finalized within two years (or even somewhat longer)" are inapposite. (*Id.*)  With one exception, reviews in those cases were ongoing and prolonged by circumstances the courts found to be reasonable.  *See United States v. Oztemel*, 3:23-CR-00026 (KAD), 2024 WL 3090251, at *11 (D. Conn. 2024) (finding two years and nine months reasonable where the government had to review a total of 112,000 records); *United States v. Hadden*, No. 20-CR-468, 2022 WL 1409600, at *4–5 (S.D.N.Y. May 4, 2022) (stating the government's "ongoing" eighteen-month review was reasonable given the "disturbance caused by the COVID pandemic during which the review was conducted"); *United States v. Almaleh*, No. 17-CR-25, 2022 WL 602069, at *20 (S.D.N.Y. Feb. 28, 2022) (noting the government made rolling productions while completing its review over the course of twenty months); *United States v. Estime*, No. 19-CR-711, 2020 WL

3

6075554, at \*14–15 (S.D.N.Y. Oct. 14, 2020) (finding "difficulties created by encryption" provided a "meritorious basis" for a ten-month delay in the government's review); *United States v. Nejad*, 436 F. Supp. 3d 707, 735 (S.D.N.Y. 2020) (concluding three years to generate a responsiveness report was reasonable since "search warrant returns comprised over one million documents in at least three different languages"); *United States v. Sosa*, 379 F. Supp. 3d 217, 222 (S.D.N.Y. 2019) (approving responsiveness reports generated within ten and fifteen months).[3]

Only one case cited by the government addresses searches conducted *after* a responsiveness report was generated, and it weighs in Ms. Sun's favor. Confronting subsequent government searches of the kind at issue here, the court in *Nejad* stated that "searches conducted subsequent to the completion of the responsiveness review violated the Fourth Amendment." 436 F. Supp. 3d at 736. Even the government does not dispute that "commonsense proposition," pivoting instead to deny that it is a "bright-line rule prohibiting diligent efforts to recreate a responsiveness report . . . ." (Opp. 18.) That is a dubious argument given established limits on when the government can access private information. *See, e.g.*, *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) ("A 'search' occurs when an expectation of privacy that society is prepared to consider reasonable is infringed."); *Lauro v. Charles*, 219 F.3d 202, 209 (2d Cir. 2000) ("[T]he Fourth Amendment's proscription of unreasonable searches and seizures not only prevents searches and seizures that would be unreasonable if conducted at all, but also ensures

---

[3]     The government also suggests that *United States v. Gorrell*, 360 F. Supp. 2d 48 (D.D.C. 2004); *United States v. Burns*, No. 07-CR-556, 2008 WL 4542990 (N.D. Ill. Apr. 29, 2008); and *United States v. Jarman*, 847 F.3d 259 (5th Cir. 2017), reflect decisions "in this Circuit." (Opp. 17.) Those cases are distinguishable on similar grounds: each concerned the length of a single review, not a two-year interval before later searches like those at issue here. *See Jarman*, 847 F.3d at 263, 266–67 (approving yearlong search where a taint team took eight months to screen potentially privileged material and the prosecution team completed a responsiveness review in four months); *accord Burns*, 2008 WL 4542990 (considering a ten-month initial search described as "lengthy"); *Gorrell*, 360 F. Supp. 2d at 55 n.5 (same).

reasonableness in the manner and scope of searches and seizures that are carried out." (cleaned up)); *Nejad*, 436 F. Supp. 3d at 736 (concluding the "handling of the entire set of data after [the completion of a responsiveness review] was not only problematic but unconstitutional"); *United States v. Collins*, 409 F. Supp. 3d 228, 244 (S.D.N.Y. 2019) ("The Government—having conducted a search of . . . iCloud data consistent with the Fourth Amendment and a search warrant—does not have the legal authority to go back and search materials that are non-responsive, i.e., outside the scope of the search warrant."); *United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012) ("[T]he Fourth Amendment requires the government to complete its review, i.e., execute the warrant, within a 'reasonable' period of time.").

Any responsiveness review necessarily requires searching through both responsive and nonresponsive material.  The government has identified no Fourth Amendment exception for redoing such reviews, and background constitutional rules do not evaporate because the government wants a do-over.  Nor does it matter that agents purportedly were focused on finding particular information that they expected to be responsive.  *See United States v. Voustianiouk*, 685 F.3d 206, 217 (2d Cir. 2012) (noting "the Fourth Amendment's general rule that the government first obtain a warrant . . . does not hinge on the strength of an officer's conviction that evidence of a crime will be uncovered").  Indeed, other courts have held that the government cannot redo searches without authorization even to locate exculpatory evidence.  *See, e.g.*, *Collins*, 409 F. Supp. 3d at 243–44 ("Even if the Government's search . . . was an insufficient search for *Brady* material, Defendants' assertion that since the Government copied and/or imaged the entirety of the contents of the electronic devices . . . , including the iCloud data . . . , the Government is entitled to conduct another search of the non-responsive material for Brady/Rule 16 Material, is legally flawed.").  It

would be a perverse constitutional rule that precludes the government from redoing searches benefitting a defendant while simultaneously permitting searches intended to inculpate them.

It is revealing—but not surprising—that the government has not identified any case sanctioning its "redoing searches doesn't matter" theory.[4]  From a doctrinal perspective, the government's demand for cases reflecting a "bright-line rule" gets things backwards.  (Opp. 18.)  The only reason the government can conduct later searches of electronic information is because the law recognizes the practical inability to complete an immediate review.  *See, e.g.*, *Metter*, 860 F. Supp. 2d at 213–14 (noting that "[a]s technology and white collar and other complex criminal litigation evolved," "courts developed a more flexible approach to the execution of search warrants for electronic evidence, holding the government to a standard of reasonableness").  Otherwise, the "bright-line rule" would be that the government had fourteen days to complete its work.  (*See* Dkt. 79-2 at 1 (requiring the government to "execute this warrant" within fourteen days).)  That practical accommodation should not be leveraged to avoid the Constitution's warrant requirement.

**B.    The government's arguments rely on factual assertions that would require an evidentiary hearing.**

Putting aside the government's lack of legal support, all of its arguments rely on material factual assertions.[5]  Even the government tacitly acknowledges as much, arguing that "no *evidence in the record* suggest[s] that the government sought to 'expand its search as its investigation and charging theories developed' in 2024."  (Opp. 19 (quoting *United States v. Wey*, 256 F. Supp. 3d

---

[4]    As discussed below, Ms. Sun does not agree that is what agents did as a factual matter.  Either way, however, the searches were unlawful.

[5]    If the Court agrees that the government violated the Fourth Amendment by conducting new searches in 2024 based on Ms. Sun's legal arguments, then of course the Court can grant her motion without a hearing.  Accepting the government's arguments, however, requires crediting its factual representations.

355, 405 (S.D.N.Y. 2017) (emphasis added) (internal alterations omitted)).)[6] But a hearing is how that record is developed and "ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Robinson*, 153 F. Supp. 2d 188, 191 (E.D.N.Y. 2001) (quoting *United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992)) (cleaned up).

The government's arguments raise a number of factual issues. To start, there is the frequent assertion that the government "simply sought to identify the same documents that it had already seized in 2022." (Opp. 19.) That factual claim is essential to the government's arguments but hardly incontestable. For one thing, agents did *not* merely identify the same documents—by the government's own admission, they included at least 86 additional communications "[o]utside of the emails listed in the charts with header information" in their new responsiveness report. (*See id.* at 3.) For another, the investigation had evolved significantly over the course of two years and agents were not in a position to reconstruct the prior review. Beyond the likely shift in perspectives as the case evolved,[7] agents also would have been obligated to remain vigilant for any newly identified exculpatory material. *See, e.g.*, *California v. Trombetta*, 467 U.S. 479, 485 (1984) (noting "the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt"); *United States v. Agurs*, 427 U.S. 97, 110 (1976) (explaining that "[i]f evidence highly probative of innocence is in [the] file, [a prosecutor] should be presumed to recognize its significance even if he [or she] has actually overlooked it");

---

[6]    Notably, the decision in *Wey* was issued after an evidentiary hearing. *See, e.g.*, 256 F. Supp. 3d. at 366 (describing "two-day suppression hearing"), 405 (discussing testimony by a prosecutor and agent regarding continuing searches of electronic evidence).

[7]    The government has never identified which agents conducted the old searches in 2022 or the new searches in 2024, so staffing changes also may have impacted the new review.

*United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("An individual prosecutor is presumed . . . to have knowledge of all information gathered in connection with his [or her] office's investigation of the case and indeed 'has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police.'" (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)). And regardless, *representations* about what agents intended when conducting the 2024 searches are just that—they reflect the government's view of the facts, but the defense (and the Court) might well reach different conclusions after an evidentiary hearing.

Nor are those the only facts put in issue by the government's arguments. Among other things, they rely on the following:

- The pervading premise that agents' intent in 2024 was merely "to re-create a responsiveness report of the emails seized in 2022 (which had been mistakenly deleted)," and that they "simply sought to identify the same documents . . . already seized in 2022." (Opp. 16, 19.)

- The claim that "the 2024 re-creation of the original responsiveness report . . . was temporally reasonable with respect to the underlying warrant," including because agents were "attend[ing] to multiple competing tasks at any given time." (*Id.* at 16, 20.)

- The assertion that agents made "diligent efforts to recreate a responsiveness report" after destroying the original. (*Id.* at 18.)

- The implicit assumption that the new searches in 2024 may be considered part of the same review conducted and completed in 2022. (*See id.* at 16–18.)

- The assertion that "the government never abandoned the charging theory that [Ms.] Sun engaged in a pay-to-play scheme involving the PRC government and its representatives and agents," even though the offenses under investigation changed and no pay-to-play scheme was ever charged. (*Id.* at 20.)

- The related assertion that agents considered a "pay-to-play" theory to be "encompassed in one of the 2022 Subject Offenses . . . and in several of the 2024 Subject Offenses, including . . . FARA" (*id.*), particularly given that the government has disclaimed any need to prove a corrupt exchange—the defining characteristic of any pay-to-play scheme—in connection with FARA. (*See* Dkt. 52 at 15–16 (urging the Court to ignore any "requirements of a *quid pro quo* and specific timing and linkage of any bribe or gratuity" and arguing that "interpretations of the gratuity, bribery, and honest services statutes have no

bearing on the scope of FARA" and that it "shares none of the elements of these public corruption statutes").)

- The insistence that "[t]here is no evidence in the record suggesting that the government sought to 'expand its search as its investigation and charging theories developed' in 2024." (Opp. at 19 (quoting *Wey*, 256 F. Supp. 3d. at 405).)

- The related assertion that the government "did not expand the scope of the search" and so "there was . . . merely an effort to identify the same documents that were already seized." (*Id.* at 19.)

- The claim that "the re-creation of the original responsiveness report did not stray from the original authorization of the 2022 Warrant," especially in the absence of any facts revealing how searches were conducted, what agents were instructed, or what procedures were followed. (*Id.* at 20.)

- The claim that, when the new 2024 searches were conducted, "the fundamental theory of liability remained unaltered" and agents had "no 'new or correcting information' that would have been 'material to the magistrate's determination of probable cause.'" (Opp. 20 (quoting *United States v. Pabon*, 871 F.3d 164, 175 (2d Cir. 2017).)

- The insistence that material obtained pursuant to the 2024 Gmail Warrant is not fruit of the poisonous tree because there was no "link" between that warrant and the 2022 Gmail Warrant. (*Id.*)

Since the government's arguments turn on those (and other) factual premises, any credence the Court might lend to those arguments requires a hearing at which the relevant facts can be established. Moreover, factual questions remain regarding whether the government's initial destruction of the original responsiveness report—whether because it was "mistakenly deleted," "inadvertently purged," or for some other reason (Opp. 18, 20)—was deliberate, reckless, or grossly negligent, such that the government's self-help remedy was unreasonable on that ground.[8]

---

[8]    That is especially true for a novel and sensitive investigation requiring special caution. *Cf. Kyles*, 514 U.S. at 438, 446–49 (quoting *Giglio v. United States,* 405 U.S. 150, 154 (1972)) (noting the obligation to establish "procedures and regulations . . . to carry the prosecutor's burden and insure communication of all relevant information on each case to every lawyer who deals with it," and recognizing that information undermining the "reliability of the investigation" may be exculpatory or impeaching). Crediting the accidental yet complete and permanent destruction of important case information from all FBI servers begs some further factual inquiry.

*Cf. United States v. Whitehorn*, No. 86 CR. 644 (WCC), 1986 WL 13809, at *2 (S.D.N.Y. Nov. 26, 1986) (quoting *United States v. Allard*, 634 F.2d 1182, 1187 (9th Cir. 1980)) ("[E]xceptions to the warrant requirement will not be extended to officials who 'create their own exigencies.'").

None of that is changed by the government's attempts to avoid a hearing by promising to "limit its use of responsive materials associated with the 2022 Warrant to items listed on the three charts of header information."[9] (Opp. 19.) The issue here is not partial suppression of certain seized items beyond the scope of a warrant, but rather the execution of the warrant itself. The government says that "the remedy [here] . . . would be partial suppression consisting solely of items falling outside of the three header information charts—none of which the government intends to use at trial." (Opp. 19.) But unlike *United States v. Matias*, 836 F.2d 744 (2d Cir. 1988), which concerned whether items beyond the scope of a valid warrant were seized, *see id.* at 747, here no viable warrant authorized any new searches at all. Thus, everything seized in 2024 was obtained unlawfully. *Cf. Nejad*, 436 F. Supp. at 736–37 (stating that "searches conducted subsequent to the completion of the responsiveness review violated the Fourth Amendment" and so for "documents seized following the conclusion of the responsiveness review" the "proper remedy [wa]s suppression").

## II.    The Government's Inevitable Discovery Arguments Fail While Underscoring the Gravity of this Constitutional Violation

In the alternative, the government argues that the inevitable discovery doctrine "provides an additional, independently sufficient basis to deny [Ms.] Sun's motion." (Opp. 23.) It does not.

---

[9]    While not dispositive, it is telling that the government realized from the outset that self-suppression of any additional material would be necessary. (*See* Dkt. 62 at 2.) That concession is a further nail in the coffin of any claim that this was a singular two-year-long review.

### A.    The inevitable discovery doctrine does not apply.

"Under the inevitable discovery exception," there must be "*no doubt* that the [government] would have lawfully discovered the evidence later." *United States v. Heath*, 455 F.3d 52, 60 (2d Cir. 2006) (quoting *United States v. Romero*, 692 F.2d 699, 704 (10th Cir. 1982) (emphasis in original)). Here, the only avenue for eventual discovery identified by the government is the July 2024 seizure of a computer pursuant to the Residence Warrant. As discussed below, however, the probable cause articulated for that subsequent seizure relied upon the very material the government now insists it would have found anyway. And no other possibilities of eventual discovery are apparent, as the private contents of a Google account likely would have remained inaccessible absent a valid warrant. *Cf. United States v. Cabassa*, 62 F.3d 470, 474 (2d Cir. 1995) ("Clearly, the doctrine of inevitable discovery requires something more where the discovery is based upon the expected issuance of a warrant. Otherwise, it would result in illegally seized evidence being received when there was a 49% chance that a warrant would not have issued or would not have issued in a timely fashion, hardly a showing of inevitability.").

Applying the inevitable discovery doctrine requires the Court to resolve in the government's favor every contingency necessary for evidence to have been discovered legally. *See United States v. Stokes*, 733 F.3d 438, 444 (2d Cir. 2013) (stating that "evidence should not be admitted . . . unless a court can find, with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor"). At a minimum, that is a factual inquiry. And on the current record, the government does not come close to carrying that burden. To succeed, the government would need to establish the inevitability of multiple contingencies, including, *inter alia*, the following:

- The government inevitably would have developed independent evidence demonstrating probable cause to seize the computer during the execution of the Residence Warrant. *But see Stokes*, 733 F.3d at 445 (citing *Cabassa*, 62 F.3d at

472–73) (finding contingency did not weigh in the government's favor where "there was a residual possibility that a magistrate would have required a stronger showing of probable cause").

- The computer was used to access Ms. Sun's Gmail account and inevitably would have been located, seized, and unlocked during the execution of the Residence Warrant. *But see id.* at 447 (contrasting "the district court's inevitability analysis . . . predicated on an assessment of the actions that might have been taken by third parties" with "the more typical application of the inevitable discovery rule," like where "the government seeks to invoke the doctrine on the basis of standardized, established procedures such as those requiring inventory searches").

- Communications from the period covered by the 2022 Gmail Warrant would be preserved on the computer two years later, such that they inevitably would be found when the Residence Warrant was executed in 2024.[10] *But see id.* at 445 (citing *Cabassa*, 62 F.3d at 472–73) (finding contingency did not weigh in the government's favor where "the agents might have been detected and the evidence might have disappeared before the warrant issued").

The government has not and cannot establish these or any of the other circumstances essential to provide the Court "with a high level of confidence, that each of the contingencies necessary to the legal discovery of the contested evidence would be resolved in the government's favor." *Stokes*, 733 F.3d at 444. As such, the inevitable discovery doctrine cannot be invoked here.[11]

### B.    The government's arguments highlight its reliance on unlawfully obtained material that contaminates later warrants.

Aside from its legal inapplicability, the inevitable discovery doctrine cannot salvage the 2022 Gmail Warrant for another more troubling reason: invoking it here would excuse the government's constitutional violation based on fruits of that same violation. In essence, the

---

[10]    Even the Residence Warrant affidavit did not suggest as much. At most, it averred that "files that have been viewed via the Internet"—such as emails viewed online through an externally-hosted server like Google—"are *sometimes* automatically downloaded into a *temporary* Internet directory or 'cache.'" (Dkt. 82-1 at 63 ¶ 147(d) (emphasis added).)

[11]    The government's opposition alone certainly does not establish that all of the necessary contingencies inevitably would have broken its way. To the extent there are relevant factual questions about any of those contingencies, a hearing is necessary.

government asks the Court to ignore any impropriety relating to the 2022 Gmail Warrant because it later found the same material on a computer seized pursuant to the Residence Warrant. (*See* Opp. 23.) The government downplays, however, that the probable cause it proffered to secure the Residence Warrant *relied on the same unlawful seizure it defends here*.[12] The government attempts to disguise its dilemma by claiming that information from the 2022 Gmail Warrant played "*almost no part*" in obtaining the Residence Warrant. (*Id.* (emphasis added).) That dodge fails for a few reasons. First, that statement ultimately is an admission that unlawfully obtained material played at least *some* role in securing the Residence Warrant. Second, it is incorrect to suggest that information from the 2022 Gmail Warrant was immaterial to obtaining the Residence Warrant.

As an initial matter, the affidavit underlying the Residence Warrant request refutes the government's argument. (*See* Dkt. 82-1.) In that affidavit, Special Agent Devin Perry grounded his request to seize any electronic devices in "repeated written communications with PRC Consular representatives" (*id.* at 11 ¶ 26), and quoted or referenced a series of alleged "emails," "communications" or "written correspondence" between Ms. Sun and others to convince the Court that probable cause existed for agents to grab any devices they might find. (*See id.* at 11–41 ¶¶ 26–112.) The government acknowledges that strategy with respect to Mr. Hu, who was also a subject of the Residence Warrant. (*See* Opp. 31 (arguing that "the Residence Affidavit indicated that a search of [Mr.] Hu's email account had unearthed evidence of money laundering activity" and urging that "[t]he affiant therefore reasonably concluded, 'I assess that these electronic records are in electronic devices used by HU'").) And it concedes that the Residence Warrant would be deficient if "the probable cause as to the device[s] consisted solely of the agent's general averments

---

[12]     As such, the Court should also suppress as fruit of the poisonous tree certain material— including the computer referenced by the government—obtained pursuant to the Residence Warrant.

on the use of phones . . . for illicit activities" (*id.* at 32 (citing *United States v. Silva*, 23 Cr. 204 (PGG), 2024 WL 3488305 (S.D.N.Y. July 19, 2024), while insisting that "[h]ere . . . there was considerable evidence of Hu's money laundering activities *from Hu's email account* . . . that justified the seizure of Hu's electronic devices." (*Id.* (emphasis added).)

The playbook was the same as to Ms. Sun.[13]  Like it did with respect to Mr. Hu, the government relied on information obtained from her email account to articulate probable cause. (*See generally* Dkt. 82-1 at 11–41 ¶¶ 26–112.)  Since the government now denies that (*see* Opp. 23), it is worth walking through how such reliance is reflected in the Residence Warrant.

First, it is plain that the government relied on personal email communications to articulate probable cause to search Ms. Sun's devices.  For example, paragraph 55 avers that, "[o]n January 28, 2019, LINDA SUN *used her personal email account* to send an email message to PRC Official-3," and then goes on to describe more communications using that account supposedly exchanged between Ms. Sun and PRC Official-3.  (Dkt. 82-1 at 19 ¶ 55 (emphasis added).)  Those messages are the only clear mentions of Ms. Sun's Gmail account, but the affidavit is replete with other references to "written communications with PRC Consular representatives" (*id.* at 11 ¶ 26), many of which may be emails as well.  The government does not identify each of the accounts corresponding to other communications; instead, the affidavit remains carefully ambiguous.

---

[13]    For that reason, Ms. Sun joins in Mr. Hu's arguments as to the Residence Warrant to the extent they concern material in which she shared a reasonable expectation of privacy.  And nothing in this submission should be taken to suggest that she credits any of the government's arguments in opposition to Mr. Hu's motion.  She believes that Mr. Hu is correct.

It is easy to deduce why. Communications using Ms. Sun's *official* email account are hardly covert.[14] Communications with or regarding the PRC consulate also were not terribly unusual given the government's acknowledgment of her role:

> "While working for the New York State government, LINDA SUN's core responsibilities included acting as a liaison with Asian communities in New York State, including the Chinese diaspora community. In furtherance of these responsibilities, SUN regularly communicated with PRC diplomatic and consular establishments in the United States, including the Embassy of the PRC in the United States of America ("PRC Embassy") and the PRC Consulate. SUN communicated with the heads of these establishments, including the PRC Ambassador to the United States and PRC Official-1, as well as their deputies and support staff, including PRC Official-2, PRC Official-3, and PRC Official-4. For example, SUN facilitated communications between the PRC establishments and the governor's office, arranged for meetings between various representatives of the PRC government and the New York State government, and coordinated appearances by heads of New York State government at events involving the PRC establishments or Asian communities. As another part of her core responsibilities, SUN helped coordinate constituent services for Asian communities."

(Dkt. 82-1 at 9 ¶ 22.) And communications over Ms. Sun's official email account would not provide probable cause to search her *personal* accounts or devices.[15] Ambiguous sourcing of accounts in the Residence Warrant affidavit thus gave the impression of probable cause for a broader range of accounts and devices based, in part, on identifying and describing emails from Ms. Sun's personal email account. (*See id.* at 19 ¶ 55; *see also id.* at 14 ¶ 35 (referencing information supposedly "reflected in . . . photographs found in one of her electronic accounts").)

---

[14]    Further undermining any probable cause, there is no indication whatsoever in those communications that any of Ms. Sun's colleagues—themselves savvy political operatives—ever batted an eye at her policy or political judgment, including with respect to hot-button issues like the relationship between the PRC and Taiwan.

[15]    As the Residence Warrant affidavit itself recognized, by the time the government sought that warrant Ms. Sun had been out of government and thus without access to any official email account for over a year. (*See* Dkt. 82-1 at 6–7 ¶ 12.)

Second, the Residence Warrant actually relied on information obtained pursuant to the 2022 Gmail Warrant in particular.[16]  Even the government admits that emails detailed in paragraph 55 were obtained pursuant to the 2022 Gmail Warrant.  (*See* Opp. 23.)  Those emails were used to bolster a narrative regarding communications with PRC representatives that had been a particular focus of the new 2024 searches (*see id.* at 3 (noting the seizure of "approximately 50 emails between [Ms.] Sun's account and accounts of PRC consular representatives" not included in the header charts) and likewise had motivated the 2024 Gmail Warrant, which—like the Residence Warrant—suddenly listed new foreign agent offenses.  (*See* Schaeffer Decl., Ex. D at 3 ¶ 6; Dkt. 82-1 at 3 ¶ 5.)  And revealingly, the government has not argued—as it otherwise might have—that the Residence Warrant was an independent source of the material obtained pursuant to the 2022 Gmail Warrant.  *See United States v. Smith*, 673 F. Supp. 3d 381, 399 (S.D.N.Y. 2023) (stating that "[f]or the independent source exception to apply, . . . [a] warrant must be supported by probable cause derived from sources independent of" the challenged conduct and "the decision to seek the warrant may not be prompted by information gleaned from the illegal conduct" (cleaned up)).

Nevertheless, the government insists that "only one email responsive to the 2022 Warrant appears in the affidavit authorizing seizure of the computer (the Residence Affidavit[)]" and complains that "[t]he defense does not challenge the warrant that authorized seizure of the computer."  (Opp. 23.)  But any "probable cause to search Ms. Sun's residence *and seize emails*" (*id.* (emphasis added)) from her personal computer relied at least partly on material obtained from

---

[16]    Similarly, any investigatory steps based on Ms. Sun's personal emails prior to obtaining the Residence Warrant almost certainly relied on material from the 2022 Gmail Warrant.  The Residence Warrant was sought on July 19, 2024.  (*See* Dkt. 82-1 at 69.)  Review if information obtained pursuant to the 2024 Gmail Warrant did not begin until "on or about July 2, 2024," and was not completed until "September 10, 2024," leaving only information from the 2022 Gmail Warrant fully reviewed by July 2024.  (Dkt. 62 at 2.)

the 2022 Gmail Warrant, so the government's argument is surprising. (*Id.*) Had Ms. Sun challenged only the Residence Warrant's particularity, one wonders whether the government's opposition to that motion might rely on the same material it now tries to sweep under the rug (as it does in responding to Mr. Hu's particularity challenge). In any event, suppression is required regardless of whether the government relied on material obtained from the 2022 Gmail Warrant in seeking the Residence Warrant (because the latter is poisoned by the government's unlawful 2024 searches) or it did not (because, absent such information, probable cause was lacking as to Ms. Sun's personal accounts and devices and so seizure of her computer was not inevitable).

## III.    Good Faith Does Not Excuse Unlawfully Resuscitating a Two-Year-Old Warrant

The government's final argument is that the Court should ignore any constitutional violation because that conduct is "covered by the good faith exception." (Opp. 21.) That is also incorrect.

### A.    *The government's attempts to reframe and minimize its conduct are unavailing.*

Once again, the government's arguments rely on reframing the actual issues. In its view, "agents sought to *comply* with the 2022 Warrant" and were "guided by a desire to be faithful to the contours of the 2022 Warrant." (*Id.* (emphasis added).) The government also complains that "there is no consensus in this Circuit as to when temporal limitations are required" or when failure to comply with such limitations "may invalidate an otherwise valid search warrant." (*Id.* (quoting *Nejad*, 436 F. Supp. 3d at 732).) So, it asks, how were its agents to know that a fully executed warrant cannot be used to conduct new searches two years later? As a general matter, the Court should be wary of that expansive argument given its alarming implications. The argument is also meritless in the context of this case.

First, the issue is not whether these agents could divine what temporal limits might be reasonable for these searches. As discussed above, that ship sailed when the government conceded

that agents completed their search after two months, generated a responsiveness report, and then did nothing more for two years. Whatever "a reasonably well trained [agent] would have known" about the permissible timeframe for an initial responsiveness review is irrelevant. *United States v. Roberts*, 852 F.2d 671, 675 (2d Cir. 1988) (citing *United States v. Leon*, 468 U.S. 897, 922 n.23 (1984)). The issue here is whether such an agent would think that a fully executed warrant can be resuscitated two years later to fix an alleged government blunder. The objective answer is no.

Second, the government repeatedly implies that the Fourth Amendment is sidelined here because agents merely "sought to re-create the responsiveness report from 2022" or "re-create an exact duplicate of a responsiveness report . . . faithful to the contours of the 2022 Warrant." (Opp. 21.) As noted above, the government provides no legal authority for that proposition. *See also Nejad*, 436 F. Supp. 3d at 736; *Collins*, 409 F. Supp. 3d at 244. The Fourth Amendment and its warrant requirement are triggered by an intrusion into an individual's reasonable expectation of privacy. *See Jacobsen*, 466 U.S. at 113. That inquiry turns on whether such an intrusion occurred and if it was authorized, not whether intruding agents conducted entirely new searches or reprised searches from years before.

Third, "the[se] agents' relative inexperience with electronic review" is irrelevant to the good faith inquiry. (Opp. 21.) The government initially acknowledges that the "'good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances,'" but then says the Court should also consider subjective factors like these "particular [agents'] knowledge and experience." (*Id.* at 22 (quoting *Herring v. United States*, 555 U.S. 135, 145 (2009)).) The Second Circuit, however, has made clear that the good faith analysis is not focused on individual agents, but rather "reasonably well trained" agents writ large. *Roberts*, 852 F.2d at

675. That is consistent with the exclusionary rule's goal to broadly deter "deliberate, reckless, or grossly negligent conduct" and "recurring or systemic negligence." *Herring*, 555 U.S. at 144. And if anything, the government's "relative inexperience" argument (Opp. 21) supports invoking the exclusionary rule here, because suppression would deter future violations by encouraging a minimum level of experience (or at least supervision) for agents conducting sensitive and highly invasive searches across years of private electronic information.[17]

Fourth, the sweep of the government's argument should give this Court pause. At bottom, it urges that no reasonable agent could anticipate temporal limitations on electronic searches— either because different courts have found different review timeframes to be reasonable, or because failing to abide by certain timelines may not always result in the invalidation of a warrant. (*See* Opp. 21.) But suppression decisions are necessarily predicated on the facts and circumstances of each case, and mandating that review timeframes be "reasonable" is supposed to be a flexible standard that balances fundamental constitutional rights against investigatory needs. It upends that balance to say that flexibility itself precludes a reasonable agent from appreciating that new email searches require a fresh warrant when conducted *two years* after the prior warrant was fully executed, the data was reviewed, and a responsiveness report was generated. It eviscerates that

---

[17] As noted previously, Ms. Sun's articulation of these arguments already seems to have deterred a further Fourth Amendment violation in this case. (*See* Mot. 17–18.) That itself suggests suppression will be an effective deterrent. For its part, the government insists that it "obtained the 2025 Warrant in an abundance of caution, approximately two months after the forensic image of the underlying data had become inaccessible," which merely "reflect[ed] caution[] and not any supposed constitutional infirmity of the agents' earlier conduct." (Opp. 22.) But caution after only two months is significant change from indifference after two years. Nor is it "logical" to conclude that suppression is unnecessary because "corrective action has already been achieved" once in this case. (*Id*. at 22–23.) Declining to suppress this illegally obtained evidence would quickly erode any newfound "caution" by signaling that similar future violations will have no consequences.

balance to argue, as the government does here, that agents can unilaterally pursue such a Fourth Amendment intrusion to remedy the government's own mistakes.

Perhaps these agents were indeed doing their best to make up for accidentally destroying evidence. *But see Voustianiouk*, 685 F.3d at 216–17 (concluding that "the officers involved in this case were well-meaning . . . [b]ut simply because they were trying to do the right thing does not mean that they reasonably concluded that the warrant in their possession authorized the search they conducted"). Ultimately, however, that is irrelevant because it is "objectively" clear that "a reasonably well trained [agent] would have known" that new searches based on a fully executed, two-year-old warrant "w[ere] illegal in light of all of the circumstances," *United States v. Bershchansky*, 788 F.3d 102, 113 (2d Cir. 2015) (quoting *Herring,* 555 U.S. at 145). Agents proceed in good faith when they "act[] in strict compliance with binding precedent," *Davis v. United States*, 564 U.S. 229, 240 (2011), and "t[ake] every step that could reasonably be expected of them." *Massachusetts v. Sheppard*, 468 U.S. 981, 989 (1984). Good faith does not excuse the government's conduct here.

> **B.  Even if the government could demonstrate good faith, its arguments are predicated on factual assertions that require a hearing.**

In any event, the government's good faith arguments—like its other arguments in opposition to Ms. Sun's motion—are predicated on factual assertions that merit a hearing. Many of those assertions were already identified above, such as the claim that "agents sought to re-create the responsiveness report from 2022, rather than locate additional responsive materials as guided by newly discovered information in the investigation." (Opp. 21.) None of those factual assertions should be credited based purely on the government's representations.

With respect to good faith in particular, the government further asserts that "[a]t bottom, the agents sought to comply with the 2022 Warrant" and the new 2024 searches "reflected an effort

to re-create an exact duplicate of a responsiveness report and [were] guided by a desire to be faithful to the contours of the 2022 Warrant." (*Id.*)  Those factual claims, too, require support, such as testimony or other evidence about agents' actual training, instruction, intentions, understanding, recollection of the prior responsiveness report, and review efforts in 2024.  The government also injects new facts that may or may not bear on the Court's analysis, including claims about "the agents' relative inexperience with electronic review" (*id.*), which might be relevant to whether the conduct here is reflective of "recurring or systemic negligence." *Herring*, 555 U.S. at 144.  And the government claims that its decision to seek the 2025 Warrant (*see* Schaeffer Decl., Ex. F) had nothing to do with rules for responsiveness reviews or the defense's request to file a suppression motion, which are factual questions potentially relevant to deterrence.  Finally, the government claims that the agents' conduct was not "sufficiently deliberate" or "sufficiently culpable" to warrant exclusion.  (Opp. 23 (quoting *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010).)  Should the Court determine that the government still might be able to demonstrate good faith in the end, all of those factual issues would require an evidentiary hearing to resolve.  It is a bridge too far for the government to argue, based on its word alone, that good faith excuses its constitutional violation.

## CONCLUSION

For the foregoing reasons, the government's conduct violated the Fourth Amendment and Ms. Sun's motion may be granted without a hearing.  In contrast, the government's arguments in

opposition rest on numerous factual assertions. Should the Court conclude that those facts are relevant to its determination, Ms. Sun requests that the Court hold an evidentiary hearing.

Dated:        April 18, 2025
              New York, New York

Respectfully submitted,

/s/ *Jarrod L. Schaeffer*

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman

ABELL ESKEW LANDAU LLP

256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7341 / -7339 / -7338
kabell@aellaw.com
jschaeffer@aellaw.com
sglicksman@aellaw.com

*Counsel for Linda Sun*