UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
  UNITED STATES OF AMERICA,

                                Plaintiff,      **MEMORANDUM DECISION AND ORDER**

             - against -

                                                        24-cr-346 (BMC)

  LINDA SUN,
     also known as "Wen Sun," "Ling Da
     Sun," and "Linda Hu," and
  CHRIS HU,

                                Defendants.
---------------------------------------------------------- X

**COGAN**, District Judge.

In August 2024, a grand jury returned a ten-count indictment against Linda Sun and her husband, Chris Hu. Sun was charged with acting as an agent of a foreign government without registering with the Attorney General in violation of the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 612(a) and 618(a)(1) and conspiracy to commit the same in violation of 18 U.S.C. § 371; visa fraud in violation of 18 U.S.C. §§ 1546(a); and four counts of illegally bringing aliens into the United States for commercial gain or advantage, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(iv) and 1324(a)(1)(B)(i). Hu was charged with conspiracy to commit bank fraud in violation of 18 U.S.C. § 1349 and misuse of means of identification in violation of 18 U.S.C. § 1956(h). Both Sun and Hu were charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). A grand jury then returned a first superseding indictment, charging Hu with three counts of money laundering under in violation of 18 U.S.C. § 1957.

Defendants have each filed a motion to suppress. Sun moves to suppress evidence obtained from, and direct and indirect products of, the Government's 2024 search of Sun's Gmail account that the Government purports to have carried out pursuant to a 2022 warrant (the "2022

Gmail Warrant"). Hu moves to suppress evidence seized pursuant to two warrants issued in 2024, referred to as the Leivine Warrant and the Home Warrant.

For the reasons that follow, Sun's motion to suppress [77] is granted in part and denied in part; Hu's motion to suppress [80] is denied.

## LEGAL STANDARD

"The Founding generation crafted the Fourth Amendment as a response to the reviled general warrants and writs of assistance of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." Carpenter v. United States, 585 U.S. 296, 303 (2018) (internal quotation marks and quotation omitted). Pursuant to the Fourth Amendment, "[w]hen an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." Id. at 304 (internal quotation marks and quotation omitted). "In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement." Riley v. California, 573 U.S. 373, 382 (2014) (citation omitted).

"[T]he Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'" United States v. Galpin, 720 F.3d 436, 445 (2d Cir. 2013) (quoting Kentucky v. King, 563 U.S. 452, 459 (2011)). Magistrate judges will find probable cause to issue a warrant where "there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). As part of the requirement that there be probable cause to issue a warrant, there is a requirement related to overbreadth: a "description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon

2

which the warrant is based." United States v. Purcell, 967 F.3d 159, 179 (2d Cir. 2020) (quotation omitted).

As for the particularity requirement, to comply with the Fourth Amendment, a warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. A warrant must therefore (1) "identify the specific offense for which the police have established probable cause"; (2) "describe the place to be searched"; and (3) "specify the items to be seized by their relation to the designated crimes." Galpin, 720 F.3d at 445-46 (internal quotation marks, quotation, and citations omitted). "A warrant is facially unconstitutional if it fails to comply with any of these requirements." Purcell, 967 F.3d at 178. The Second Circuit has "found the particularity requirement to be violated where a warrant fails to place some limitation on the kind of evidence sought and instead leaves it entirely to the discretion of the officials conducting the search to decide what items are to be seized." Id. (quotation omitted) (cleaned up).

Courts reviewing the issuance of a warrant "accord 'great deference' to a judge's determination that probable cause exists, and [] resolve any doubt about the existence of probable cause in favor of upholding the warrant." United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (internal quotations omitted) (citation omitted). A reviewing court's duty "is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Gates, 462 U.S. at 238-39 (quotation omitted) (cleaned up).

If a search or seizure lacks a valid warrant and does not fall into an exception to the warrant requirement, courts apply the exclusionary rule, "a prudential remedy crafted by the Supreme Court," United States v. Raymonda, 780 F.3d 105, 117 (2d Cir. 2015) (internal quotation marks omitted), which "bars the prosecution from introducing evidence obtained by

3

way of a Fourth Amendment violation." Davis v. United States, 564 U.S. 229, 232 (2011). The Supreme Court has articulated that the "[exclusionary] rule's sole purpose . . . is to deter future Fourth Amendment violations." Id. at 236-37 (citations omitted). Thus, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful . . . or when their conduct involves only simple, isolated negligence, . . . the deterrence rationale loses much of its force, and exclusion cannot pay its way." Id. at 238 (internal quotation marks and quotations omitted omitted). Law enforcement officers do not act "in objectively reasonable reliance on a warrant subsequently invalidated by a reviewing court," such that the good faith exception to the exclusionary rule would apply, "in at least four circumstances: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." Raymonda, 780 F.3d at 118 (internal quotation marks and quotations omitted).

In addition to this good faith exception, there is an exception to the exclusionary rule when discovery would have inevitably been discovered. "Under the 'inevitable discovery' doctrine, evidence obtained during the course of an unreasonable search and seizure should not be excluded 'if the government can prove that the evidence would have been obtained inevitably' without the constitutional violation." United States v. Heath, 455 F.3d 52, 55 (2d Cir. 2006) (quoting Nix v. Williams, 467 U.S. 431, 447 (1984)) (citation omitted). "[T]he inevitable discovery doctrine does not ask whether the government lawfully *could have* obtained the evidence at issue by means of corrected [warrants] or that it would have done so after the defense alerted it to defects in its initial [warrants]. Rather, inevitable discovery asks whether the

4

government has shown that it certainly *would have* discovered the evidence by a lawful means even if no warrant had been issued or challenged." United States v. Lauria, 70 F.4th 106, 124 (2d Cir. 2023) (emphasis in original). The Second Circuit has held that when, "but for the defense's exposure of misstatements in the warrant affidavits [or issues with the warrant], the government would have had no reason – and therefore would have been unlikely – to pursue alternative lawful means to procure the evidence at issues," the inevitable discovery doctrine will not apply. Id.

A defendant is not automatically entitled to an evidentiary hearing on a motion to suppress evidence. United States v. Barrios, 210 F.3d 355 (2d Cir. 2000). A defendant must show that there are contested issues of fact that necessitate a hearing. To make such a showing, a defendant's moving papers must be "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." United States v. Pena, 961 F.2d 333, 339 (2d Cir. 1992). If a defendant's motion to suppress evidence is based on an allegation that a search warrant contained a false statement or omission, courts will hold an evidentiary hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), if the defendant can show that "(1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." Lauria, 70 F.4th at 125 (internal quotation marks and quotation omitted).

## DISCUSSION

### I.      Sun's Motion to Suppress Evidence Seized Pursuant to the 2022 Gmail Warrant

In 2022, the Government obtained the 2022 Gmail Warrant to search seven years' worth of data from Sun's personal Gmail account. The Government received electronic data pursuant to the 2022 Gmail Warrant, FBI agents reviewed the return "as guided by three charts of header

information regarding Sun's email account," and the agents generated a responsiveness report in or around July 2022.

At some point between July 2022 and May 2024, the Government realized that "the search warrant returns, including the reviewing agents' responsiveness report," had been "inadvertently expunged from FBI computers." Rather than seek a new warrant, from May 2024 into July 2024, FBI agents re-searched and reviewed the full return of data received pursuant to the 2022 Gmail Warrant, and created a new responsiveness report (the "2024 search"). The Government asserts that it accessed the full return of data received pursuant to the 2022 Gmail Warrant again in 2024 in an attempt to re-create the responsiveness report the FBI had first generated in 2022. During this search of the data, the Government seized at least 86 emails that it knows were not included in the 2022 responsiveness report. The Government has represented that it will not rely on these 86 emails in this case.

In July 2024, pursuant to a separate warrant (the Home Warrant), the Government seized a computer from Sun's residence that contains "most of" the emails the Government obtained in its 2024 search of the data received from the 2022 Gmail Warrant. Hr'g Tr. at 12:10-13, United States v. Sun, No. 24-cr-346 (E.D.N.Y. April 23, 2025) (hereinafter "April 23, 2025 Hearing Transcript"). The Government relied on at least one email obtained in its 2024 search in obtaining the Home Warrant. Also in 2024, the Government obtained a warrant to search Sun's Gmail account (the "2024 Gmail Warrant"), covering a different time period and asserting different predicate offenses than the 2022 Gmail Warrant. The affidavit in support of the 2022 Gmail Warrant was incorporated by reference and attached as an exhibit to the 2024 Gmail Warrant.

A. The Reasonableness of the Government's 2024 Search

The execution of the 2022 Gmail Warrant was complete when the FBI agents generated a responsiveness report in or around July 2022. See United States v. Nejad, 436 F. Supp. 3d 707, 736 (S.D.N.Y. 2020) ("At the conclusion of its responsiveness review in April 2017, the D.A. had identified all of the documents from the entire data set properly seized under the warrants, and the execution of those warrants was thus complete."). Any search after that, including the 2024 search of the data obtained pursuant to the 2022 Gmail Warrant, would include data the Government had already found nonresponsive and would have required a new warrant. Id. ("searches conducted subsequent to the completion of the responsiveness review violated the Fourth Amendment"); cf. United States v. Collins, 409 F. Supp. 3d 228, 244 (S.D.N.Y. 2019) ("The Government – having conducted a search of . . . iCloud data consistent with the Fourth Amendment and a search warrant – does not have the legal authority to go back and search materials that are non-responsive, i.e., outside the scope of the search warrant."). Thus, the 2022 Gmail Warrant did not cover the 2024 search.

However, the Government did not obtain a new warrant. Instead, it argues that the 2024 search was reasonable because it was temporally reasonable with respect to the 2022 Gmail Warrant and because the 2024 search was not a new search; rather, it was an attempt to seize the same emails the Government had previously seized in 2022 (and then inadvertently deleted).

The Government's temporal reasonableness argument is irrelevant: the unreasonableness of the Government's 2024 search stems not from the time that had passed between the 2022 Gmail Warrant and the 2024 search, but from the fact that the Government conducted an additional search not authorized by the 2022 Gmail Warrant.

The Government's argument that the 2024 search was not a new search also fails. The Government itself admits that it collected at least 86 emails in the 2024 search that were not

7

collected during the 2022 search. And although the Government represents that it will not rely on these 86 emails, the Government cannot assure this Court that all of the other emails returned in the 2024 search were previously seized in the 2022 search. This is because the 2022 search no longer exists. Accordingly, the Court has no way of knowing which emails were "first identified as responsive during [the 2024 search]," such that they would be "outside the scope of the [2022 Gmail Warrant]" and appropriately suppressed. Nejad, 436 F. Supp. 3d at 736.

Because the Government was not authorized to conduct the 2024 search by the 2022 Gmail Warrant, the execution of which was completed in 2022, and the Government did not obtain any other warrant to conduct its 2024 search, the 2024 search was unreasonable under the Fourth Amendment.

## B. The Good Faith Exception

The good faith exception does not apply to the Government's 2024 search. Although the good faith exception may apply even to a warrantless search "where officers committed a constitutional violation . . . under circumstances that they did not reasonably know, at the time, were unconstitutional," that determination is made by "assessing the reasonableness of an officer's mistaken belief that no warrant was required in a particular circumstance," including by considering whether "the Supreme Court [or the Second Circuit] had considered whether a warrant is required for" such circumstances. United States v. Maher, 120 F.4th 297, 321 (2d Cir. 2024) (quotation and citations omitted) (cleaned up).

The Government contends that, "[a]t bottom, the agents sought to comply with the 2022 [Gmail] Warrant." The circumstances under which FBI agents "sought to comply" with the 2022 Gmail Warrant are that they had already fully executed the 2022 Gmail Warrant in 2022, and yet proceeded to conduct a new search of information obtained two years earlier pursuant to that warrant without seeking or obtaining a new warrant. Considering similar circumstances, the

8

Second Circuit held in United States v. Ganias, 824 F.3d 199 (2d Cir. 2016) (en banc), that it was reasonable for the Government to apply for a new warrant to conduct a new search of mirrored copies of the defendant's hard drives of which the Government had already completed a search pursuant to a warrant, and which the Government retained after that search. In that case, the Second Circuit declined to resolve "whether the Government's retention of forensic copies . . . during the pendency of its investigation violated the Fourth Amendment," instead deciding the case on the ground that the FBI agent conducting the search acted reasonably in applying for and obtaining a new search warrant. Id. at 220-21. Having retained a forensic copy of Sun's Gmail account, the FBI agents should have obtained a new search warrant here as well. Given Second Circuit precedent, it was not reasonable for the FBI agents to believe that no warrant was required to conduct a new search of the information they obtained from the 2022 Gmail Warrant, or that they could rely on the already fully executed 2022 Gmail Warrant to conduct a new search. See United States v. Wey, 256 F. Supp. 3d 355, 406-07 (S.D.N.Y. 2017) (discussing Ganias and finding no good faith exception for FBI agent's search of electronic materials they had deemed unresponsive to warrant two years earlier); see also Nejad, 436 F. Supp. 3d at 736 (district court case holding, before the FBI agents' 2024 search, that "documents seized following the conclusion of the responsiveness review were seized outside the scope of the search warrants"); Collins, 409 F. Supp. 3d at 244 (another district court case holding, before the FBI agents' 2024 search, that "[t]he Government – having conducted a search of . . . iCloud data consistent with the Fourth Amendment and a search warrant – does not have the legal authority to go back and search materials that are non-responsive, i.e., outside the scope of the search warrant"). In other words, "[f]or the Government to skirt that new-warrant obstacle [discussed in Ganias] by – appearances would suggest – intentionally taking advantage of its sweeping

electronic take to look for evidence" not authorized by a warrant "is inconsistent . . . with a claim of good faith in executing the [2022 Gmail Warrant]." Wey, 256 F. Supp. 3d at 407.

The Government's discussion of the temporal reasonableness of the 2024 search as a basis for the good faith exception is again misplaced, for the same reason as discussed above: the 2024 search was not unreasonable because of its timing, it was unreasonable because the warrant it purported to execute had already been executed and the Government failed to obtain a new warrant to authorize the search. And although the Government asserts that the 2024 search was not "deliberate, reckless, or grossly negligent conduct, or [reflecting] recurring or systemic negligence," Herring v. United States, 555 U.S. 135, 144 (2009), in addition to the fact that the search ignored Second Circuit precent, the Government concedes in the very next paragraph of its opposition to Sun's motion to suppress "the agents' relative inexperience with electronic review." Seemingly pointing to systemic negligence, that not one FBI agent stopped to get a warrant before conducting a new search (not to mention the "inadvertent" deletion of the original 2022 review, for which the Government has provided no explanation and which seemingly went unnoticed for almost two years) is the exact type of conduct the exclusionary rule is in place to deter, not evidence of "good faith" such that the exclusionary rule would not apply. See Davis, 564 U.S. at 238.

### C. The Inevitable Discovery Doctrine

Even though the 2024 search violated the Fourth Amendment and the good faith exception does not apply, the results of the 2024 search (and the direct and indirect products thereof) need not be suppressed to the extent the inevitable discovery doctrine applies. As discussed above, the doctrine of inevitable discovery provides an exception to the exclusionary rule "where the record establishes 'with a sufficiently high degree of certainty that a reasonable officer *would have*' lawfully discovered the evidence regardless of the disclosure of any legal

defect in the actual discovery of the evidence." Lauria, 70 F.4th at 123 (quoting Heath, 455 F.3d at 58) (emphasis in Heath). Here, the Home Warrant provides that certainty. See Heath, 455 F.3d at 60 (high degree of certainty may be established if the reviewing court "has a high level of confidence that [a lawful] warrant in fact would have issued and that the specific evidence in question would have been obtained by lawful means.").

Pursuant to the Home Warrant, issued in 2024, the Government seized Sun's computer, containing "most of" the emails the Government obtained in its 2024 search of the data received from the 2022 Gmail Warrant. April 23, 2025 Hearing Transcript at 12:10-13. Although the Government relied on one email obtained from its 2024 search in its affidavit in support of the Home Warrant, there was probable cause to issue the Home Warrant without the information related to that email. Thus, the Government would have inevitably found "most of" the emails the Government obtained in its 2024 search through its Home Warrant.

The affidavit accompanying the Home Warrant (the "Home Affidavit") recounted how Sun "acted to benefit the PRC [People's Republic of China] government and traded access for various PRC government representatives and agents, in return for economic considerations." It included information from numerous WeChat communications between Sun and her parents in which they discuss the actions underlying the predicate crimes included in the Home Affidavit and the Home Warrant, such as someone referred to as "Chairman Xia" upgrading Sun's airfare and Sun's assumption that Xia "would start asking her to do him favors such as arranging peoples' visits (to the Governor's office);" Sun, Hu, and Sun's parents receiving gifts from PRC officials and agents; and Sun and Hu using Sun's parents as straw purchasers for vehicles. Special Agent Perry assessed that these WeChat communications would be found in Sun's electronic devices. Given that the Home Warrant identified evidence of the predicate crimes in

11

electronic messages sent by Sun, which necessarily would have existed on electronic devices, there was probable cause to search Sun's electronic devices, including her computer.

The paragraph in the Home Affidavit referencing an email obtained through the Government's 2024 search describes an act Sun committed on behalf of an alleged agent of the PRC. The Home Affidavit included numerous other acts Sun allegedly performed to benefit the PRC government, including issuing unauthorized invitation letters for delegations from China to visit New York and granting an official state title to CC-1, an alleged co-conspirator, without authorization. Removing the paragraph based on the email from the 2024 search thus does not deprive the Home Warrant of probable cause. Therefore, the Government inevitably would have been granted the Home Warrant regardless of its access to Sun's Gmail account, and would have discovered the emails on Sun's computer.

There is one caveat to this application of the inevitable discovery doctrine. The Government has stated that "most of" the emails the Government obtained in its 2024 search were on the computer seized from Sun's residence. April 23, 2025 Hearing Transcript at 12:10-13. Any emails that the Government obtained in its 2024 search that were not present on the computer seized pursuant to the Home Warrant are not subject to the inevitable discovery doctrine, because the Government has not identified any way, other than the unlawful 2024 search, by which these emails would have been obtained.

Sun argues that any suppression applied to the 2024 search should also apply to the information obtained from the 2024 Gmail Warrant, because it was tainted by the Government's unlawful 2024 search. The affidavit in support of the 2022 Gmail Warrant was incorporated by reference and attached as an exhibit to the 2024 Gmail Warrant, but no party to this litigation has provided the Court will the full text of the affidavit filed in support of the 2024 Gmail Warrant,

12

so the Court has no way of determining whether probable cause would have existed absent the unlawful 2024 search. Although reserving decision on this point, the Court notes its doubt that the 2024 search could have tainted the 2024 Gmail Warrant, considering that the 2024 Gmail Warrant was executed on May 31, 2024, and the Government conducted its "efforts to recreate the responsiveness report . . . between May 31, 2024 and July 3, 2024." Because the Government's 2024 search may have begun before its "efforts to recreate the responsiveness report," the Court withholds judgment on this point.

If the Government finds that any information it obtained from the 2024 Gmail Warrant is not on the computer seized from Sun's residence, the Government shall file a letter indicating as such, and will also file the full affidavit it submitted in support of the 2024 Gmail Warrant. In the event that there is information obtained from the 2024 Gmail Warrant that is missing from Sun's computer seized pursuant to the Home Warrant, the inevitable discovery doctrine will not apply, and this Court will make a determination as to whether the 2024 Gmail Warrant was tainted by the Government's 2024 search such that suppression may be warranted.

In sum, suppression is proper for emails obtained pursuant to the Government's unlawful 2024 search that do not also exist on the computer the Government seized pursuant to the Home Warrant. If there are emails obtained pursuant to the 2024 Gmail Warrant that do not also exist on the computer seized pursuant to the Home Warrant, the Court will issue a subsequent decision on whether those emails must be suppressed.

The Court withholds decision on whether plaintiff is entitled to an evidentiary hearing regarding the 2024 search's potential taint of the 2024 Gmail Warrant, based on whether any data from the 2024 Gmail Warrant is not on Sun's computer seized pursuant to the Home Warrant and whether, after reviewing the full affidavit accompanying the 2024 Gmail Warrant,

13

the Court can conclude with a "high level of confidence" that the 2024 Gmail Warrant would have issued without the 2024 search. Heath, 455 F.3d at 60. Otherwise, there are no material facts in dispute warranting a hearing. See United States v. Zimmerman, 480 F. Supp. 3d 446, 451 (E.D.N.Y. 2020) ("[A] defendant is entitled to an evidentiary hearing where there is 'a contested issue of material fact.'" (quoting United States v. Harun, 232 F. Supp. 3d 282, 285 (E.D.N.Y. 2017)).

## II. Hu's Motion to Suppress Evidence Seized Pursuant to the Leivine and Home Warrants

### A. The Leivine Warrant

Hu owns a wine and liquor store called Leivine Wine & Spirits. Leivine had a soft launch in early August 2022, and held its grand opening on or about November 5, 2022.

In 2024, the Government obtained the Leivine Warrant to search Leivine in connection with the crimes of money laundering, false statements, attempt to evade or defeat tax, and conspiracies to commit the same. The affidavit accompanying the Warrant (the "Leivine Affidavit") asserted that Sun worked as an undisclosed an agent for the Government of the People's Republic of China ("PRC") and its ruling political party, the Chinese Communist Party ("CCP"). It then asserted that cash received in exchange for Sun's actions as an agent was being laundered through Leivine, based on the following facts:

1. $10,000 was discovered pursuant to a separate warrant at Hu's home (the Home Warrant), which Hu stated was revenue from Leivine that he needed to deposit at the bank;

2. Hu stated that Leivine generated millions of dollars in cash revenue a year, and that he would deposit funds into the bank multiple times a day;

14

3. Between August 2022 and February 2024, Leivine averaged around $77,000 of cash deposits each month;

4. Approximately $200,000 in cash was deposited to accounts held by Leivine before Leivine held its grand opening on or about November 5, 2022;

5. Between September 2022 and February 2024, approximately $1.123 million was transferred from personal bank accounts held in Hu's name to one of Leivine's bank accounts;

6. Between October 2022 and February 2024, at least seven different bank accounts in Leivine's name (the "feeder accounts") received deposits and then disbursed those deposits into the same bank account, also in Leivine's name (the "BOA 6999 Account"), and four of these feeder accounts disbursed more than 97% of the deposits they received to the BOA 6999 Account during this time period;

7. The affiant, FBI Special Agent Devin Perry, assessed that "wine and liquor stores, such as Leivine, generally conduct primarily cashless transactions. Given Leivine's location in a high-end development in Flushing, I assess it is unlikely that the large volume of cash HU has been depositing in Leivine accounts constitutes Leivine's actual income."

Hu asserts that the evidence obtained pursuant to the Leivine Warrant must be suppressed because the Leivine Warrant lacked probable cause, was overbroad, and was not sufficiently particular.

Hu argues that the Leivine Warrant lacked probable cause because the Leivine Affidavit included facts which the Government knew – based on bank records, sales records, and other business records the Government possessed before requesting the Leivine Warrant – were not indicia of probable cause, and in reality were facts pertaining to Leivine's normal, routine

15

business transactions. Hu argues that the information the Government already had possession of, and omitted from the Leivine Affidavit, would have defeated the existence of probable cause to search Leivine.

First, Hu asserts that the Government had bank records, sales records, and other documentation showing that the $77,000 monthly average in cash deposits were the proceeds of normal, routine cash transactions for liquor purchases at Leivine. Second, Hu states that the government had business records establishing that the $200,000 in cash deposited into accounts held by Leivine before Leivine's grand opening was from Leivine's soft launch.

Setting aside the statements in the Leivine Affidavit concerning cash deposited into Leivine bank accounts before its grand opening and Leivine's $77,000 monthly average in cash deposits, I find that the Leivine Affidavit still established probable cause. There was probable cause to issue a warrant to search Leivine based on the following facts: (1) $1.123 million was transferred from Hu's personal bank accounts to Leivine's bank account over a 1.5 year period, and (2) seven different feeder accounts all disbursed deposits into the BOA 6999 Account, and four of the feeder accounts disbursed more than 97% of their deposits to the BOA 6999 Account over the time periods discussed in the Leivine Affidavit. Hu does not assert that the Government had any information, or omitted any facts, pertaining to these statements.

Money laundering may be committed by conducting a financial transaction "to conceal or disguise the nature" of proceeds, "knowing that the property involved . . . represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i). Coupled with the facts included in the Leivine Affidavit that describe Sun's actions as an agent for the PRC and the benefits she received for these actions (which Hu does not challenge as knowingly false or misleading), the facts of the $1.123 million being transferred from Hu's personal bank accounts

16

to Leivine's bank account and the feeder accounts disbursing deposits into the BOA 6999 Account provide probable cause to believe that Hu committed laundering through Leivine by using it to disguise proceeds from Sun's unlawful activity. Given the numerous different bank accounts involved, including some that appear to have the sole purpose of passing money through to another account, the facts that remain in the Leivine Affidavit even after Hu's challenge still provide probable cause for the Leivine Warrant. See United States v. Hickey, 16 F. Supp. 2d 223, 227 (E.D.N.Y.), recons. granted on other grounds, 48 F. Supp. 2d 214, 238 (E.D.N.Y. 1998) (finding probable cause to search business records at different businesses based on assertions that the defendants used bank accounts "to hide the involvement of" one of the defendants and "[t]he monies were then transferred, through a series of financial transactions, to accounts and deposited for the benefit of" the defendant and others.). Because the omissions Hu identifies were not necessary to the issuing judge's probable cause finding, Hu is not entitled to a Franks hearing or suppression. See Lauria, 70 F.4th at 125 (omissions must be "necessary to the issuing judge's probable cause finding" for a defendant to receive a Franks hearing).

Turning to Hu's argument that the Leivine Warrant was overbroad and lacked particularity, for the reasons discussed above, I find that there was probable cause to search Leivine based on the facts indicating that it was involved in a money laundering scheme. However, there is merit in Hu's argument that the warrant lacked particularity with respect to the list of items to be seized in paragraph 2 of Attachment B to the Leivine Warrant. Attachment B to the Leivine Warrant provides a list of "Particular Things to be Seized." Although paragraph 1 in Attachment B limits the items to be seized to those that relate to the crimes for which the Leivine Affidavit establishes probable cause and a specific time frame, paragraph 2 provides no such limitations, instead listing as property to be seized "Records on the Devices," and including

17

examples of such records but no crimes or time period to which the records must relate. Without these limitations, a warrant to seize any and all records on devices amounts to an impermissible general warrant.

Despite this lack of particularity, the good faith exception applies to the Leivine Warrant. The formatting of Attachment B is such that paragraph 2 appears to be a subparagraph of paragraph 1. If paragraph 2's numbering matched its appearance as a subparagraph, it would unquestioningly be sufficiently particular, because the limitations of paragraph 1 would apply to paragraph 2 as well. See United States v. Mendlowitz, No. 17-cr-248, 2019 WL 1017533, at *9 (S.D.N.Y. March 2, 2019) (warrant sufficiently particular where "every sub-paragraph of the list of evidence to be seized [was] modified by introductory language limiting the search to evidence of the scheme") (citation omitted). Furthermore, "the language of a warrant is to be construed in light of an illustrative list of seizable items," United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990). The illustrative list of seizable items under paragraph 2, including financial records related to the receipt or deposit of cash in the name of Leivine and communications related to the receipt or deposit of cash, easily falls within the limitations set by paragraph 1.

Considering that the Leivine Warrant prominently displayed at the top of Attachment B, in paragraph 1, limitations on the items to be seized by listing the crimes and time frame they must relate to; that paragraph 2 appears by its formatting to be a subparagraph of paragraph 1; and that paragraph 2's illustrative list contains items clearly related to the crimes for which the Leivine Affidavit established probable cause, the warrant was not so facially deficient that reliance upon it was unreasonable. See United States v. Cwibeker, No. 12-cr-632, 2014 WL 7423106, at *8 (E.D.N.Y. Dec. 31, 2014) (good faith exception applied to warrant that

mentioned crime for which there was probable cause in paragraph 11 of items to be seized and there were "interior limitations in many parts of the search warrant").

Hu's motion to suppress as to the Leivine Warrant is therefore denied.

### B. The Home Warrant

As discussed above, the Government obtained the Home Warrant to search Sun and Hu's home in 2024. The Home Affidavit stated that a search of Hu's email account, conducted pursuant to a different warrant, revealed "evidence of money laundering and bank fraud, including . . . a ledger in which Hu tracks cash deposits into his family and his business' accounts." Hu argues that the Home Warrant was overbroad in authorizing the seizure of all of his electronic devices and digital media. However, the statement in the Home Affidavit that Hu's email account revealed "evidence of money laundering and bank fraud" was sufficient to establish probable cause as to Hu's electronic devices and digital media. Having identified evidence of a crime in Hu's email account, which would also likely be on his electronic devices, and which would itself be digital media, the affidavit established "a fair probability that [more] contraband or evidence of a crime would be found" in Hu's electronic devices and digital media. Gates, 462 U.S. at 238.

In an almost exact replica of the Leivine Warrant, the Home Warrant included an Attachment B which listed "Particular Things to be Seized," paragraph 2 of which did not specify the crimes or time frame to which the items needed to relate. Hu raises the same particularity argument for the Home Warrant as he does for the Leivine Warrant. For the same reasons discussed with respect to the Leivine Warrant, the good faith exception applies such that the lack of particularity in paragraph 2 does not warrant suppression.

Accordingly, Hu's motion to suppress is denied as to the Home Warrant as well.

## CONCLUSION

For the foregoing reasons, Sun's motion to suppress [77] is granted in part and denied in part; Hu's motion to suppress [80] is denied.

**SO ORDERED.**

*Brian M. Cogan*
U.S.D.J.

Dated: Brooklyn, New York
       April 27, 2025