UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- v. -

LINDA SUN,

    a/k/a "Wen Sun," "Ling Da Sun," and
    "Linda Hu," and

CHRIS HU,

                    *Defendants*.

S2 24 Cr. 346 (BMC) (TAM)

*(Oral argument requested)*

**MEMORANDUM OF LAW IN SUPPORT OF LINDA SUN'S MOTION TO DISMISS
THE SECOND SUPERSEDING INDICTMENT**

ABELL ESKEW LANDAU LLP

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman

256 Fifth Avenue, 5th Floor
New York, NY 10001

*Counsel for Linda Sun*

**Table of Contents**

PRELIMINARY STATEMENT..................................................................................................... 1

LEGAL STANDARD ................................................................................................................... 2

ARGUMENT .............................................................................................................................. 6

I.    THE SECOND SUPERSEDING INDICTMENT ................................................... 6

II.   COUNT ONE MUST BE DISMISSED ................................................................ 10

    A.    Consular Officials Cannot Conspire to Violate FARA .............................11

        i.    Individuals excepted by an affirmative legislative policy are not culpable and cannot be deemed unindicted co-conspirators.................... 12

        ii.   Individuals excepted by an affirmative legislative policy do not possess the specific intent required of unindicted co-conspirators.......... 14

        iii.  Precedent forecloses treating indicted and unindicted co-conspirators differently for purposes of the affirmative legislative policy exception... 15

    B.    Due Process and the Rule of Lenity Require Dismissal Regardless..................... 17

III.  COUNTS EIGHT AND NINE MUST BE DISMISSED ................................................. 18

    A.    Elements of Honest Services Wire Fraud ......................................................... 18

        i.    Materiality .................................................................................................... 19

        ii.   Fraudulent Intent ........................................................................................ 19

    B.    The S-2 Fails to Allege Materiality as to Counts Eight and Nine........................ 26

        i.    Counts Eight and Nine never allege that any misstatements or omissions were material........................................................................... 27

        ii.   Materiality cannot be assumed based on other allegations...................... 28

    C.    The S-2 Fails to Sufficiently Allege Fraudulent Intent ......................................... 34

        i.    District Courts remain bound by the Second Circuit's fraudulent intent precedents .......................................................................................... 34

        ii.   The S-2 fails to allege fraudulent intent as required in this Circuit .......... 40

    D.    Counts Eight and Nine Are Barred By the Statute of Limitations........................ 41

IV.   COUNTS TEN AND ELEVEN MUST BE DISMISSED................................................. 42

    A.    Elements of Federal Program Bribery ................................................................. 42

    B.    Count Ten Fails to Allege an Explicit Quid Pro Quo............................................. 43

    C.    Count Eleven Likewise Fails to Allege an Explicit Quid Pro Quo...................... 47

    D.    Count Eleven Fails to Allege an Offense as to the First Object of the Conspiracy ......................................................................................................... 47

      E.     Count Eleven Further Alleges an Object Barred by the Statute of Limitations.... 49

V.     COUNT FOURTEEN MUST BE DISMISSED .............................................................. 50

CONCLUSION................................................................................................................................. 52

## Table of Authorities

**Cases**

*Carpenter v. United States*,
    484 U.S. 19 (1987) ................................................................................ 20, 40

*Cartica Mgmt., LLC v. Corpbanca, S.A.*,
    50 F. Supp. 3d 477 (S.D.N.Y. 2014) .................................................... 34

*Ciminelli v. United States*,
    598 U.S. 306 (2023) ............................................................................. passim

*Cleveland v. United States*,
    531 U.S. 12 (2000) ............................................................. 21, 38, 29

*Dowling v. United States*,
    473 U.S. 207 (1985) ................................................................................ 5

*Escalera v. Coombe*,
    852 F.2d 45 (2d Cir. 1988) ................................................................... 36

*Evans v. United States*,
    504 U.S. 255 (1992) ......................................................................... 43, 44

*Farnsworth v. Zerbst*,
    98 F.2d 541 (5th Cir. 1938) .............................................................. 13, 14

*Gebardi v. United States*,
    287 U.S. 112 (1932) .............................................. 13, 14, 15, 16, 17

*Hamling v. United States*,
    418 U.S. 87 (1974) ............................................................................. 3, 52

*Jones v. United States*,
    529 U.S. 848 (2000) .............................................................................. 39

*Kelly v. United States*,
    590 U.S. 391 (2020) ..................................................................... 38, 39, 45

*Kousisis v. United States*,
    145 S. Ct. 1382 (2025) ........................................................................ passim

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023) .............................................................................. 36

*McCormick v. United States*,
    500 U.S. 257 (1991) ......................................................................... 43, 44

*McNally v. United States*,
    483 U.S. 350 (1987) ............................................................................. passim

*Moore v. United States*,
    160 U.S. 268 (1895) .............................................................................. 48

*Neder v. United States*,
   527 U.S. 1, 20–25 (1999)..............................................................................19, 27

*Nigro v. United States*,
   117 F.2d 624 (8th Cir. 1941) ........................................................................16, 17

*Ocasio v. United States*,
   578 U.S. 282 (2016) ..............................................................................................14

*Percoco v. United States*,
   598 U.S. 319 (2023)………………………………………………………………...39

*Rewis v. United States*,
   401 U.S. 808 (1971)..........................................................................................5, 38

*Russell v. United States*,
   369 U.S. 749 (1962) ..............................................................................2, 3, 4, 52

*Salinas v. United States*,
   522 U.S. 52 (1997) ..........................................................................................14, 15

*Sanabria v. United States*,
   437 U.S. 54 (1978) ..................................................................................................2

*Santana-Felix v. Barr*,
   924 F.3d 51 (2d Cir. 2010) .................................................................................15

*Skilling v. United States*,
   561 U.S. 358 (2010)......................................................................................passim

*Snyder v. United States*,
   603 U.S. 1 (2024) ..........................................................................................passim

*Sorich v. United States*,
   555 U.S. 1204 (2009)............................................................................................21

*Toussie v. United States*,
   397 U.S. 112 (1970).................................................................................................5

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
   822 F.3d 650 (2d Cir. 2016) ...............................................................................19

*United States v. Adams*,
   760 F. Supp. 3d 6 (S.D.N.Y. 2024) .....................................................................42

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) ...............................................................................5, 46

*United States v. Alfisi*,
   308 F.3d 144 (2d Cir. 2002) ................................................................................43

*United States v. Autuori*,
   212 F.3d 105 (2d Cir. 2000) ...........................................................................19, 24

*United States v. Benjamin*,
   95 F.4th 60 (2d Cir.), *cert. denied*, 145 S. Ct. 982 (2024) .......................2, 43, 44, 46

*United States v. Berlin*,
    472 F.2d 1002 (2d Cir.), *cert. denied*, 412 U.S. 949 (1973) ................................................. 4, 29

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015) ................................................................................... passim

*United States v. Black*,
    No. S4 00 CR. 632 (WHP), 2002 WL 460063 (S.D.N.Y. Mar. 26, 2002) ............................ 22

*United States v. Bruno*,
    661 F.3d 733 (2d Cir. 2011) ................................................................................... 45

*United States v. Bucuvalas*,
    909 F.2d 593 (1st Cir. 1990) .................................................................................. 12

*United States v. Carll*,
    105 U.S. 611 (1881) ............................................................................................ 3

*United States v. Carlton*,
    442 F.3d 802 (2d Cir. 2006) ................................................................................ 12, 13

*United States v. Carpenter*,
    791 F.2d 1024 (2d Cir. 1986) .............................................................................. 22, 25

*United States v. Chastain*,
    No. 23-7038, 2025 WL 2165839 (2d Cir. July 31, 2025) .................................... 35, 39, 40

*United States v. Clark*,
    765 F.2d 297 (2d Cir. 1985) ................................................................................. 48

*United States v. Coffey*,
    361 F. Supp. 2d 102 (E.D.N.Y. 2005) ................................................................... 22, 23

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) ................................................................................. 19

*United States v. Dass*,
    7 F. App'x 76 (2d Cir. 2001) ................................................................................ 45

*United States v. Davis*,
    588 U.S. 445 (2019) ........................................................................................ 5, 18

*United States v. DeMizio*,
    No. 08 Cr. 336 (JG), 2012 WL 1020045 (E.D.N.Y. Mar. 26, 2012) ................................ 45

*United States v. Desimone*,
    119 F.3d 217 (2d Cir. 1997) ............................................................................... 12, 13

*United States v. Foley*,
    73 F.3d 484 (2d Cir. 1996) .............................................................................. passim

*United States v. Fox*,
    130 F.2d 56 (3d Cir. 1942) ................................................................................... 13

*United States v. Gabriel*,
    920 F. Supp. 498 (S.D.N.Y. 1996) .......................................................................... 42

*United States v. Gonzalez*,
  686 F.3d 122 (2d Cir. 2012) ............................................................... 4, 29, 43

*United States v. Greenberg*,
  835 F.3d 295 (2d Cir. 2016) ......................................................................... 19

*United States v. Heicklen*,
  858 F. Supp. 2d 256 (S.D.N.Y. 2012) ...................................... 4, 11, 43, 48

*United States v. Hendrickson*,
  26 F.3d 321 (2d Cir. 1994) ........................................................................... 12

*United States v. Hernandez*,
  980 F.2d 868 (2d Cir. 1992) ..................................................................... 3, 41

*United States v. Holte*,
  236 U.S. 140 (1915) ...................................................................................... 14

*United States v. Hoskins*,
  902 F.3d 69 (2d Cir. 2018) ........................................................................... 16

*United States v. Jabar*,
  19 F.4th 66 (2d Cir. 2021) ....................................................... 19, 22, 34, 40

*United States v. Jorquera*,
  No. 19-CR-479 (AMD), 2021 WL 5232587 (E.D.N.Y. Nov. 10, 2021) ................. 34

*United States v. Lanier*,
  520 U.S. 259 (1997) ...................................................................................... 18

*United States v. Lopez*,
  143 F.4th 99 (2d Cir. 2025) ................................................................... 21, 36

*United States v. Mazer*,
  631 F. App'x 57 (2d Cir. 2015) ............................................................. 25, 40

*United States v. Mennuti*,
  679 F.2d 1032 (2d Cir. 1982) ..................................................................... 50

*United States v. Mittelstaedt*,
  31 F.3d 1208 (2d Cir. 1994) ................................................................. passim

*United States v. Novak*,
  443 F.3d 150 (2d Cir. 2006) ................................................................. passim

*United States v. Pirro*,
  212 F.3d 86, 92 (2d Cir. 2000) ............................................................ passim

*United States v. Rabinowich*,
  238 U.S. 78 (1915) ........................................................................................ 14

*United States v. Rucker*,
  586 F.2d 899 (2d Cir. 1978) ....................................................................... 50

*United States v. Runner*,
  143 F.4th 146 (2d Cir. 2025) ............................................................... passim

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) ........................................................................ passim

*United States v. Salmonese*,
   352 F.3d 608 (2d Cir. 2003) ............................................................................... 50

*United States v. Sampson*,
   898 F.3d 270 (2d Cir. 2018) ............................................................... 5, 41, 48, 49

*United States v. Santos*,
   553 U.S. 507 (2008) ...................................................................................... 5, 38

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996) .......................................................................... 21, 22

*United States v. Schwartz*,
   924 F.2d 410 (2d Cir. 1991) ........................................................................ 20, 22

*United States v. Shellef*,
   507 F.3d 82 (2d Cir. 2007) ............................................................ 22, 23, 35, 39

*United States v. Silverman*,
   430 F.2d 106 (2d Cir. 1970) ........................................................................ 3, 4, 29

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ........................................................................... passim

*United States v. Stringer*,
   730 F.3d 120 (2d Cir. 2013) ............................................................................... 41

*United States v. Sun-Diamond Growers of California*,
   526 U.S. 398 (1999) ............................................................................. 43, 45, 46

*United States v. Thomas*,
   274 F.3d 655 (2d Cir. 2001) .......................................................................... 4, 29

*United States v. Thompson*,
   141 F. Supp. 3d 188 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) ............................ 40

*United States v. Torres*,
   604 F.3d 58 (2d Cir. 2010) ................................................................................ 14

*United States v. Urso*,
   369 F. Supp. 2d 254 (E.D.N.Y. 2005) ........................................................... 3, 42, 48

*United States v. Valencia*,
   226 F. Supp. 2d 503 (S.D.N.Y. 2002) .................................................................. 12

*United States v. Vazquez*,
   113 F.3d 383 (2d Cir. 1997) ............................................................................. 13

*United States v. Von Barta*,
   635 F.2d 999 (2d Cir. 1980) ........................................................................ 24, 25

*United States v. Walker*,
   191 F.3d 326 (2d Cir. 1999) ............................................................................. 22

*United States v. Walsh*,
 194 F.3d 37 (2d Cir. 1999) ................................................................... 2, 46, 50

*United States v. Weaver*,
 860 F.3d 90 (2d Cir. 2017) ......................................................................... 18, 19

*United States v. Yaron*,
 No. S2 10 Cr. 363 (GBD), 2011 WL 3279054 (S.D.N.Y. July 28, 2011) ................................ 45

*Universal Health Servs., Inc. v. United States*,
 579 U.S. 176 (2016) ................................................................... 26, 29, 31, 32

## Statutes

18 U.S.C. § 1343 ............................................................................ passim

18 U.S.C. § 1346 ............................................................................ passim

18 U.S.C. § 1349 ...................................................................... 10, 28, 40

18 U.S.C. § 3282 ........................................................................ 5, 41, 49

18 U.S.C. § 371 .......................................................................... 10, 18

18 U.S.C. § 666 ............................................................................ passim

22 U.S.C. § 613 ..............................................................................11

## Rules

Fed. R. Crim. P. 51 ............................................................................ 1

Fed. R. Crim. P. 12 ............................................................................ 4

Fed. R. Crim. P. 7 ............................................................................ 2

Fed. R. Evid. 201 ......................................................................... 7, 31

## Secondary Sources

Black's Law Dictionary (12th ed., 2024) ............................................... 37

"Cuomo: 'Cruelest irony' that we need China to produce coronavirus supplies," N.Y. Post (Apr. 2, 2020), *available at* https://nypost.com/2020/04/02/cuomo-cruelest-irony-that-we-need-china-for-coronavirus-supplies/ (last accessed July 28, 2025) ................................... 7

"Frantic for Coronavirus Gear, Americans in Need Turn to China's Elite," N.Y. Times (Apr. 24, 2020), *available at* https://www.nytimes.com/2020/04/24/business/us-china-coronavirus-donations.html (last accessed July 28, 2025) ........................................................... 7

"Trump Administration Told Taiwan's President to Avoid New York Stopover," N.Y. Times (July 30, 2025), *available at* https://www.nytimes.com/2025/07/30/world/asia/trump-taiwan-china.html (last accessed July 31, 2025) ………………………………...……..………... 10

"US Blocked Taiwan President From NY Stopover After China Intervened: Report," NEWSWEEK (July 28, 2025), *available at* https://www.newsweek.com/taiwan-president-donald-trump-stopover-china-trade-2105405 (last accessed July 31, 2025) ……………………………….. 10

## PRELIMINARY STATEMENT

In her first motion to dismiss the charges in this case, Ms. Sun observed that these charges were not really about foreign influence, but rather stemmed from the government's view that Ms. Sun and her family had too much money.  Now the third in a series of successive indictments confirms that assessment, making clear that this case was never about Ms. Sun acting as some foreign agent.

Confronted with weaknesses in its case as trial loomed, the government delayed and concocted new theories that curiously claim the same frozen funds as joint proceeds of disparate offenses supposedly years apart.  Those peculiar assertions are compounded by glaring inconsistencies between what the government claimed before and what it now alleges.  And in its zeal to pile on additional charges, the government skipped over essential elements of the new offenses that it injected into this case.  Among other things, the second superseding indictment now charges bribery without its defining element, honest services wire fraud that does not meet threshold standards for fraud, and multiple offenses that are barred by the statute of limitations.

Ms. Sun maintains that she did not commit any of the offenses with which she is charged and expects that a jury would reject the government's most recent accusations at trial.  Because a number of the charges against her are legally flawed, however, there is no need to wait until November.  Those deficient charges should be dismissed now.[1]

---

[1]    Ms. Sun respectfully disagrees with the denial of her first motion to dismiss, but accepts that the Court's prior determinations remain the law of this case.  For the record, *see* Fed. R. Crim. P. 51(b), Ms. Sun incorporates and renews her prior arguments with respect to Counts One through Seven and Ten of the prior superseding indictment, which now appear in the second superseding indictment as Counts One through Seven and Fourteen.  (*See* Dkts. 45, 46, 57, 69.)  In deference to the Court's prior rulings, she will not belabor in this submission arguments already considered and decided by the Court except where addressing such arguments is necessary.

**LEGAL STANDARD**

"An indictment that fails to allege the essential elements of the crime charged offends both the Fifth and Sixth Amendments." *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000) (citing *Russell v. United States*, 369 U.S. 749, 760–61 (1962)).[2] "The Sixth Amendment guarantees that 'in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation.'" *United States v. Benjamin*, 95 F.4th 60, 66 (2d Cir.), *cert. denied*, 145 S. Ct. 982 (2024) (quoting U.S. CONST., amend. VI). The Federal Rules of Criminal Procedure "implement[] that constitutional guarantee by requiring that the indictment 'be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'" *Id.* (quoting Fed. R. Crim. P. 7(c)(1)).

"The Fifth Amendment guarantees that '[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . . .'" *Pirro*, 212 F.3d at 92 (quoting U.S. CONST., amend. V). It therefore "requires that an indictment contain some amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Id.* (quoting *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999)). "Because the requirement of a sufficient indictment serves these important purposes, [an] indictment must be considered as it was actually drawn, not as it might have been drawn." *Id.* (citing *Sanabria v. United States*, 437 U.S. 54, 65–66 (1978)) (noting that "[t]he precise manner in which an indictment is drawn cannot be ignored").

Typically, an indictment is sufficient if it (*i*) "contains the elements of the offense charged," (*ii*) "fairly informs a defendant of the charge against which [s]he must defend," and (*iii*) "enables

---

[2]     Unless otherwise indicated, case text quotations omit all internal alterations, quotation marks, and citations.

h[er] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974).  To meet those requirements, "[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself," but only if "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished."  *Id.* (quoting *United States v. Carll*, 105 U.S. 611, 612 (1881)); *accord Russell*, 369 U.S. at 765 (explaining that "[a]n indictment not framed to apprise the defendant 'with reasonable certainty, of the nature of the accusation against h[er] is defective, although it may follow the language of the statute"); *United States v. Urso*, 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005) (requiring "sufficient factual particularity such that the defendant is able to prepare to meet the government's charges, and . . . all concerned parties, including the court, can be confident that the government's case at trial will reflect the evidence presented to the grand jury").

An indictment is reviewed "in its entirety," *United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992), assessed using "common sense," and may be "read to include facts which are necessarily implied by the specific allegations made."  *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)).  But there are important limitations on that review.  For instance, because "each count of an indictment must be treated as if it were a separate indictment" and "the validity of a count cannot depend upon the allegations contained in any other count not expressly incorporated," reviewing an indictment "in its entirety" means assessing allegations count by count "without reference to the allegations contained in the other counts."  *Hernandez*, 980 F.2d at 871.  Additionally, "it has long been the rule . . . that a deficiency in an indictment's factual allegations of the elements of an offense is not cured by the fact that the relevant count cited the statute that the defendant is alleged to have

violated." *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) (quoting *United States v. Berlin*, 472 F.2d 1002, 1008 (2d Cir.), *cert. denied*, 412 U.S. 949 (1973)).  And courts only infer facts "necessarily implied by the specific allegations made," *Stavroulakis*, 952 F.2d at 693 (quoting *Silverman*, 430 F.2d at 111), because filling any gaps "would work the harm the Grand Jury Clause is intended to prevent—a federal prosecution begun by arms of the Government without the consent of fellow citizens." *United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001).

Sometimes more than simply regurgitating the applicable statute is required.  In particular, "when the definition of an offense includes 'generic terms,'" an indictment "must descend to particulars" because "it is not sufficient" to "charge the offence in the same generic terms as in the definition." *Stavroulakis*, 952 F.2d 693 (quoting *Russell,* 369 U.S. at 765).   Likewise, "when one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *Pirro*, 212 F.3d at 93 (quoting *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996)).  Implicit elements may include significant judicial refinements that do not appear in a statute's text. *See, e.g.*, LaFave, et al., 5 CRIM. PROC. § 19.3(b) (4th ed.) (observing that "[i]f courts have added a significant refinement in the interpretation of a particular statutory element, that element often must be pleaded as interpreted rather than as stated in the statutory language, especially if the judicial interpretation substantially limits [its] scope").

Whether an indictment contains "sufficient specificity" does not answer the separate question of whether the facts alleged actually "constitute an offense as a matter of law." *United States v. Heicklen*, 858 F. Supp. 2d 256, 262 (S.D.N.Y. 2012); *accord* Fed. R. Crim. P. 12(b)(3)(B)(iii), (v) (distinguishing between "lack of specificity" and a "failure to state an offense").  "Since federal crimes are solely creatures of statute," an indictment is also deficient if

"it fails to allege a crime within the terms of the applicable statute." *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) (citing *Dowling v. United States*, 473 U.S. 207, 213 (1985)). When analyzing a statute, courts "[a]pply[] constitutional avoidance to narrow" its scope rather than "construe a criminal statute to penalize conduct it does not clearly proscribe." *United States v. Davis*, 588 U.S. 445, 464–65 (2019); *Dowling*, 473 U.S. at 213 ("Due respect for the prerogatives of Congress in defining federal crimes prompts restraint in this area, where we typically find a narrow interpretation appropriate."). Any uncertainty is resolved against the government, as "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008); *Rewis v. United States*, 401 U.S. 808, 812 (1971) ("[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.").

Finally, even if proper in other respects, federal offenses may only be prosecuted within a prescribed period. Statutes of limitations "have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity," and thus "are to be liberally interpreted in favor of repose." *Toussie v. United States*, 397 U.S. 112, 115 (1970). With respect to the offenses charged in this case, "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense . . . unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." 18 U.S.C. § 3282(a). That "five-year window for prosecution opens when a crime is complete," and "[a] crime is complete as soon as every element in the crime occurs." *United States v. Sampson*, 898 F.3d 270, 277 (2d Cir. 2018). When it is clear from the face of an indictment that the statute of limitations bars prosecution, "a party may raise and establish a statute-of-limitations defense via a Rule 12(b) motion . . . ." *Id.* at 279.

## ARGUMENT

### I.    THE SECOND SUPERSEDING INDICTMENT

The initial indictment in this case was returned on August 26, 2024.  (*See* Dkt. 4 ("Indictment" or "Ind.")).  Subsequently, on February 4, 2025, the government obtained and filed a superseding indictment.  (*See* Dkt. 65 ("S-1").)  Ms. Sun filed a motion to dismiss the Indictment and later renewed that motion as to the S-1, which Mr. Hu joined in part.  (*See* Dkts. 45, 46, 57, 69, 70.)  The Court denied Ms. Sun's prior motion on May 5, 2025.  (*See* Dkt. 100.)

On June 25, 2025, the government obtained and filed a second superseding indictment.  (*See* Dkt. 116 ("S-2").)  The S-2 adds a number of charges against Ms. Sun and Mr. Hu that are predicated on new legal theories and allegations.  (*See* S-2 ¶¶ 118–30, 140–48, 157–58.)  With respect to Counts One through Seven and Twelve through Seventeen, however, the S-2 is nearly identical to the S-1.  (*Compare, e.g.*, S-2 ¶¶ 131–39, 149–56 *with* S-1 ¶¶ 114–30.)  To be sure, there are some notable changes—the S-2 now abandons a claim that Ms. Sun "received substantial economic and other benefits" from the People's Republic of China ("PRC") or the Chinese Communist Party ("CCP") "[i]n return for" various alleged actions (*compare, e.g.*, S-2 ¶ 16 *with* S-1 ¶ 11), for example—but in broad strokes those counts charge the same offenses.

The primary difference between the S-2 and the S-1 is the inclusion of four new charges against both defendants, along with two other charges alleged only against Mr. Hu.  (*See* S-2 ¶¶ 140–48, 157–58.)  Those additional charges all stem from new theories regarding alleged contracts with the State of New York for certain goods and services during the COVID-19 pandemic in 2020.  (*See id.* ¶¶ 118–130.)  As alleged in the S-2,[3] "[d]uring the COVID-19 pandemic, [Ms. Sun] was a

---

[3]    Ms. Sun disputes the truth and accuracy of the S-2's allegations, but assumes the allegations are true for purposes of this motion.  *See United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2019 WL 286895, at *1 (E.D.N.Y. Jan. 22, 2019).

member of a team of NYS government employees responsible for procuring personal protective equipment ('PPE') from around the world." (S-2 ¶ 1.)  While the search was worldwide, most PPE originated—and therefore needed to be sourced from—the PRC.  *See, e.g.*, "Frantic for Coronavirus Gear, Americans in Need Turn to China's Elite," N.Y. TIMES (Apr. 24, 2020), *available at* https://www.nytimes.com/2020/04/24/business/us-china-coronavirus-donations.html (last accessed July 28, 2025); "Cuomo: 'Cruelest irony' that we need China to produce coronavirus supplies," N.Y. POST (Apr. 2, 2020), *available at* https://nypost.com/2020/04/02/cuomo-cruelest-irony-that-we-need-china-for-coronavirus-supplies/ (last accessed July 28, 2025).[4]  According to the S-2, Ms. Sun "facilitated contracts between the NYS government and two businesses—a company . . . operated by one of [her] second cousins" (the so-called "Cousin Company"), and "a company . . . that was operated by [her husband] and a business associate . . . with whom [Mr. Hu] also co-owned the Wine Store" (dubbed the "Associate Company"). (S-2 ¶ 20.)  Those companies allegedly procured for the NYS government "millions of dollars' worth of PPE sourced in the PRC" during the pandemic. (*Id.*)

More specifically, the S-2 alleges that "[d]uring the COVID-19 pandemic," Ms. Sun "work[ed] with the team of NYS government employees responsible for obtaining PPE" to help "coordinate the NYS government's purchase of PPE from vendors located in the PRC." (S-2 ¶ 118.)  During that time, she purportedly "referred" the Cousin Company and the Associate Company as vendors though they allegedly "were not recommended by the PRC government but had ties to [her]" (*id.*), and Ms. Sun, "the Cousin Company, and the Associate Company failed to disclose the businesses' associations with [her] family to the NYS government" (*id.* ¶ 20).  In

---

[4]    The Court may take judicial notice of reliable public source materials on this motion. *See United States v. Marsalis*, 314 F. Supp. 3d 462, 464 n.2 (E.D.N.Y. 2018) (collecting cases); *see also* Fed. R. Evid. 201.

particular, the S-2 alleges that Ms. Sun did not "disclose to the NYS government" the "relationships" that she or her husband had "with the Associate Company and the Cousin Company," that she and her husband were "directly benefiting from the profits that the Associate Company reaped from these contracts," or that they had "received a portion of the profits that the Associate Company and the Cousin Company made as a result of their contracts with the NYS government for PPE, including through kickback payments from the Cousin Company."[5]  (*Id.* ¶¶ 20, 119.)  And in making the referrals, Ms. Sun supposedly "claim[ed] falsely" that the Cousin Company and the Associate Company "were referrals from components of the PRC government." (*Id.* ¶ 118.)

Beyond making "referrals," the S-2 does not allege that Ms. Sun had any ability to direct, control, or make decisions about which vendors would be awarded contracts.  (*See* S-2 ¶¶ 118–128.)  Quite the opposite.  The S-2 claims that "[t]o conceal her relationship with the Cousin Company from procurement authorities at the NYS government," she altered an email "to suggest that the Jiangsu Department of Commerce had recommended the Cousin Company."[6]  (*Id.* ¶ 124.) The S-2 further alleges that Ms. Sun "arranged for the Associate Company to be a vendor for NYS government contracts" by "list[ing] the Associate Company as a potential supplier" of PPE in a March 2020 email "to other members of the NYS government PPE task force with procurement

---

[5]      Other issues aside, any alleged failure to disclose that Ms. Sun and her husband "*received a portion of the profits that the Associate Company and the Cousin Company made as a result of their contracts* with the NYS government for PPE" obviously was not an omission at the time that she allegedly "referred . . . the Cousin Company and the Associate Company," because they had not yet received any contracts and so could not have given any portion of the contract payments to Ms. Sun or Mr. Hu.  (*Id.* ¶¶ 118–119 (emphasis added).)

[6]      The S-2 also alleges that Ms. Sun "wrote to NYS procurement officials . . . that the Cousin Company's surgical mask was the 'gold standard.'"  (S-2 ¶ 125.)  Notably, however, there are no allegations that this representation was false or that the Cousin Company ever delivered substandard products.

authority." (*Id.* ¶ 128.) With respect to the Associate Company, the S-2 does not identify any misrepresentations or omissions other than Ms. Sun's failure to disclose her alleged "relationship[]" with the company.[7] (*Id.* ¶¶ 118–129.) But across the board, the S-2's allegations make clear that while Ms. Sun may have referred potential vendors, she could not decide to award contracts and possessed no actual "procurement authority." (*Id.* ¶ 128.)

Ultimately, the S-2 alleges that in May 2020 and April 2020, "the Associate Company and the Cousin Company entered into contracts with the NYS government." (S-2 ¶ 120.) Those contracts allegedly "resulted in the Cousin Company and the Associate Company selling millions of dollars' worth of PPE sourced in the PRC to the NYS government." (*Id.* ¶ 20.) At no point does the S-2 claim that the Cousin Company or the Associate Company failed to deliver goods or services paid for under their PPE contracts.[8] It does not allege that New York lost an opportunity to secure another vendor because it contracted with the Cousin Company or the Associate Company. And nothing in the S-2 alleges that those companies received better deals than other vendors, charged unfair or above-market prices, or inflated their prices to account for bribe or kickback amounts. Payments on the PPE contracts were made by "[t]he NYS Department of Health ('DOH')," which allegedly "wired funds" to the Cousin Company and the Associate Company on specified dates. (*Id.* ¶ 120.) The S-2 alleges that the earliest of those payments was

---

[7]    The S-2 also alleges that an "NYS internal document" was "found in the computer owned by the defendants" that listed the Associate Company as "referred by Chinese chamber of commerce" even though there allegedly "was no such referral for the Associate Company." (S-2 ¶129.) It is impossible to tell from the allegations what this document is or whether it was ever communicated to anyone, let alone whether it would have been material. Certainly, there are no allegations to that effect.

[8]    To the contrary, the S-2 alleges that "[t]he Associate Company issued a refund to the NYS government" for more than $4.2 million when "it was unable to fulfill a portion of a contract." (S-2 ¶ 120 & n.3.)

made on March 19, 2020, and the last payment to either company was made on June 18, 2020. (*See id.*)

Based on that alleged conduct, the S-2 adds new counts against Ms. Sun that charge conspiracy to commit honest services wire fraud, in violation of 18 U.S.C. § 1349 ("Count Eight"); honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346 ("Count Nine"); federal program bribery, in violation of 18 U.S.C. § 666 ("Count Ten"); and conspiracy to commit offenses against the United States, in violation of 18 U.S.C. §§ 371 and 666 ("Count Eleven"). (*See* S-2 ¶¶ 140–48.)

## II.    COUNT ONE MUST BE DISMISSED

Count One continues to allege that Ms. Sun conspired to violate the Foreign Agents Registration Act ("FARA"). (*See id.* ¶¶ 131–33.) As Ms. Sun pointed out previously, carefully parsing what alleged conduct can actually constitute a FARA violation reveals that much of what is asserted falls outside FARA's plain text. (*See* Dkt. 46 at 13–15.) The S-2 is no different and its revised allegations reflect how much the government's FARA accusations have shriveled.[9]

---

[9]    For instance, the S-2 now highlights that "[t]he PRC government d[oes] not accept the . . . official name Republic of China" for Taiwan and accuses Ms. Sun of fealty to the PRC because she allegedly asked if "[p]olitically can we refrain from using the phrase 'Republic of China' so as to avoid creating an international incident by recognizing Taiwan." (S-2 ¶¶ 27, 29(k).) But the S-2 also refers throughout to Taiwan as, well, Taiwan. Faulting Ms. Sun for a convention that the government itself observes is absurd. *Cf.* "Trump Administration Told Taiwan's President to Avoid New York Stopover," N.Y. TIMES (July 30, 2025), *available at* https://www.nytimes.com/2025/07/30/world/asia/trump-taiwan-china.html (last accessed July 31, 2025); "US Blocked Taiwan President From NY Stopover After China Intervened: Report," NEWSWEEK (July 28, 2025), *available at* https://www.newsweek.com/taiwan-president-donald-trump-stopover-china-trade-2105405 (last accessed July 31, 2025).

Assuming, however, that some of the conduct alleged in the S-2 falls within FARA's ambit,[10] Count One fails to state an offense to the extent that it alleges Ms. Sun conspired with PRC consular officials.  *See Pirro*, 212 F.3d at 92–93 (dismissing count because conduct alleged did not violate the applicable statute); *Heicklen*, 858 F. Supp. 2d at 275–76 (dismissing indictment where facts alleged did not constitute the crime charged).

## A.  Consular Officials Cannot Conspire to Violate FARA

As before, the S-2 alleges that Ms. Sun acted at the direction of "high-ranking government official[s] at the PRC Consulate" and "PRC government official[s] assigned to the Political Section of the PRC Consulate," and then subsequently violated FARA.  (S-2 ¶¶ 4–9, 26, 29–42.)  Ms. Sun previously argued that PRC consular officials cannot be co-conspirators for the purpose of Count One (*see* Dkts. 46 at 42–44; 57 at 14–15) because FARA expressly precludes liability for consular officials.  *See* 22 U.S.C. § 613(a)–(c).  She respectfully renews that argument with respect to the S-2.

In ruling on Ms. Sun's prior motion, the Court "agree[d] it is quite likely that PRC Officials-1 through -4 could not be charged with conspiracy to violate FARA."  (Dkt. 100 at 17.)  That is undoubtedly correct because, as Ms. Sun pointed out, FARA's text and structure reflect an affirmative legislative policy to except such officials.  (*See* Dkt. 46 at 42–43.)  And as the Court further observed, FARA's legislative history confirms a congressional intent and "policy basis" for excluding those officials.  (Dkt. 100 at 17 n.1.)  The Court declined to dismiss Count One, however, because it theorized that an inability to indict PRC consular officials for conspiracy "does not mean

---

[10]    Separate from the relief requested herein, the Court should strike from the S-2 paragraph 29(g) and the picture that follows.  (*See* S-2 ¶ 29(g).)  The conduct alleged there is not claimed to have been undertaken in Ms. Sun's official capacity, is not otherwise connected to any conduct supposedly underlying the charged offenses, and expressly concerns purely private activity protected by the First Amendment.  Its inclusion in the S-2 is improper.

they could not be considered *unindicted* co-conspirators" in the absence of "cases which would prevent them from being considered unindicted co-conspirators for purposes of a conspiracy charge against [Ms.] Sun." (*Id.* at 17–18 (emphasis added).)  Reviewing cases cited by Ms. Sun, the Court viewed them as supporting "the proposition that the [g]overnment may not circumvent the substantive inability to indict a person under a statute by indicting that person for conspiracy to violate the statute," but concluded "that doesn't mean they did not conspire."[11]  (*Id.* at 18.)

For several reasons, those excepted from criminal liability by an affirmative legislative policy cannot be unindicted co-conspirators in a conspiracy with which they cannot be charged.

### i.   Individuals excepted by an affirmative legislative policy are not culpable and cannot be deemed unindicted co-conspirators

An "agreement to conspire requires that at least two *culpable* co-conspirators agree . . . ." *United States v. Carlton*, 442 F.3d 802, 811 (2d Cir. 2006) (emphasis added); *accord United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997) (noting that "a conspiracy requires the participation of at least two culpable co-conspirators"); *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir. 1994) (stating "it is axiomatic that no conspiratorial agreement exists unless at least two culpable co-conspirators agree"); *United States v. Valencia*, 226 F. Supp. 2d 503, 510 (S.D.N.Y. 2002), *aff'd*, 100 F. App'x 17 (2d Cir. 2004) (Chin, J.) ("To prove the existence of a conspiracy, the Government must show that at least two culpable co-conspirators agreed to participate in a joint venture intended to commit an unlawful act."); *cf. United States v. Bucuvalas*, 909 F.2d 593, 596–97 (1st

---

[11]    Ms. Sun did not seek reconsideration on this point because such motions traditionally may advance only a narrow class of arguments, *see, e.g.*, *United States v. Yannotti*, 457 F. Supp. 2d 385, 388–89 (S.D.N.Y. 2006) (observing district courts generally ask whether "the moving party can point to controlling decisions or data that the court overlooked"), and reconsideration did not appear to be a proper vehicle for raising the arguments in this submission.  Now that the government has filed a new charging instrument, however, Ms. Sun respectfully amplifies her arguments and provides additional authority regarding points raised in the Court's prior decision.

Cir. 1990) (citing, *inter alia*, *Gebardi v. United States*, 287 U.S. 112, 116 (1932)) ("It has been, and remains, the law that where the evidence against all of an individual's alleged co-conspirators is deemed legally insufficient, the evidence against that individual is by definition also insufficient.").  If an ostensible co-conspirator cannot be culpable—say, because he is actually "an agent of the government" who "lacks the criminal intent necessary to render him a *bona fide* co-conspirator," *United States v. Vazquez*, 113 F.3d 383, 387 (2d Cir. 1997)—then there can be no conspiracy irrespective of whether the non-culpable co-conspirator is formally indicted.  Indeed, where a conspiracy fails because a supposed co-conspirator was actually a government agent, it could not rescue the conspiracy to label the non-culpable agent an unindicted co-conspirator.  *See, e.g.*, *Carlton*, 442 F.3d at 812 (finding no conspiracy where "the sole potential co-conspirator" was an uncharged government informant); *Desimone*, 119 F.3d at 223 (noting the government "concede[d]" that its informant "cannot be considered a culpable coconspirator" even though unindicted).

Similarly, persons who cannot be charged with conspiring to violate FARA are—by definition—not culpable because they are affirmatively excluded from the statute's scope and cannot be charged or held liable for allegedly conspiring to violate FARA.  As such, they cannot be deemed co-conspirators, unindicted or otherwise.  Courts sometimes have permitted charges against defendants who conspired with foreign officials protected by diplomatic immunity.  *See, e.g.*, *Farnsworth v. Zerbst*, 98 F.2d 541, 544 (5th Cir. 1938) ("An American citizen ought not to be excused in a case like this because he conspired with a foreign diplomat."); *accord United States v. Fox*, 130 F.2d 56, 57 (3d Cir. 1942) (citing *Farnsworth*, 98 F.2d at 544) ("[O]ne may be convicted and punished for a conspiracy even though his fellow conspirators may be immune from prosecution because of the immunity attaching to representatives of foreign governments . . . .").

13

But those cases are readily distinguishable. Diplomatic immunity says nothing about actual culpability; it merely precludes criminal prosecution in the same way that death or escape might preclude the prosecution of other co-conspirators. *See Farnsworth*, 98 F.2d at 544. The affirmative legislative policy exception, on the other hand, actually carves out certain individuals from criminal liability as a statutory matter—thus making the underlying criminal prohibition inapplicable from the start. Underscoring that difference, the cases on which courts have relied when permitting conspiracy prosecutions that involve diplomat co-conspirators are the same cases distinguished by the Supreme Court in the context of the affirmative legislative policy exception. *Compare, e.g.*, *Farnsworth*, 98 F.2d at 544 (citing *United States v. Rabinowich*, 238 U.S. 78 (1915); *United States v. Holte*, 236 U.S. 140 (1915)), *with Gebardi*, 287 U.S. at 120–21 (distinguishing *Rabinowich* and *Holte*).

In sum, because PRC consular officials are affirmatively excluded from FARA's scope by an express legislative policy, they cannot be culpable members of any FARA conspiracy and may not be deemed indicted or unindicted co-conspirators.

### ii. *Individuals excepted by an affirmative legislative policy do not possess the specific intent required of unindicted co-conspirators*

The "partners in [a] criminal plan must agree to pursue the same criminal objective," *Salinas v. United States*, 522 U.S. 52, 63–64 (1997), and to be co-conspirators—whether indicted or not—participants must be part of "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense.'" *Ocasio v. United States*, 578 U.S. 282, 287 (2016) (quoting *Salinas*, 522 U.S. at 65). Thus, a co-conspirator must have "at least the degree of criminal intent necessary for the substantive offense itself." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010). Persons affirmatively exempted from FARA's scope cannot intend to violate a statute that excludes their conduct, however, because the

14

underlying "endeavor . . . , if completed," still would not "satisfy all of the elements of the underlying substantive criminal offense" as to them. *Salinas*, 522 U.S. at 65. And "[a]bsent intent to commit the object offense, conspiracy is not a crime." *Santana-Felix v. Barr*, 924 F.3d 51, 54 (2d Cir. 2019). Thus, people who are affirmatively excluded from FARA's scope—and thus cannot be charged or held liable for conspiring to violate the statute—cannot possess the specific intent necessary to be co-conspirators. And that intent requirement is the same for indicted and unindicted co-conspirators.

### iii.   *Precedent forecloses treating indicted and unindicted co-conspirators differently for purposes of the affirmative legislative policy exception*

Precedent also confirms that there is no difference between indicted and unindicted co-conspirators in this context. That conclusion flows first from *Gebardi* itself. In that case, the petitioners were "a man and a woman" who "were indicted . . . for conspiring together, and with others not named, to transport the woman from one state to another for the purpose of engaging in sexual intercourse with the man." 287 U.S. at 115–16. Analyzing the statute that the petitioners allegedly conspired to violate, the Supreme Court found "evidence of an affirmative legislative policy" to preclude liability for women who consensually participated in the offense. *Id.* at 122–23. As "a necessary implication of that policy," the Court further concluded "that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former . . . does not punish, was not automatically to be made punishable under the latter." *Id.* The Court then reversed *both* petitioners' convictions: "the woman petitioner . . . [wa]s not guilty of a conspiracy" and, "[a]s there [wa]s no proof that the man conspired with anyone else to bring about the transportation," the male petitioner's conviction required reversal as well. *Id.*

15

As this Court recognized, *Gebardi* made clear that "if one alleged co-conspirator is found not guilty of conspiracy, the other co-conspirator's conviction cannot stand because he would have no one with whom to conspire." (Dkt. 100 at 18.)  It further opined, however, that "[e]ven if PRC Officials-1 through -4 could not themselves be charged with conspiracy to violate FARA, [Ms.] Sun point[ed] to no cases which would prevent them from being considered unindicted co-conspirators for purposes of a conspiracy charge against [her]." (*Id.*)  But *Gebardi* itself is such a case, because the Supreme Court would not have dismissed the male petitioner's conviction if the female petitioner had remained a viable unindicted co-conspirator.[12]  Or as the Second Circuit put it, the reasoning in *Gebardi* holds that the female petitioner "*had not conspired* to violate the Mann Act"—not merely that she could not be *charged* with conspiracy—and so "her companion had no one with whom to conspire" and "[b]oth of their convictions for conspiracy were reversed." *United States v. Hoskins*, 902 F.3d 69, 79 (2d Cir. 2018) (citing *Gebardi*, 287 U.S. at 123) (emphasis added).  The outcome in *Gebardi* thus indicates that individuals excluded from the scope of a criminal statute pursuant to an affirmative legislative policy do not conspire and therefore cannot be unindicted co-conspirators.

Although comparable fact patterns are rare, decisions in analogous situations are in accord.  In *Nigro v. United States*, 117 F.2d 624 (8th Cir. 1941), for example, the Eighth Circuit reversed a conspiracy conviction after concluding pursuant to the affirmative legislative policy exception that the sole unindicted co-conspirator could not have conspired.  *See id.* at 629.  In *Nigro*, a doctor was charged with conspiring to violate a portion of the Internal Revenue Code that barred "sell[ing], barter[ing], exchang[ing], or giv[ing] away" certain drugs except under specified

---

[12]    Indeed, if the female petitioner could have been an unindicted co-conspirator, whether she could be charged or not would have had no bearing on whether the male petitioner's charges could stand because the government is not obliged to charge all potential co-conspirators.

conditions.  *Id.* at 626.  The government claimed that the defendant had conspired with one of his patients, Erba Conley, an addict who obtained prescriptions from the doctor but was not indicted.[13] *See id.* at 627.  Concluding that "Conley, in the circumstances shown . . . , could not be guilty of a conspiracy to violate" the charged offense, the court explained that "the omission of Congress to make the act of an addict in purchasing narcotics to satisfy his cravings an offense is evidence of an affirmative legislative policy to leave the purchaser unpunished" and "[i]t would contravene that policy to hold the immunity which the [statute] itself confers is taken away by the conspiracy statute."  *Id.* at 628–29 (citing *Gebardi*, 287 U.S. at 123).  Having found that Conley could not be "a party to the conspiracy charged," the court went on to conclude—even though Conley was unindicted—that "[i]t follows that appellant was not a conspirator, however guilty [] his own state of mind may have been," because "[h]e could not conspire with himself."  *Id.* at 630.

Ms. Sun has not located any cases treating indicted and unindicted co-conspirators differently for purposes of the affirmative legislative policy exception or suggesting that, despite being excepted, officials who cannot be indicted as co-conspirators nevertheless may be deemed unindicted co-conspirators.  Notably, the government also never cited any in its prior briefing.[14]

## B.  Due Process and the Rule of Lenity Require Dismissal Regardless

Even if it were *possible* to treat excepted persons as unindicted co-conspirators—and, for the reasons discussed above, it is not and prior cases have not—bedrock constitutional principles foreclose implicating PRC consular officials as unindicted co-conspirators here.  First, "due

---

[13]    Other defendants initially were charged with conspiring as well, but the court observed that no evidence tied them to the conspiracy and "[g]overnment counsel appear to concede that the conspiracy, if any, was one solely between the appellant and Conley."  *Nigro*, 117 F.2d at 627–28. Thus, the court focused solely on whether a conspiracy existed between those two.

[14]    In fact, the government did not even attempt to draw such a distinction.  (*See* Dkt. 52 at 25–27.)  Ms. Sun respectfully submits that is because no apposite authority has done so.

process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). Permitting individuals excepted by an affirmative legislative policy to be deemed unindicted co-conspirators would expand the zone of potential criminal liability for Ms. Sun, allowing her to be convicted for conspiring with people that no "prior judicial decision has fairly disclosed" would "be within [the] scope" of a FARA conspiracy. *Id.* Likewise, whether construing FARA or § 371 as applied to this case, the rule of lenity "teach[es] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *Davis*, 588 U.S. at 464. In this case, that precludes finding that Ms. Sun may be convicted of conspiring with individuals excepted by an affirmative legislative policy on the novel ground that such individuals may still be deemed unindicted co-conspirators.

## III.    COUNTS EIGHT AND NINE MUST BE DISMISSED

Counts Eight and Nine charge the defendants with conspiring to commit honest services wire fraud and substantive honest services wire fraud, respectively. (*See* S-2 ¶¶ 140–43.) In such cases, a scheme to defraud "includes a scheme or artifice to deprive another of the intangible right of honest services," 18 U.S.C. § 1346, so long as the alleged conduct falls in the heartland of traditional bribe or kickback schemes. *See Skilling v. United States*, 561 U.S. 358, 409 (2010). As discussed below, however, precedent in this Circuit requires the government to specifically allege certain essential elements of honest services wire fraud, including materiality and fraudulent intent. The S-2 fails to allege those elements as to Counts Eight and Nine.

### A.  Elements of Honest Services Wire Fraud

The primary "essential elements" of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017) (quoting *United States v. Binday*, 804 F.3d

558, 569 (2d Cir. 2015)).  "[T]he gravamen of the offense is the scheme to defraud," *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016) (quoting *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 657 (2d Cir. 2016)), which subdivides into three elements that the government must allege and prove:  "the existence of a scheme to defraud, . . . the requisite scienter (or fraudulent intent) on the part of the defendant, . . . and . . . the materiality of [any] misrepresentations," *United States v. Autuori*, 212 F.3d 105, 115 (2d Cir. 2000); *accord Weaver*, 860 F.3d at 94 (quoting *O'Donnell*, 822 F.3d at 657) ("In order to prove the existence of a scheme to defraud, the government must also prove 'that . . . misrepresentations were material.'"); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) ("Critical to a showing of a scheme to defraud is proof that defendants possessed a fraudulent intent.").

### i.   Materiality

The Supreme Court has long held "that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes," and so the federal fraud statutes require proof of "a misrepresentation or concealment of material fact."  *Neder v. United States*, 527 U.S. 1, 22, 25 (1999) (emphasis omitted); *see also Weaver*, 860 F.3d at 94.  The "demanding requirement of materiality" is an essential element of fraud offenses because it serves as "the principled basis for distinguishing everyday misstatements from actionable fraud."  *United States v. Runner*, 143 F.4th 146, 156 n.8 (2d Cir. 2025) (quoting *Kousisis v. United States*, 145 S. Ct. 1382, 1396, 1398 (2025)).  And although materiality "is implicit in the statute, rather than explicit," an indictment is required to allege it "explicitly," otherwise that indictment "fails to allege an offense."  *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488).

### ii.   Fraudulent Intent

Also "[e]ssential to a scheme to defraud is fraudulent intent."  *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021) (quoting *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994)).

Because this element has evolved over time and grown more complex in the Second Circuit—especially with respect to honest services fraud—the requirement of fraudulent intent necessitates a brief digression.

The mail fraud statute that we recognize today was first enacted in 1909. *See Skilling*, 561 U.S. at 399; *McNally v. United States*, 483 U.S. 350, 356–58 (1987). Initially, courts throughout the country interpreted the "obtaining money or property" provision to be disjunctive and concluded "that the money-or-property requirement . . . d[id] not limit schemes to defraud to those aimed at causing deprivation of money or property." *McNally*, 483 U.S. at 358. Extrapolating from that principle, courts construed the statute to reach "schemes to defraud . . . designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly."[15] *Id.*; *see also Skilling*, 561 U.S. at 400 ("Emphasizing Congress' disjunctive phrasing, the Courts of Appeals, one after the other, interpreted the term 'scheme or artifice to defraud' to include deprivations not only of money or property, but also of intangible rights.").

The Supreme Court saw things differently. In *McNally v. United States*, it disagreed that the mail fraud statute protected intangible rights, "read[ing] § 1341 as limited in scope to the protection of property rights" in order to avoid "constru[ing] the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards of disclosure and good government for local and state officials." 483 U.S. at 360. In response, Congress quickly enacted § 1346, "which—despite the wide array of intangible rights courts

---

[15] Courts interpreted the wire fraud statute in the same way. *See, e.g.*, *Carpenter v. United States*, 484 U.S. 19, 25 n.6 (1987) ("The mail and wire fraud statutes share the same language in relevant part, and accordingly we apply the same analysis to both sets of offenses here."); *United States v. Schwartz*, 924 F.2d 410, 416 (2d Cir. 1991) ("Because the mail fraud and the wire fraud statutes use the same relevant language, we analyze them the same way.").

protected under the fraud statutes pre-*McNally*—revived 'only the intangible right of honest services.'" *Ciminelli v. United States*, 598 U.S. 306, 315 (2023) (quoting *Cleveland v. United States*, 531 U.S. 12, 19–20 (2000)).

The scope of what was covered by § 1346, however, was not entirely clear.[16] "Alert to § 1346's potential breadth, the Courts of Appeals . . . divided on how best to interpret the statute" following its enactment. *Skilling*, 561 U.S. at 403. "[T]o preserve what Congress certainly intended the statute to cover," in *Skilling v. United States* the Supreme Court "pare[d] that body of precedent down to its core" by confining § 1346 to "fraudulent schemes to deprive another of honest services through bribes or kickbacks supplied by a third party who had not been deceived." *Id.* at 404. In doing so, the Court rejected the government's argument that § 1346 reached "undisclosed self-dealing by a public official or private employee," such as "the taking of official action by [an] employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty." *Id.* at 409.

Everyone now agrees that § 1346 "reach[es] only schemes that involve[] bribery or kickbacks." *United States v. Lopez*, 143 F.4th 99, 107 (2d Cir. 2025). But that is a ceiling, not a floor. Decisions by the Courts of Appeals, including the Second Circuit, have imposed additional constraints that limit the scope of § 1346. For example, even before *Skilling* it was widely agreed that honest services fraud "d[id] not encompass every instance of official misconduct that results in [an] official's personal gain." *United States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996) (collecting cases); *accord Sorich v. United States*, 555 U.S. 1204, 1206 (2009) (Scalia, J., dissenting from denial of certiorari) ("It is practically gospel in the lower courts that the statute

---

[16]     In some senses, it is still unclear. *See United States v. Napout*, 963 F.3d 163, 183 (2d Cir. 2020) ("There are undoubtedly lingering ambiguities in § 1346 . . . .").

'does not encompass every instance of official misconduct.'" (quoting *Sawyer*, 85 F.3d at 725));
*see also United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987)
(observing that "not every breach of an employee's fiduciary duty to his employer constitutes mail
or wire fraud").   Precedents in this Circuit specifying the fraudulent intent required of fraud
defendants have further refined the requirements of honest services fraud.

First, the Second Circuit "broke 'fraudulent intent' itself down into two components:
'intent to deceive and intent to cause actual harm.'"   *Runner*, 143 F.4th 146 at 154 (quoting
*Stavroulakis*, 952 F.2d at 694).   "[A]n intent to deceive alone" was deemed "insufficient to sustain
a wire fraud conviction," and so "misrepresentations amounting only to a deceit must be coupled
with a contemplated harm to the victim."   *Jabar*, 19 F.4th at 76 (quoting *Starr*, 816 F.2d at 98).
While fraudulent intent "does not require the government to prove that [] victims of the fraud were
*actually* injured, the government 'must, at a minimum, prove that defendants *contemplated* some
actual harm or injury to their victims.'"   *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006)
(quoting *Starr*, 816 F.2d at 98 (emphasis in original)).   Thus, an indictment "is required to allege
that the defendant contemplated actual harm that would befall victims due to his deception in order
to meet the 'scheme to defraud' prong."   *United States v. Shellef*, 507 F.3d 82, 107 (2d Cir. 2007);
*see also United States v. Walker*, 191 F.3d 326, 335 (2d Cir. 1999) (stating in connection with §
1346 that "[w]hile the scheme to defraud need not have been successful, the defendant must have
contemplated some actual harm or injury to the victims"); *United States v. Coffey*, 361 F. Supp. 2d
102, 115 (E.D.N.Y. 2005) (quoting *Schwartz*, 924 F.2d at 420) (explaining in connection with §
1346 that the government must allege "defendants contemplated doing actual harm, that is,
something more than merely deceiving the victim"); *United States v. Black*, No. S4 00 CR. 632
(WHP), 2002 WL 460063, at *5 (S.D.N.Y. Mar. 26, 2002) (stating in connection with § 1346

convictions that "the defendant must have contemplated some actual harm or injury to the victims").

Second, the Second Circuit "specified" that in fraud cases "the harm contemplated must affect the very nature of the bargain itself." *Runner*, 143 F.4th 146 at 154 (quoting *Starr*, 816 F.2d at 98). Cases in this Circuit thus "have repeatedly rejected application of the mail and wire fraud statutes where the purported victim received the full economic benefit of its bargain." *Binday*, 804 F.3d at 570; *accord Shellef*, 507 F.3d at 108 (explaining the court has long "drawn a fine line between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes"). Here, that means "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed." *Novak*, 443 F.3d at 159. The requisite intent to harm requires instead alleging some deprivation tied to the "nature or quality of the services . . . that w[ere] the basis of the . . . bargain." *Id.* at 157 (quoting *Starr*, 816 F.2d at 99–100); *see also Binday*, 804 F.3d at 570–71 (observing convictions have been upheld "where the deceit affected the victim's economic calculus or the benefits and burdens of the agreement" or "where . . . [it] pertained to the quality of services bargained for"). That requirement applies even where an alleged omission contradicts an "assumption that the money [] paid . . . would be directed toward a lawful purpose," because such an expectation does not "implicitly constitute a part of the bargain between the parties" and so "that defeated expectation alone" is insufficient to establish an intent to harm. *Novak*, 443 F.3d at 157; *see also Coffey*, 361 F. Supp. 2d at 118 (concluding that "loss of honest services is chargeable as an offense under 18 U.S.C. § 1346 when it fundamentally changes the

23

expectation of the bargain and unknowingly vests control of monetary matters in the hands of those, or their affiliates, responsible for the fraud").

Third, specifically in the honest services fraud context, the Second Circuit clarified that harm contemplated by a defendant need not be "economic or pecuniary" in nature. *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc). It further required, however, that any "misrepresentation or omission at issue . . . must be 'material,' such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." *Id.* The Second Circuit described that additional requirement as "arising out of fundamental principles of the law of fraud," because "[a] material misrepresentation is an element of the crime." *Id.* at 146 (emphasis omitted). And though it acknowledged "something of an overlap" because a "scheme or artifice to defraud" already "requires 'material misrepresentations,'" *id.* at 146 n.20 (quoting *Autuori*, 212 F.3d at 115), it nevertheless included materiality as an additional element under § 1346, *see Rybicki*, 354 F.3d at 145–46, which echoed a prior holding that no harm within the meaning of the "federal fraud statutes" arises if an indictment claims only a "lack of information that might have an impact on the decision regarding where government money is spent, without more . . . ." *United States v. Mittelstaedt*, 31 F.3d 1208, 1217 (2d Cir. 1994).

The Second Circuit has consistently applied those principles, including in pre-*McNally* cases involving deprivations of intangible rights. For example, in *United States v. Von Barta*, 635 F.2d 999 (2d Cir. 1980), the Second Circuit observed that it was "generally accepted that the object of [a] fraudulent scheme need not be the deprivation of a tangible interest" and that "[a]rtifices designed to cause losses of an intangible nature also violate the statute." *Id.* at 1006. The *Von Barta* court thus concluded that federal fraud may "encompass[] a fraudulent scheme to deprive

24

an employer of his intangible right to an employee's honest and faithful services," but emphasized that there must be, among other things, a "violation of the employee's duty to disclose material information to his employer," the "deceit must have gone to the nature of the bargain," the "nondisclosures or affirmative misrepresentations must have been material," and "some actual harm or injury" must have been "at least contemplated." *Id.* at 1005–06 & n.14. The court understood those "limiting principles" to counterbalance the expansion of federal fraud to cover deprivations of intangible interests, especially in light of an "absence of legislative guidance" and "conflicting approaches" taken by other courts. *Id.* at 1005.

That view persisted after *McNally* and the enactment of § 1346, as the Second Circuit continued applying its fraudulent intent requirements, *see, e.g.*, *Novak*, 443 F.3d at 157 (applying in a case involving a kickback scheme), including in cases involving § 1346, *see, e.g.*, *United States v. Mazer*, 631 F. App'x 57, 59–61 (2d Cir. 2015) (applying in a case involving convictions for "honest services fraud and conspiring to commit honest services wire fraud"). For example, in *United States v. Mittelstaedt* the court cautioned that "[w]here an individual standing in a fiduciary relation to another conceals material information that the fiduciary is legally obliged to disclose, that non-disclosure does not give rise to mail fraud liability unless the omission can or does result in some tangible harm." 31 F.3d at 1217 (citing *Carpenter*, 791 F.2d at 1035). The court added the additional materiality element considered separately under § 1346. *See Rybicki*, 354 F.3d at 145–46. And it "repeatedly" declined to find fraudulent intent when purported victims "received the full economic benefit of [their] bargain." *Mazer*, 631 F. App'x at 60.

All of those limitations remain essential in the context of honest services fraud, because misrepresenting or omitting information—without more—does not (and should not) constitute a deprivation of the intangible right protected by § 1346. *See Rybicki*, 354 F.3d at 145–46;

*Mittelstaedt*, 31 F.3d at 1217.  Recent Supreme Court decisions have espoused similar principles. *See, e.g.*, *Ciminelli*, 598 U.S. at 316 (holding that "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" and "cannot form the basis for a conviction under the federal fraud statutes").

### B.  The S-2 Fails to Allege Materiality as to Counts Eight and Nine

"[T]he common law has long embraced . . . materiality . . . as the principled basis for distinguishing everyday misstatements from actionable fraud." *Kousisis*, 145 S. Ct. at 1396.  In general, "a misrepresentation is material if a reasonable person would attach importance to it in deciding how to proceed, or if the defendant knew (or should have known) that the recipient would likely deem it important." *Id.* (citing *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 193 (2016)).  The test for "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Id.* (quoting *Universal Health Servs., Inc.*, 579 U.S. at 193); *see also Rybicki*, 354 F.3d at 145 (holding that a misrepresentation or omission is "material" in the context of private honest services fraud if it "naturally tend[s] to lead or is capable of leading a reasonable employer to change its conduct").  Properly applied, "[t]he materiality standard is demanding," *Universal Health Servs., Inc.*, 579 U.S. at 194, and it "substantially narrows the universe of actionable misrepresentations," *Kousisis*, 145 S. Ct. at 1398.  Indeed, "[a] misrepresentation cannot be deemed material merely because the [g]overnment designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment," and it is not "sufficient for a finding of materiality that the [g]overnment would have the option to decline to pay if it knew of the defendant's noncompliance." *Universal Health Servs., Inc.*, 579 U.S. at 194.

### i.   *Counts Eight and Nine never allege that any misstatements or omissions were material*

Whether as an element of wire fraud or in connection with § 1346, nowhere do Counts Eight or Nine allege that any misstatements or omissions were material.  In relevant part, Count Eight alleges as follows:

> In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LINDA SUN . . . and CHRIS HU, together with others, did knowingly and intentionally conspire to devise a scheme and artifice to defraud the NYS government of its intangible right to the honest services of SUN through kickbacks, to wit: payments to HU through bank accounts held at Financial Institution-1 in the name of the Relative, contrary to Title 18, United States Code, Sections 1343 and 1346.

(S-2 ¶ 141.)  Similarly, Count Nine alleges a substantive violation of § 1346 without any mention of materiality:

> In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LINDA SUN . . . together with others, did knowingly and intentionally devise a scheme and artifice to defraud the NYS government of its intangible right to the honest services of SUN through kickbacks, to wit: payments to HU through bank accounts held at Financial Institution-1 in the name of the Relative.

(*Id.* ¶ 143.)   Regardless of whether those counts otherwise repeat the relevant statutes, each is insufficient because "when one element of the offense is implicit in the statute, rather than explicit, and the indictment tracks the language of the statute and fails to allege the implicit element explicitly, the indictment fails to allege an offense." *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488).  Because materiality is an essential element of Counts Eight and Nine, *see Neder*, 527 U.S. at 20–25; *Rybicki*, 354 F.3d at 145–47, the failure to allege it "explicitly" means that "the indictment fails to allege an offense" as to those counts.  *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488).

Notably, the government *did* allege materiality in connection with other offenses in this same charging instrument. (*See* S-2 ¶¶ 137 (alleging "one or more false statements with respect to one or more material facts"), 150 (alleging "one or more materially false and fraudulent pretenses, representations and promises").) In fact, Count Twelve—which, like Count Eight, also charges a violation of § 1349—made sure to allege that the charged conspiracy "to execute a scheme and artifice to defraud" proceeded "by means of one or more *materially* false and fraudulent pretenses, representations and promises . . . ." (*Id.* ¶ 150 (emphasis added).) The conspicuous lack of any similar allegations in Counts Eight and Nine is telling—and dispositive. On their face, the counts "fail[] to allege an offense," *Pirro*, 212 F.3d at 93, and dismissal is required, especially since at this stage Ms. Sun "is entitled to a more exacting review of the indictment" to ensure that it "explicitly" alleges all essential elements. *Id.* at 92–93.

### ii.   Materiality cannot be assumed based on other allegations

But wait, the government will insist, Counts Eight and Nine "reallege[] and incorporate[]" the prior "allegations contained in paragraphs one through 130 . . . as if fully set forth" in those counts. (S-2 ¶¶ 140, 142.) True enough, but that cannot salvage them. The factual allegations relevant to Counts Eight and Nine appear under a single heading in the S-2.[17] (*See id.* ¶¶ 118–130.) And nothing there mentions materiality. (*See id.*) At most, the S-2 alleges that while Ms. Sun was "working with the team of NYS government employees responsible for obtaining PPE" during the COVID-19 pandemic, she "referred two vendors" that "had ties to [her]" without "disclos[ing] to the NYS government" those "relationships" or that she and her husband "received a portion of the profits" from contracts with those companies, and "claim[ed] falsely" in an email

---

[17]    There is also a short summary of those allegations early on in the S-2, but nothing in that high-level synopsis mentions or alleges materiality either. (*See* S-2 ¶ 20.)

the PRC had recommended the companies. (*Id.* ¶¶ 118–19.) Nothing explicitly alleges that any purported misstatements or omissions were material.

Nor can materiality be inferred. For one thing, inferring the existence of an essential element that was not alleged goes well beyond reading an indictment "to include facts which are *necessarily* implied by the specific allegations made." *Stavroulakis*, 952 F.2d at 693 (quoting *Silverman*, 430 F.2d at 111) (emphasis added). In *United States v. Berlin,* for example, the defendant was charged with aiding and abetting an applicant in making a false statement to obtain mortgage insurance. 472 F.2d at 1005. An essential element of that offense was knowledge of the statement's falsity, but the indictment did not explicitly allege that the defendant knew the submitted statements or documents were false. *See id.* at 1006. The government argued that other allegations "implie[d] knowledge of the falsity of the statements," but the Second Circuit disagreed because "knowledge of the falsity at the time [the defendant] caused the statements to be made [wa]s not *necessarily* implied from the allegation that he 'counseled and caused' the statements to be made." *Id.* at 1007–08 (emphasis added). There, as here, the appropriate remedy was dismissal of the relevant counts. *See id.*

Filling the S-2's gaps also would require the Court to make crucial factual assumptions, which is particularly improper when assessing materiality. As noted, "materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Kousisis*, 145 S. Ct. at 1396 (quoting *Universal Health Servs., Inc.*, 579 U.S. at 193). Allegations about the materiality of particular misrepresentations or omissions—especially in the context of such fact-dependent matters as behavior, motives, or expectations—must come from the government after presentation to a grand jury, not the Court. *See, e.g.*, *Gonzalez*, 686 F.3d at 128 (quoting *Thomas*, 274 F.3d at 670) ("[I]t would be inappropriate for a court to speculate as to whether a grand jury

29

*might* have returned an indictment in conformity with the available evidence, because such an exercise would work the harm the Grand Jury Clause is intended to prevent . . . ." (emphasis in original)).  And the circumstances here aptly demonstrate why.

Consider the S-2's allegations that "the contracts between the NYS government and the Cousin Company contained language prohibiting self-dealing involving NYS government employees . . . ."  (S-2 ¶ 123.)  That language, which the government purports to excerpt in the S-2, supposedly confirmed that "[n]one of the Seller's principals, owners, officers, directors, employees, or agents (including, to the Seller's knowledge based upon due inquiry, any Manufacturer or subcontractor) is a government official or an instrumentality of a government, except as previously disclosed to and approved by the Buyer."  (*Id.*)  The S-2 never alleges that this provision was material, and the balance of the provision actually suggests otherwise.  (*See id.* (providing that "[i]f, at any time during the term of this Contract," a covered individual "becomes a government official or instrumentality of the government," then "the Buyer *may*, and hereby reserves the right to, take whatever precautions and actions may be appropriate to assure compliance with Anti-Corruption Laws" (emphasis added)).)  In fact, the S-2 never even alleges that the defendants or the companies actually violated this provision.[18]  (*See* S-2 ¶ 123.)

Courts do not assume that contract terms are material.  *See Kousisis*, 145 S. Ct. at 1400–01 (Thomas, J., concurring) (quoting *Universal Health Servs., Inc.*, 579 U.S. at 194 n.5) (stating that "regulatory requirements in a contract are not automatically material" and "for a contract term to

---

[18]    An actual violation of this particular provision is impossible to infer.  The S-2 does not allege, for instance, that Ms. Sun (as opposed to her husband) had any role with respect to the Associate Company or the Cousin Company, nor does it allege that any principal, owner, officer, director, employee, or agent of either company was a government official or instrumentality.  At most, the S-2 alleges that Ms. Sun had "ties" or "relationships" with the Associate Company and the Cousin Company, which falls far short of alleging the formal roles specified in the provision. (S-2 ¶¶ 118–19.)

be material, it must go to 'the very essence of the bargain'").  "Materiality, in addition, cannot be found where noncompliance is minor or insubstantial." *Universal Health Servs., Inc.*, 579 U.S. at 194.  Even then, "[a] party's actions may reveal that a contract term is not material even if the contract's language would suggest otherwise." *Kousisis*, 145 S. Ct. at 1401 (Thomas, J., concurring).  During the period relevant here, New York had, among other things, suspended various disclosure and procurement laws and rules in light of the COVID-19 pandemic. *See, e.g.*, *Declaring a Disaster Emergency in the State of New York*, N.Y.S. Exec. Order 202 ("EO 202"), *available at* https://www.governor.ny.gov/sites/default/files/atoms/files/EO_202.pdf (last accessed July 28, 2025).[19]  As of March 7, 2020, for example, section 163 of the New York State Finance Law, which otherwise instructs that "[t]he state's procurement process shall be guided by the . . . principle[] . . . . [t]o ensure that officers and employees of state entities do not benefit financially or otherwise from the award of state contracts," N.Y. State Fin. Law § 163(2)(e), was "suspend[ed] or modif[ied]" so as "to allow the purchase of necessary commodities, services, technology, and materials without following the standard notice and procurement processes."  EO 202.  At a minimum, that precludes making assumptions about the materiality of these particular contract terms.  *See also Universal Health Servs., Inc.*, 579 U.S. at 194 (noting that "[a] misrepresentation cannot be deemed material merely because the [g]overnment designates compliance with a particular . . . contractual requirement as a condition of payment" or "the [g]overnment would have the option to decline to pay if it knew of . . . noncompliance").

Or consider the S-2's allegation that Ms. Sun sent an email misrepresenting who had recommended the Cousin Company.  (*See* S-2 ¶¶ 118, 124–25.)  Again, there is no allegation that

---

[19]     Again, the Court may take judicial notice of publicly issued state government orders.  *See Marsalis*, 314 F. Supp. 3d at 464 n.2; *see also* Fed. R. Evid. 201.

the misrepresentation—if it was one, since the S-2 never actually alleges that the Cousin Company was not recommended at some other point—was material to any decision awarding a PPE contract. And presuming materiality in connection with that allegation would be particularly perverse. The crux of the alleged misrepresentation is that the Cousin Company was not, in fact, promoted to Ms. Sun by an organ of the PRC. (*See* S-2 ¶¶ 118, 124–25, 129.) But since the bulk of the S-2 alleges that Ms. Sun was acting under the influence of the PRC—and charges her with violating other laws on that basis—it would be farcical to infer that her alleged misstatement was material based on an assumption that New York would contract *only* with companies specifically sponsored by the PRC.[20] At a minimum, that is too far a leap given the S-2's failure to explicitly allege materiality.

Lastly, there is the S-2's allegation that Ms. Sun failed to disclose her purported relationships with the Cousin Company and the Associate Company. (*See* S-2 ¶¶ 118–19.) Intuitively, failing to disclose a personal financial interest feels like it could be material. But a possibility of potential materiality is insufficient, *see Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488) (requiring an indictment "to allege [an] implicit element explicitly"), especially when the governing standard "is demanding," *Universal Health Servs., Inc.*, 579 U.S. at 194. Here, the S-2 never even alleges that Ms. Sun was required to disclose her purported financial interests at the time of the alleged schemes, which purportedly took place while PPE sources were in high demand and other disclosure and procurement protocols were suspended. To the contrary, the only obligatory disclosure the S-2 identifies is Ms. Sun's "annual financial disclosure to the NYS

---

[20]    The underlying assumption that Ms. Sun felt compelled to misrepresent the PRC's endorsement in referring the Associate Company is also somewhat farfetched since the S-2 simultaneously alleges both that the PRC actually "recommended many of the PPE vendors that [she] referred to the NYS government for procurement contracts" and that Ms. Sun had a "position of influence with the PRC government" at the time. (S-2 ¶ 118.)

government," which allegedly was submitted "[o]n or about May 13, 2021"—almost a year after all of the alleged schemes had ended. (S-2 ¶ 122; *compare id.* ¶¶ 141, 143, 145, 147 (alleging schemes that ended no later than "August 2020").)

An undisclosed financial interest is not automatically material. *See, e.g.*, *Rybicki*, 354 F.3d at 145–46; *Mittelstaedt*, 31 F.3d at 1217. As already discussed, New York had singular priorities during the pandemic flowing from extraordinary circumstances; so even if Ms. Sun's alleged financial interest might have been material under *some* conditions, it may not have been material under *those* conditions. And the S-2 does not allege other facts that might reasonably support an inference of materiality, such as claiming that the Cousin Company or the Associate Company got preferential treatment or better deals than other companies, that New York lost out on another vendor because it contracted with the Cousin Company or the Associate Company, that the Cousin Company or the Associate Company charged unfair or above-market prices, or that any PPE contract prices were inflated to account for bribe or kickback amounts. *Cf. Mittelstaedt*, 31 F.3d at 1217 ("To convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the [government] of a pecuniary nature or that the [government] could have negotiated a better deal for itself if it had not been deceived." (emphasis omitted)). In fact, the S-2 never alleges that the terms of the PPE contracts with the Cousin Company and the Associate Company were different in *any* respect from contracts with other companies.

Under these circumstances, the Court simply cannot assume or infer materiality that is never explicitly alleged. Because of that failure, the S-2 never asserts that "but-for" Ms. Sun's alleged omissions the PPE contracts would not have been awarded. *Kousisis*, 145 S. Ct. at 1396. That missing link goes to the very core of the charged offense, and its absence is all the more revealing when a mountain of publicly available information—including numerous

contemporaneous statements by state officials—reflect an unprecedented emergency that created a desperate demand for any PPE, which even the S-2 concedes these companies delivered at agreed prices. Omitting allegations regarding materiality was not merely a technical error; it is a dispositive exclusion.

### C. The S-2 Fails to Sufficiently Allege Fraudulent Intent

Second Circuit precedent has long required that in order to establish the fraudulent intent essential to any scheme to defraud—including honest services fraud—the government must allege some "contemplated harm to the victim," *Jabar*, 19 F.4th at 76 (quoting *Starr*, 816 F.2d at 98), that "affected the victim's economic calculus or . . . pertained to the quality of services bargained for," *Binday*, 804 F.3d at 570–71, and that any misrepresentation or omission was material to the claimed § 1346 violation, *Rybicki*, 354 F.3d at 145. Because those requirements continue to define essential elements of honest services wire fraud in the Second Circuit, the S-2 was required to allege them. *See Pirro*, 212 F.3d at 93. It does not.

#### i. *District Courts remain bound by the Second Circuit's fraudulent intent precedents*

The Second Circuit's fraudulent intent precedents continue to determine the contours of honest services fraud offenses in this Circuit. Those decisions have not been abrogated by either the Supreme Court or the Second Circuit; as such, they continue to bind lower courts and define necessary elements that the government must allege and prove. *See United States v. Jorquera*, No. 19-CR-479 (AMD), 2021 WL 5232587, at *6 (E.D.N.Y. Nov. 10, 2021) (quoting *Cartica Mgmt., LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477, 486 (S.D.N.Y. 2014)) ("District courts . . . are bound by decisions of the Court of Appeals in the appropriate circuit unless overruled by an intervening Supreme Court decision or other change in law."). Because the S-2 does not sufficiently allege

required elements of fraudulent intent in connection with Counts Eight and Nine, it fails to allege those offenses.

It is true, of course, that a different analysis now prevails in traditional mail and wire fraud cases that do not allege a deprivation of the intangible right to honest services. A few months ago, the Supreme Court held in *Kousisis v. United States* that "a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off." *Kousisis*, 145 S. Ct. at 1392. In doing so, it rejected the Second Circuit's requirement that a defendant "seek to cause the victim net pecuniary loss" in order to state an offense under the mail and wire fraud statutes. *Id.* at 1390 (referencing, *inter alia*, *Shellef*, 507 F.3d at 108–09). Thus, "the Supreme Court erased the 'fine line' that [the Second Circuit] had drawn in excluding certain inducement schemes from the mail and wire fraud statutes," *Runner*, 143 F.4th 146 at 155 (quoting *Shellef*, 507 F.3d at 108), and "schemes that 'do no more than cause their victims to enter into transactions they would otherwise avoid'" may now be "criminal under the mail and wire fraud statutes" if a defendant "intentionally lies to induce a victim into a transaction that will cost her money or property." *Id.* (citations omitted). *Kousisis*, however, did not alter the Second Circuit's requirements for fraudulent intent as they apply to offenses involving the more amorphous right to honest services.

First, *Kousisis* did not abrogate the Second Circuit's precedents defining the fraudulent intent required under § 1346 because it did not address that issue. *See United States v. Chastain*, No. 23-7038, 2025 WL 2165839, at *8 (2d Cir. July 31, 2025) ("In *Kousisis* . . . the Supreme Court held only that *actual economic loss* is not an element of a wire fraud offense." (emphasis in original)). Moreover, *Kousisis* expressly concerned only mail and wire fraud convictions related to tangible property, and not any offense involving "a scheme or artifice to deprive another of the

35

intangible right of honest services."  18 U.S.C. § 1346; *cf. Lopez*, 143 F.4th at 110 (distinguishing the decision in *Ciminelli* as "even further afield" because "it addressed the scope of § 1343, not § 1346").  Indeed, the sole mention of § 1346 in *Kousisis* was to note that the statute was not implicated.  *See id.* at 1391 n.3.  The Supreme Court thus had no occasion to—and did not—consider whether proving honest services fraud may require something more than just fraudulent inducement.  "[I]n adjudicating the case before [it]," this Court "must focus on the concrete holdings of the cases that currently bind [it] rather than on signals that may forecast future decisions."  *Lopez*, 143 F.4th at 110; *cf. Escalera v. Coombe*, 852 F.2d 45, 47 (2d Cir. 1988) (declining on remand to "reconsider issues that [we]re not directly implicated by the Supreme Court's decision").  "This is true even if [a] lower court thinks [a] precedent is in tension with 'some other line of decisions.'"  *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989)).

Second, there are compelling reasons why the reasoning in *Kousisis* would not apply to § 1346.  "Start with the statute."  *Kousisis*, 145 S. Ct. at 1391.  The Supreme Court's analysis turned expressly on the particular text of § 1343.  *See id.* at 1391–92.  Specifically, it focused on the fact that "a defendant violates § 1343 by scheming to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim economically worse off."  *Id.* at 1392.  Reasoning that "[t]o 'obtain' something means 'to gain or attain possession' of it, usually 'by some planned action or method,'" *id.* at 1391 (citation omitted), the Court concluded that "[a] thing is no less 'obtained' simply because something *else* is simultaneously given in return."  *Id.* at 1392 (emphasis in original).  Thus, "the broad, generic language of § 1343" left the Court "struggling to see any basis for excluding a fraudulent-inducement scheme."  *Id.* at 1391.

36

The statue defining honest services fraud is different.  In contrast to § 1343, the text of § 1346 defines a narrow "exception" to the rule that the federal fraud statutes reach only tangible property interests.  *Kousisis*, 145 S. Ct. at 1390–91 & n.3.  And unlike § 1343, which contemplates "any scheme or artifice to defraud . . . for *obtaining* money or property," 18 U.S.C. § 1343 (emphasis added), the language of § 1346 concerns "a scheme or artifice to *deprive another* of the intangible right of honest services," 18 U.S.C. § 1346 (emphasis added).  Generally, to "deprive" another of means "[a]n act of taking away" or "withholding" something from them.  "Deprivation."  BLACK'S LAW DICTIONARY (12th ed., 2024).  So while § 1343 concerns what the perpetrator of a scheme obtains, § 1346 focuses on what is taken from a victim.  Because the text of § 1346 differs materially from that analyzed in *Kousisis*, the Court's conclusion that "the broad, generic language of § 1343" encompasses fraudulent inducement does not say the same about § 1346.  145 S. Ct. at 1391.  Moreover, while a theory that "criminalizes . . . intentionally lying to induce a victim into a transaction that will cost her money or property" may make sense with respect to *tangible* interests, *id.* at 1398, different questions arise with § 1346 because, among other reasons, a "betrayed party" may "suffer[] no deprivation of money or property" and any "enrichment" may come from another that "had not been deceived" in any way.  *Skilling*, 561 U.S. at 400 (contrasting traditional fraud, "in which the victim's loss of money or property supplied the defendant's gain, with one the mirror image of the other," with honest services fraud, which "lack[s] similar symmetry").

Third, the Second Circuit has not abrogated its prior precedents as applied to honest services fraud offenses or applied *Kousisis* to cases involving § 1346.  Though it recognized recently in *United States v. Runner* that "[b]y embracing the fraudulent-inducement theory, the Supreme Court erased the 'fine line' that our court had drawn in excluding certain inducement

schemes from the mail and wire fraud statutes," 143 F.4th 146 at 155 (quoting *Shellef*, 507 F.3d at 108), *Runner* did not involve honest services fraud. *See id.* No decision of the Second Circuit has revisited the requirements for fraudulent intent in honest services fraud cases in light of *Kousisis*, and there are good reasons why it would not alter them if it did: attempting to stretch *Kousisis* to cover § 1346 offenses quickly runs afoul of other Supreme Court pronouncements. In *Skilling*, for example, the Court "specifically rejected a proposal to construe the [honest services] statute as encompassing 'undisclosed self-dealing by a public official,' even when he hid financial interests." *Kelly v. United States*, 590 U.S. 391, 399 (2020) (quoting *Skilling*, 561 U.S. at 409). The Court also has made clear that "[s]chemes that target the exercise of the [g]overnment's regulatory power . . . do not count" for purposes of federal fraud. *Kousisis*, 145 S. Ct. at 1390 (citing *Kelly*, 590 U.S. at 400). And in *Ciminelli*, the Court held that "[t]he right to valuable economic information needed to make discretionary economic decisions is not a traditional property interest" and "cannot form the basis for a conviction under the federal fraud statutes." 598 U.S. at 316. Across those cases, the Court has emphasized that without some "clear statement by Congress," courts should "not read the [] fraud statute[s] to place under federal superintendence a vast array of conduct traditionally policed by the States," *Cleveland*, 531 U.S. at 27, or "make[] a federal crime . . . of deceptive actions traditionally left to state contract and tort law." *Ciminelli*, 598 U.S. at 315.

Fourth, to the extent there remains any doubt about the continuing vitality of the Second Circuit's fraudulent intent precedents, because that authority narrows the scope of § 1346, the rule of lenity demands that those precedents control here by "requir[ing] ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *Santos*, 553 U.S. at 514; *accord Rewis*, 401 U.S. at 812.

38

In sum, the Second Circuit's precedents requiring the government to allege and prove some contemplated harm affecting the nature of the relevant services are a necessary bulwark against "criminaliz[ing] traditionally civil matters and federaliz[ing] traditionally state matters." *Ciminelli*, 598 U.S. at 316. Ignoring those precedents directly embroils "the Federal Government in setting standards of disclosure and good government for local and state officials," *Skilling*, 561 U.S. at 402 (quoting *McNally*, 483 U.S. at 360), because eliminating the fraudulent intent requirements is a blank check to indict those officials for federal fraud even when they never "contemplated actual harm . . . would befall" anyone, *Shellef*, 507 F.3d at 107, did not compromise the "nature or quality of the services" provided, *Novak*, 443 F.3d at 157 (quoting *Starr*, 816 F.2d at 99–100), and did nothing to deprive an erstwhile victim of the "full economic benefit of its bargain," *Binday*, 804 F.3d at 570. Such an unbounded view of "honest services" improperly transforms § 1346 into a strict liability statute for any breach of a fiduciary duty where money changes hands. *Contra Percoco v. United States*, 598 U.S. 319, 328–29 (2023) ("The intangible right of honest services must be defined with the clarity typical of criminal statutes . . . ."); *Kelly*, 590 U.S. at 404 (rejecting notion that the federal government can "use the criminal law to enforce (its view of) integrity in broad swaths of state and local policymaking"); *Chastain*, 2025 WL 2165839 at *8 (quoting *Ciminelli*, 598 U.S. at 315) ("If the wire fraud statute criminalized conduct that merely departed from traditional notions of fundamental honesty and fair play, 'almost any deceptive act could be criminal.'"); *Mittelstaedt*, 31 F.3d at 1217 ("The mail fraud statute, however, does not enforce ethics in government in the way that the securities laws enforce ethics in business . . . ."). The Supreme Court has consistently rebuffed comparable efforts to broaden the government's authority over state and local officials. *See, e.g.*, *Snyder v. United States*, 603 U.S. 1, 19 (2024); *Ciminelli*, 598 U.S. at 315; *Cleveland*, 531 U.S. at 27; *see also Jones v. United States*,

529 U.S. 848, 858 (2000) ("Unless Congress conveys its purpose clearly, it will not be deemed to have significantly changed the federal-state balance in the prosecution of crimes."). In this Circuit, the fraudulent intent requirements continue to forestall such overreach in honest services fraud cases. *See, e.g.*, *Mazer*, 631 F. App'x at 59–61; *Novak*, 443 F.3d at 159.

### ii. *The S-2 fails to allege fraudulent intent as required in this Circuit*

Although it concerns an "intangible" interest, 18 U.S.C. § 1346, honest services wire fraud is merely "a type of wire fraud prohibited under § 1343." *Napout*, 963 F.3d at 180. And whether the underlying interest is "tangible" or "intangible," *Chastain*, 2025 WL 2165839 at *6 (quoting *Carpenter*, 484 U.S. at 25), "[i]n either form . . . 'the wire fraud statute reaches only traditional property interests,'" *id.* (quoting *Ciminelli*, 598 U.S. at 316). The fraudulent intent requirements specified by the Second Circuit are essential to holding that line for honest services fraud. At no point, however, does the S-2 allege that Ms. Sun ever "contemplated harm" to New York, *Jabar*, 19 F.4th at 76 (quoting *Starr*, 816 F.2d at 98), let alone some harm that "affected the [state]'s economic calculus or . . . pertained to the quality of services [it] bargained for," *Binday*, 804 F.3d at 570–71. Nor can those elements be inferred, since the S-2 never claims that the Cousin Company or the Associate Company received overly favorable deals, that New York did not get what it bargained for in the PPE contracts, or that any contract prices were inflated to fund bribes or kickbacks. And as already discussed at length above, nothing in the S-2 sufficiently alleges that any misrepresentation or omission was material. *See Rybicki*, 354 F.3d at 145. So while the statutory allegations applicable to Counts Eight and Nine may parrot language from the relevant statutes (*see* S-2 ¶¶ 140–43), "track[ing] the language of the statute" is insufficient because the S-2 "fails to allege [an] implicit element explicitly," and omitting those elements "fails to allege an offense." *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488); *see also United States v. Thompson*, 141 F. Supp. 3d 188, 194 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) (quoting *United*

*States v. Stringer*, 730 F.3d 120, 126 (2d Cir. 2013)) (observing that "in 'certain statutes specification of how a particular element will be met (as opposed to categorical recitation of the element) is of such importance to the fairness of the proceeding that it must be spelled out in the indictment'").

### D.  Counts Eight and Nine Are Barred By the Statute of Limitations

Even if Counts Eight and Nine sufficiently alleged offenses, their prosecution also is barred by the statute of limitations.  The offenses charged in both counts must be brought "within five years next after such offense shall have been committed."  18 U.S.C. § 3282.  For purposes of the statute of limitations, "[a] crime is complete as soon as every element in the crime occurs." *Sampson*, at 277.  Here, the allegations in the S-2 establish that the charged offenses would have been complete no later than June 18, 2020—when the property at issue was allegedly obtained from New York—and nothing relevant to Counts Eight and Nine alleges later conduct that would toll the statute of limitations.[21]  (*See* S-2 ¶ 120.)  While the statutory allegations in Counts Eight and Nine allege that the schemes occurred "[in] or about and between March 2020 and August 2020," they specifically note that "both dates" are merely "approximate."  (*Id.* ¶¶ 141, 143.)  In the face of detailed allegations demonstrating that the charged offenses would have been legally complete by June 18, 2020 (*see id.* ¶¶ 120), equivocal boilerplate positing that the scheme maybe continued to approximately August 2020 is not enough to allege an offense before the expiration

---

[21]     In connection with Count Eleven, the S-2 seems to suggest some later developments— namely, three wires supposedly from "a bank account associated with the Cousin Entity" in July and early August 2020.  (S-2 ¶¶ 148(s)–(u).)  But those allegations are not relevant to Counts Eight and Nine, which only reallege and incorporate "paragraphs one through 130" (*id.* ¶¶ 140, 142), as "the validity of a count cannot depend upon the allegations contained in any other count not expressly incorporated."  *Hernandez*, 980 F.2d at 871.  In any event, later payments would not extend the statute of limitations if they were not "made 'in furtherance of' an ongoing scheme, [but] merely as 'the *result* of a completed' one."  *United States v. Silver*, 948 F.3d 538, 573 (2d Cir. 2020) (quoting *United States v. Grimm*, 738 F.3d 498, 503 (2d Cir. 2013)) (emphasis in original).

of the statute of limitations.  *See, e.g.*, *United States v. Gabriel*, 920 F. Supp. 498, 506 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) ("It is one thing to accept a facially sufficient indictment at face value; but it would be quite another to allow broad conclusory allegations to override more particularized allegations of the same pleading . . . .")

## IV.    COUNTS TEN AND ELEVEN MUST BE DISMISSED

Counts Ten and Eleven charge the defendants with federal program bribery and conspiring to commit similar offenses against the United States, respectively.  (*See* S-2 ¶¶ 144–48.)  Both counts suffer from numerous legal deficiencies and fail to provide "sufficient factual particularity such that the defendant is able to prepare to meet the government's charges, and . . . all concerned parties, including the [C]ourt, can be confident that the government's case at trial will reflect the evidence presented to the grand jury."  *Urso*, 369 F. Supp. 2d at 267.  Most significantly, they fail to allege the explicit quid pro quo that is central to any bribery charge.

### A.  Elements of Federal Program Bribery

As relevant here, the essential elements of federal program bribery are that (*i*) a defendant was an agent of state government or a state governmental agency; (*ii*) the defendant corruptly solicited or agreed to accept something of value with the intent to be influenced or rewarded in connection with the business of the state; (*iii*) the defendant agreed to do so in connection with business or transactions involving anything of value of $5,000 or more; (*iv*) the state received in excess of $10,000 in federal funds in any single year; and (*v*) the defendant acted willfully and knowingly.  18 U.S.C. § 666(a)(1)(B).  "While § 666 does not on its face contain a requirement to show a quid pro quo agreement, the Supreme Court has explained that it requires one."  *United States v. Adams*, 760 F. Supp. 3d 6, 15 (S.D.N.Y. 2024) (citing *Snyder*, 603 U.S. 1).  Thus, "[t]he 'corrupt' intent necessary to a bribery conviction is in the nature of a quid pro quo requirement; that is, there must be 'a specific intent to give something of value *in exchange* for an official act.'"

*United States v. Alfisi*, 308 F.3d 144, 149 (2d Cir. 2002) (quoting *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999) (emphasis in original)).

In *McCormick v. United States*, 500 U.S. 257 (1991), the Supreme Court clarified that in cases involving public officials and campaign contributions, a quid pro quo requires that a contribution be exchanged "in return for an explicit promise or undertaking by the official to perform or not to perform an official act." *Id.* at 273. The following year, in *Evans v. United States*, 504 U.S. 255 (1992), the Court "clarified that *McCormick*'s explicit quid pro quo requirement applies to non-campaign-contribution payments" as well, and that "the agreement constituting the quid pro quo must be 'explicit' in the sense that it must be clear that the official 'obtained a payment knowing that the payment was made in return for official acts.'" *Benjamin*, 95 F.4th at 71 (quoting *Evans*, 504 U.S. at 286). Applying those principles, the Second Circuit has made clear that although a quid pro quo need not be "stated expressly" between the parties, *id.* at 74, an indictment still must allege the existence of an "explicit" agreement, *McCormick*, 500 U.S. at 273, even if the government intends at trial to prove that agreement through circumstantial evidence. *See Benjamin*, 95 F.4th at 74 (assessing whether the indictment "sufficiently alleged an explicit quid pro quo").

### B. Count Ten Fails to Allege an Explicit Quid Pro Quo

Count Ten fails to allege an explicit quid pro quo. As a result, it both fails to allege an essential element necessary for the offense and purports to charge an offense beyond the scope of the statute. *See Gonzalez*, 686 F.3d at 127 ("An indictment that does not set out all of the essential elements of the offense charged is defective."); *Heicklen*, 858 F. Supp. 2d at 275–76 (dismissing indictment where facts alleged did not constitute the crime charged). As the Second Circuit recognized in *Benjamin*, the government typically alleges an explicit agreement that satisfies *McCormick* and *Evans* by alleging that a particular benefit was provided "in exchange for" a

43

particular official act. 95 F.4th at 74. The S-2 does not. With respect to Count Ten, it alleges instead that:

> In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant LINDA SUN, . . . and CHRIS HU, with SUN being an agent of the NYS government, together with others, did knowingly, intentionally, and corruptly solicit and demand for the benefit of SUN and HU, and accept and agree to accept, one or more things of value, to wit: United States currency, from one or more persons, to wit: the Cousin, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the DOH involving things of value of $5,000 or more, while the DOH was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs . . . .

(S-2 ¶ 145.) That is not sufficient to allege an explicit quid pro quo. Read charitably, it could be viewed as generally identifying a quid ("United States currency" from "the Cousin"), but it does not sufficiently allege the remainder—the pro and the quo—necessary to any explicit agreement.[22]

(*Id.*) Nor does the S-2 ever allege that a benefit was provided "in exchange for" or "in return for" any particular "official acts" relevant to Count Ten.[23]  *Benjamin*, 95 F.4th at 71, 74. And that is particularly problematic here, because the S-2 elsewhere alleges that payments from the Cousin were "kickbacks" provided months after any supposed corrupt agreement. (S-2 ¶¶ 143; *see also id.* ¶¶ 148(s)–(u).) That suggests the payments charged in Count Ten are not bribes at all.

---

[22]    While § 666 does not use the term "official act," the Supreme Court has indicated that *some* official exercise of authority is required, *see Snyder*, 603 U.S. at 12 ("Section 666 shares the defining characteristics of § 201(b)'s bribery provision: the corrupt state of mind and the intent to be influenced *in the official act*." (emphasis added)); *Benjamin*, 95 F.4th at 74 (quoting *Evans*, 504 U.S. at 268) (stating that a corrupt payment must have been "made in return *for official acts*" (emphasis added)), even if that exercise does not mirror the special definition of "official act" applicable to the federal bribery statute. *See McDonnell v. United States*, 579 U.S. 550, 574 (2016). So in addition to not alleging an explicit quid pro quo, the S-2 also fails to allege an essential aspect of any erstwhile quo.

[23]    Under different circumstances, the Second Circuit has recognized "that the requisite quid pro quo . . . may be satisfied upon a showing that a government official received a benefit in exchange for his promise to perform official acts or to perform such acts as the opportunities arise." *United States v. Ganim*, 510 F.3d 134, 142 (2d Cir. 2007). That is not alleged in the S-2.

Courts differentiate between bribes and kickbacks.  *See, e.g.*, *Kelly*, 590 U.S. at 399 ("Save for bribes *or* kickbacks . . . , a state or local official's fraudulent schemes violate that law only when, again, they are 'for obtaining money or property.'" (emphasis added)); *Skilling*, 561 U.S. at 407 (distinguishing between "bribery *or* kickback schemes" (emphasis added)); *United States v. Bruno*, 661 F.3d 733, 740 (2d Cir. 2011) (vacating conviction because "the district court did not require the jury to find that [the defendant] accepted bribes *or* kickbacks to be convicted of honest services fraud" (emphasis added)).  The difference is not semantics.  A bribe is a benefit given as part of "a quid pro quo—a specific intent to give or receive something of value in exchange for an official act." *Sun-Diamond Growers of California*, 526 U.S. at 404–05 (emphasis omitted).  But "[a] kickback can take many forms," including "*any* . . . gratuity" or "compensation *of any kind* that is provided . . . to improperly obtain or reward favorable treatment." *United States v. DeMizio*, No. 08 Cr. 336 (JG), 2012 WL 1020045, at *7 (E.D.N.Y. Mar. 26, 2012), *aff'd*, 741 F.3d 373 (2d Cir. 2014) (quoting 41 U.S.C. § 8701(2) (emphasis in original)); *accord Skilling*, 561 U.S. at 412–13 (same); *cf. United States v. Dass*, 7 F. App'x 76, 78 (2d Cir. 2001) (stating in connection with 18 U.S.C. § 1954 that "the kickback statute . . . punishes a person who pays illegal gratuities as well as bribes"); *United States v. Yaron*, No. S2 10 Cr. 363 (GBD), 2011 WL 3279054, at *4 (S.D.N.Y. July 28, 2011) (observing that "gratuities" are "well within the definition of kickback as cited by the U.S. Supreme Court and the Second Circuit").  And the Supreme Court has held that § 666 does not "make[] it a federal crime for state and local officials to accept gratuities for their past official acts." *Snyder*, 603 U.S. at 10.  Alleging a kickback is therefore insufficient to state a federal bribery offense, because a kickback can be "a reward for some future act that the public official will take (and may already have determined to take), or for a past act . . . already taken,"

45

*Sun-Diamond Growers*, 526 U.S. at 405, which does not violate § 666.  Yet that is all Count Ten does.

The facts in *Snyder* provide a useful comparison.  In *Snyder*, the City of Portage, Indiana, "awarded two contracts to a local truck company" that were worth "about $1.1 million" in total. 603 U.S. at 9.  The following year, the truck company "cut a $13,000 check to James Snyder, who was the mayor of Portage (and had been at the time of the contracts)."  *Id.*  Evidence presented at Snyder's trial showed that his appointee "tailored bid specifications . . . to favor" the trucking company and "that during the bidding process, Snyder was in contact with the [owners of the company], but no other bidders."  *Id.* at 32–33 (Jackson, J., dissenting).  When the government investigated, Snyder said he moonlighted as a contractor for the company and described the payment as compensation for consulting services.  *Id.* at 9.  Nevertheless, the *Snyder* Court considered the payment a gratuity that was outside the bounds of § 666.  *Id.*

Without allegations setting out an explicit quid pro quo, the benefit alleged in Count Ten— money from the Cousin purportedly paid months after any official action—are more consistent with gratuities than bribes.  Indeed, the S-2 does not allege anything close to the facts in *Snyder* (where still the payment was a gratuity) and is bereft of facts justifying any inference that alleged payments from the Cousin were part of some preexisting corrupt agreement.  That is precisely why courts must assess whether an indictment "sufficiently alleged an explicit quid pro quo." *Benjamin*, 95 F.4th at 74.  Here, the S-2's failure to do so produces the very problems that requirement prevents:  a count that "fails to allege a crime within the terms of the applicable statute," *Aleynikov*, 676 F.3d at 75–76, and constitutionally insufficient notice and assurance "that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44).  The Court cannot fill those

holes for the government—certainly not when the S-2 itself describes the same payments not as bribes but as "kickbacks," which encompass gratuities not covered under the statute.

### C.  Count Eleven Likewise Fails to Allege an Explicit Quid Pro Quo

Count Eleven likewise fails to allege an explicit quid pro quo.  That count alleges, in relevant part, the following:

> In or about and between March 2020 and August 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendants LINDA SUN . . . and CHRIS HU, together with others, did knowingly and intentionally conspire . . . [while] SUN, [was] an agent of the NYS government, to corruptly solicit and demand for the benefit of SUN and HU, and accept and agree to accept, one or more things of value, to wit: United States currency, from one or more persons, to wit: the Cousin, intending to be influenced and rewarded in connection with business and one or more transactions and series of transactions of the DOH involving things of value of $5,000 or more, while the DOH was in receipt of, in any one-year period, benefits in excess of $10,000 under one or more Federal programs . . . .

(S-2 ¶ 147(b).)  As in Count Ten, that language is insufficient to allege an explicit quid pro quo. And again, it cannot be inferred from other allegations in the S-2 that payments from the Cousin were bribes within the meaning of § 666 in the absence of that essential element, including because the S-2 elsewhere describes the same payments as "kickbacks."  (*See* S-2 ¶¶ 143; *see also id.* ¶¶ 148(s)–(u).)  Thus, for the same reasons already discussed in connection with Count Ten, Count Eleven also fails to state an offense.

### D.  Count Eleven Fails to Allege an Offense as to the First Object of the Conspiracy

The first object of the conspiracy charged in Count Eleven claims that "[i]n or about and between March 2020 and August 2020," Ms. Sun and her husband conspired while she was "an agent of the NYS government, to embezzle, steal, obtain by fraud, misapply and otherwise without authority convert to the use of a person other than the rightful owner property of DOH," in violation of § 666(a)(1)(A).  (S-2 ¶ 147(a).)  While "an indictment charging conspiracy need only put the

defendants on notice that they are being charged with a conspiracy to commit the underlying offense, the facts alleged in an indictment need still constitute an offense as a matter of law." (Dkt. 100 at 14 (quoting *Heicklen*, 858 F. Supp. 2d at 262; *Urso*, 369 F. Supp. 2d at 268).) In this case, nothing in the S-2 sufficiently alleges conduct that constitutes embezzlement, theft, fraud, or conversion as a matter of law in connection with the alleged PPE contracts.

"Section 666 does not define 'embezzlement,'" so the Second Circuit has "interpret[ed] the word according to its traditional meaning." *Sampson*, 898 F.3d at 277. Historically, the term was defined as "the fraudulent appropriation of property by a person to whom such property has been intrusted, or into whose hands it has lawfully come." *Id.* (quoting *Moore v. United States*, 160 U.S. 268, 269 (1895)). Thus, "[a]n individual commits 'embezzlement' when he: (1) with intent to defraud; (2) converts to his own use; (3) property belonging to another; in a situation where (4) the property initially lawfully came within his possession or control." *Sampson*, 898 F.3d at 277 (citing *United States v. Clark*, 765 F.2d 297, 303–04 (2d Cir. 1985)). Even assuming the truth of the S-2's accusations, it does not allege conduct falling within that definition.

At the outset, as discussed in connection with Counts Eight and Nine, nothing in the S-2 sufficiently alleges an intent to defraud.[24] Moreover, the "property of DOH" allegedly obtained by Ms. Sun consisted of funds voluntarily paid by New York to the Associate Company pursuant to a contract for services and goods that were, in fact, performed and provided. (*See* S-2 ¶ 120.) The facts alleged are thus far afield from paradigmatic examples of embezzlement like an employee stealing cash from a till or illegally withdrawing funds from a business account; instead, without alleging fraudulent intent, the S-2 seeks to cast routine business transactions as

---

[24]     For the same reason, the S-2 fails to allege that "property of DOH" was obtained by "fraud." (S-2 ¶ 147(a).)

embezzlement.  And since the S-2 never claims that Ms. Sun obtained anything directly from New York, any money relevant to Count Eleven's first object would have been provided to her *by the Associate Company* after it was paid by New York for the goods and services it actually provided. At that point, any money Ms. Sun allegedly received was no longer the property of New York, but of the Associate Company.  Likewise, "[a] 'conversion' in this context consists of 'the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights,'" including a "'denial or violation of the owner's dominion, rights or possession' over his property."  *Sampson*, 898 F.3d at 277 n.5 (quoting *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403–04 (2d Cir. 2006)).  But by the S-2's own logic, New York had already parted with the property in question by making contract payments when the defendants supposedly exercised any right of ownership over those funds.  Count Eleven therefore does not allege facts sufficient to constitute any scheme to embezzle or convert property.

### E.  Count Eleven Further Alleges an Object Barred by the Statute of Limitations

Regardless, even if Count Eleven did sufficiently allege the first object of the charged conspiracy, that portion is barred by the statute of limitations.  As to charges of embezzlement, theft, fraud, or conversion under § 666, the government is required to bring such charges "within five years next after such offense shall have been committed."  18 U.S.C. § 3282.  Here, the facts alleged in the S-2 establish that any so-called embezzlement, fraud, or conversion was complete no later than June 18, 2020, because that was when the property at issue allegedly was obtained from New York.[25]  (*See* S-2 ¶ 120.)  With that object complete, the conspiracy to commit that

---

[25]    Unlike *Sampson*, the issue here is not "a statute-of-limitations defense that turns on the precise timing of a defendant's fraudulent conversion."  898 F.3d at 281.  The S-2 does not allege periods for retaining or remitting funds that would create factual disputes regarding the timing of

object ended.  *See United States v. Salmonese*, 352 F.3d 608, 615 (2d Cir. 2003) (quoting *United States v. Mennuti*, 679 F.2d 1032, 1035 (2d Cir. 1982)) ("[W]here a conspiracy's purpose is economic enrichment, the jointly undertaken scheme continues through the conspirators' receipt of 'their anticipated economic benefits.'"); *United States v. Rucker*, 586 F.2d 899, 906 (2d Cir. 1978) (stating that a conspiracy "continues until its aim has been achieved, it has been abandoned, or otherwise terminated").  And since the date that object was accomplished is more than five years from the date the S-2 was returned,[26] the statute of limitations bars its prosecution.

## V.    COUNT FOURTEEN MUST BE DISMISSED

Ms. Sun previously moved to dismiss the charge of money laundering conspiracy (then Count Ten) because it was devoid of any factual allegations connecting her to any supposed money laundering conspiracy.  As she argued, the complete lack of supporting allegations deprived her of sufficient notice regarding what that count charged, made it impossible to prepare a defense to the charge, and practically required the government to "fill in elements of its case with facts other than those considered by the grand jury."  *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44).  The S-2 does nothing to remedy those deficiencies.  In fact, it exacerbates them.

The Court previously rejected Ms. Sun's argument "that the superseding indictment does not link [an] alleged violation of FARA with any particular payments that could constitute proceeds under the money laundering statute."  (Dkt. 100 at 28.)  In doing so, it expressly grounded its

---

when any fraudulent intent—which is also not alleged—had formed.  Rather, it merely alleges that the defendants obtained the relevant funds and kept them.  (*See* S-2 ¶ 120.)

[26]    The S-2 does not allege any further acts relevant to this object.  Notably, although it does allege certain payments were made in July 2020 and August 2020, those payments allegedly relate to the Cousin Company and are irrelevant to the first object of Count Eleven, which concerns only payments related to the Associate Company.  (*See* S-2 ¶¶ 147(b), 148(s)–(u).)

decision in specific language that it viewed as alleging a contingent relationship between Ms. Sun's purported FARA violations and supposed economic benefits:

> However, the superseding indictment explicitly states that, *"[i]n return for"* Sun's actions that violated FARA, as summarized in paragraphs 9 and 10 of the superseding indictment, Sun "received substantial economic and other benefits from representatives of the PRC government and the CCP . . . ."

(Dkt. 100 at 28 (quoting S-1 ¶ 11) (emphasis added).)  The Court concluded that "[t]his clearly links the FARA violation with particular payments that could constitute proceeds under the money laundering statute."  (*Id.*)  As noted above, however, the S-2 has now removed the very language upon which the Court relied.  (*Compare, e.g.*, S-2 ¶ 16 *with* S-1 ¶ 11.)  Instead, the S-2 now alleges merely that Ms. Sun "received substantial economic and other benefits" from PRC representatives or the CCP "*[w]hile* taking these and other actions."  (S-2 ¶ 16 (emphasis added).)  That revision is consequential.

By intentionally removing prior language that implied an exchange and alleging instead mere concurrence, the government substituted watered-down phrasing that no longer alleges contingency or reciprocity—and it did so *after* the Court expressly cited the prior language as its basis for concluding that the S-1's allegations regarding the conspiracy were sufficient.[27]  The only reasonable inference from that revision at this stage is that the grand jury no longer believed evidence justified "link[ing] the FARA violation with particular payments" relevant to the alleged conspiracy.  (Dkt. 100 at 28.)  And to the extent other allegations plausibly concern the supposed

---

[27]    The S-2 does allege elsewhere that "[i]n return for these and other acts, the PRC Consulate provided SUN and her family with gifts, including tickets to shows, concerts, and events, as well as salted ducks prepared by PRC Official-1's personal chef."  (S-2 ¶ 29.)  But that does not help the government.  Unlike the now altered paragraph, that reference confines itself to concrete domestic items (*compare id.* ¶ 16 *with id.* ¶ 29), none of which could plausibly be concealed via an international wire transfer.  And Count Fourteen charges only a conspiracy to commit *international* concealment money laundering.  (*See id.* ¶ 154 (citing 18 U.S.C. § 1956(a)(2)(B)(i)).)

51

money laundering scheme, none come close to "fairly inform[ing]" Ms. Sun "of the charge against which [s]he must defend" or "enabl[ing] h[er] to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling*, 418 U.S. at 117. Because Count Fourteen fails to provide any factual particularity regarding Ms. Sun's supposed involvement in an international money laundering scheme—and indeed, intentionally removes allegations on which the Court previously relied to salvage the charge—it fails to sufficiently allege an offense against Ms. Sun.

## **CONCLUSION**

For the foregoing reasons, the S-2 fails in numerous ways to state offenses against Ms. Sun. Because those failures "offend[] both the Fifth and Sixth Amendments," *Pirro*, 212 F.3d at 92 (citing *Russell*, 369 U.S. at 760–61), they require dismissal of the counts charging those offenses.

Dated: August 5, 2025
New York, New York

Respectfully submitted,

ABELL ESKEW LANDAU LLP

/s/ *Jarrod L. Schaeffer*

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman

(646) 970-7341 / -7339 / -7338

kabell@aellaw.com
jschaeffer@aellaw.com
sglicksman@aellaw.com

*Counsel for Linda Sun*

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on August 5, 2025, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve notification of the filing to all registered parties of record.

/s/ *Jarrod L. Schaeffer*

Jarrod L. Schaeffer