UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>- v. -<br><br>LINDA SUN,<br>    a/k/a "Wen Sun," "Ling Da Sun," and<br>    "Linda Hu," and<br><br>CHRIS HU,<br><br>                  *Defendants*. | S3 24 Cr. 346 (BMC) (TAM)<br><br>***(Oral argument requested)*** |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF LINDA SUN'S
<u>MOTION TO DISMISS THE THIRD SUPERSEDING INDICTMENT</u>**

ABELL ESKEW LANDAU LLP

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman

256 Fifth Avenue, 5th Floor
New York, NY 10001

*Counsel for Linda Sun*

## Table of Contents

PRELIMINARY STATEMENT........................................................................................... 1

ARGUMENT .................................................................................................................... 1

I.     COUNT ONE REMAINS DEFECTIVE............................................................... 1

II.    THE GOVERNMENT'S ARGUMENTS UNDERSCORE CONSTITUTIONAL
       CONCERNS REQUIRING DISMISSAL OF THE FARA COUNTS .............................. 4

III.   COUNTS EIGHT AND NINE REMAIN DEFECTIVE .................................... 7

       A.     The S-3 fails to sufficiently allege fraudulent intent for purposes of honest
              services wire fraud. ......................................................................................... 8

       B.     The S-3 fails to sufficiently allege materiality. ...................................................... 15

       C.     The S-3 fails to allege an offense against Chris Hu in light of *Percoco v. United
              States*. ............................................................................................................ 21

IV.    COUNTS TEN AND ELEVEN REMAIN DEFECTIVE .................................... 22

       A.     The S-3 substantially amended the S-2 to supply a missing essential element. ... 22

       B.     Count Eleven fails to allege an offense as to the first object of its conspiracy. ..... 23

V.     COUNTS EIGHT THROUGH ELEVEN ARE BARRED BY THE STATUTE OF
       LIMITATIONS.................................................................................................... 24

       A.     Counts Eight through Eleven do not relate back to the prior indictment because
              they were substantially amended. ...................................................................... 26

       B.     Counts Eight through Eleven cannot relate back because their predecessors
              were not validly pending when the S-3 was filed. ................................................ 33

       C.     The substantially amended versions of Counts Eight, Nine, and the first object
              of Eleven remain barred regardless....................................................................... 35

VI.    COUNT FOURTEEN MUST BE DISMISSED................................................ 36

CONCLUSION................................................................................................................. 38

## Table of Authorities

**Cases**

*Cartica Mgmt., LLC v. Corpbanca, S.A.*,
  50 F. Supp. 3d 477 (S.D.N.Y. 2014) ................................................................. 12

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ......................................................................................... 14

*Connick v. Myers*,
  461 U.S. 138 (1983 ............................................................................................. 7

*Garrison v. State of Louisiana*,
  379 U.S. 64 (1964) ............................................................................................. 5

*Gebardi v. United States*,
  287 U.S. 112 (1932) ........................................................................................... 3

*Gregory v. United States*,
  253 F.2d 104 (5th Cir. 1958) ........................................................................... 10

*Hamling v. United States*,
  418 U.S. 87 (1974) ........................................................................................... 37

*Jones v. United States*,
  526 U.S. 227 (1999) ......................................................................................... 27

*Kousisis v. United States*,
  145 S. Ct. 1382 (2025) ..............................................................9, 10, 11, 20

*Miller v. New York*,
  No. 15 Civ. 2741 (ENV) (LB), 2019 WL 1232085 (E.D.N.Y. Mar. 15, 2019) ....................... 26

*N.A.A.C.P. v. Claiborne Hardware Co.*,
  458 U.S. 886 (1982) ........................................................................................... 7

*Namet v. United States*,
  373 U.S. 179 (1963) ......................................................................................... 16

*Ocasio v. United States*,
  578 U.S. 282 (2016) ......................................................................................... 38

*Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*,
  105 F.4th 46 (2d Cir.), *cert. denied sub nom. Raging Cap. Mgmt., LLC v. Packer*,
  145 S. Ct. 550 (2024) ....................................................................................... 13

*Percoco v. United States*,
  598 U.S. 319 (2023) .................................................................................i, 21, 22

*Reed v. Town of Gilbert, Arizona*,
   576 U.S. 155 (2015) ........................................................................................ 7

*Roman v. Napoli*,
   No. 08 Civ. 6561 (MAT), 2010 WL 4922627 (W.D.N.Y. Dec. 2, 2010) ................................ 26

*Russell v. United States*,
   369 U.S. 749 (1962) .............................................................................. 16, 18

*Salinas v. United States*,
   522 U.S. 52 (1997) ...................................................................................... 38

*Skilling v. United States*,
   561 U.S. 358 (2010) .................................................................................... 13

*Sorich v. United States*,
   555 U.S. 1204 (2009) .................................................................................. 15

*Toussie v. United States*,
   397 U.S. 112 (1970) ........................................................................ 25, 32, 33

*United States v. Ahmed*,
   94 F. Supp. 3d 394 (E.D.N.Y. 2015) ..................................................... 28, 34

*United States v. Aleynikov*,
   676 F.3d 71 (2d Cir. 2012) ............................................................................ 2

*United States v. Aracri*,
   968 F.2d 1512 (2d Cir. 1992) ....................................................................... 3

*United States v. Ben Zvi*,
   168 F.3d 49 (2d Cir. 1999) ........................................................ 25, 26, 27, 31

*United States v. Benjamin*,
   95 F.4th 60 (2d Cir.), *cert. denied*, 145 S. Ct. 982 (2024) ........................... 17, 26, 30

*United States v. Berlin*,
   472 F.2d 1002 (2d Cir.), *cert. denied*, 412 U.S. 949 (1973) ................................... 18

*United States v. Black*,
   291 F. Supp. 262 (S.D.N.Y. 1968) ............................................................. 34

*United States v. Brennan*,
   183 F.3d 139 (2d Cir. 1999) .......................................................................... 4

*United States v. Brewster*,
   No. 19-CR-833 (SHS), 2021 WL 3423521 (S.D.N.Y. Aug. 5, 2021) ........................ 19

*United States v. Carpenter,*
   791 F.2d 1024 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987) ................................................ 14

*United States v. Chastain,*
   145 F.4th 282 (2d Cir. 2025) ...............................................................................9, 11, 14

*United States v. Cornier-Ortiz,*
   361 F.3d 29 (1st Cir. 2004) ...................................................................................... 24

*United States v. Davis,*
   588 U.S. 445 (2019) ................................................................................................ 16

*United States v. Farhane,*
   634 F.3d 127 (2d Cir. 2011) .................................................................................. 5, 7

*United States v. Foley,*
   73 F.3d 484 (2d Cir. 1996) ........................................................................... 18, 28, 29

*United States v. Gabriel,*
   920 F. Supp. 498 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) ...................................... 35

*United States v. Ganim,*
   510 F.3d 134 (2d Cir. 2007) ............................................................................... 22, 27

*United States v. Gengo,*
   808 F.2d 1 (2d Cir. 1986) ................................................................................... 25, 26

*United States v. Gillespie,*
   666 F. Supp. 1137 (N.D. Ill. 1987) ............................................................................. 31

*United States v. Gonzalez,*
   686 F.3d 122 (2d Cir. 2012) ............................................................................... 21, 28

*United States v. Grady,*
   544 F.2d 598 (2d Cir. 1976) .................................................................... 25, 29, 31, 33

*United States v. Greer,*
   440 F.3d 1267 (11th Cir. 2006) ................................................................................ 12

*United States v. Hashmi,*
   No. 06-CR-442 (LAP), 2009 WL 4042841 (S.D.N.Y. Nov. 18, 2009) .................................... 27

*United States v. Hild,*
   147 F.4th 103 (2d Cir. 2025) ..................................................................................... 8

*United States v. Hoskins,*
   902 F.3d 69 (2d Cir. 2018) ........................................................................................ 3

*United States v. Jorquera,*
　No. 19-CR-479 (AMD), 2021 WL 5232587 (E.D.N.Y. Nov. 10, 2021)................................. 12

*United States v. Klein,*
　476 F.3d 113 (2d. Cir.), *as corrected* (Mar. 8, 2007) ....................................... 15, 16, 17, 18, 19

*United States v. Lopez,*
　143 F.4th 99 (2d Cir. 2025).......................................................................................... 12, 13

*United States v. Mittelstaedt,*
　31 F.3d 1208 (2d Cir. 1994)......................................................................................... 18, 20

*United States v. Mollica,*
　849 F.2d 723 (2d Cir. 1988)................................................................................................ 17

*United States v. Napout,*
　963 F.3d 163 (2d Cir. 2020) ............................................................................................... 14

*United States v. Novak,*
　443 F.3d 150 (2d Cir. 2006) ...................................................................................... 8, 9, 10

*United States v. O'Neill,*
　463 F. Supp. 1205 (E.D. Pa. 1979) ................................................................................... 26

*United States v. Peraire-Bueno,*
　No. 24-CR-293 (JGLC), 2025 WL 2062021 (S.D.N.Y. July 23, 2025)............................ 19, 20

*United States v. Philippeaux,*
　No. 13-CR-277 (RA), 2021 WL 1842195 (S.D.N.Y. May 7, 2021) ........................................ 34

*United States v. Polouizzi,*
　564 F.3d 142 (2d Cir. 2009) .............................................................................................. 12

*United States v. Resendiz-Ponce,*
　549 U.S. 102 (2007)........................................................................................................... 34

*United States v. Rojas-Contreras,*
　474 U.S. 231 (1985)........................................................................................................... 32

*United States v. Rosenblatt,*
　554 F.2d 36 (2d Cir. 1977)................................................................................................ 16

*United States v. Runner,*
　143 F.4th 146 (2d Cir. 2025)...................................................................................8, 11, 18, 20

*United States v. Rutkoske,*
　394 F. Supp. 2d 641 (S.D.N.Y. 2005 ................................................................................ 33

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) ................................................................. 9, 10, 19, 20

*United States v. Salmonese*,
   352 F.3d 608 (2d Cir. 2003) ................................................................... passim

*United States v. Sampson*,
   898 F.3d 270 (2d Cir. 2018) ......................................................................... 35

*United States v. Santos*,
   553 U.S. 507 (2008) ....................................................................................... 12

*United States v. Sawyer*,
   85 F.3d 713 (1st Cir. 1996) ...................................................................... 14, 15

*United States v. Scharton*,
   285 U.S. 518 (1932) ....................................................................................... 25

*United States v. Silverman*,
   430 F.2d 106 (2d Cir. 1970) ..................................................................... 20, 28

*United States v. Sorcher*,
   498 F. Supp. 2d 603 (E.D.N.Y. 2007) .................................................. 25, 26, 27

*United States v. Starr*,
   816 F.2d 94 (2d Cir. 1987) ......................................................................... 8, 9, 10

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992) ..................................................................... 16, 20, 28

*United States v. Sun-Diamond Growers of California*,
   526 U.S. 398 (1999) ....................................................................................... 22

*United States v. Thomas*,
   274 F.3d 655 (2d Cir. 2001) ......................................................................... 28

*United States v. Thompson*,
   141 F. Supp. 3d 188 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) ............. 16

*United States v. Tillem*,
   906 F.2d 814 (2d Cir. 1990) ......................................................................... 16

*United States v. Triumph Cap. Grp., Inc.*,
   260 F. Supp. 2d 470 (D. Conn. 2003) ......................................................... 34

*United States v. Urlacher*,
   979 F.2d 935 (2d Cir. 1992) ......................................................................... 24

*United States v. Von Barta,*
    635 F.2d 999 (2d Cir. 1980) ............................................................................ 10

*United States v. Walsh,*
    194 F.3d 37 (2d Cir. 1999) ............................................................... 17, 24, 37

*United States v. Weaver,*
    860 F.3d 90 (2d Cir. 2017) ........................................................................ 8, 27

*United States v. Wilkerson,*
    361 F.3d 717 (2d Cir. 2004) ............................................................................ 18

*United States v. Wong,*
    40 F.3d 1347 (2d Cir. 1994) ........................................................................... 12

*United States v. Wynder,*
    147 F.4th 200 (2d Cir. 2025) ............................................................................ 8

*United States v. Yaron,*
    No. S2 10-CR-363 (GBD), 2011 WL 3279054 (S.D.N.Y. July 28, 2011) .............................. 30

*Universal Health Servs., Inc. v. United States,*
    579 U.S. 176 (2016) ........................................................................................ 20

**Statutes**

18 U.S.C. § 1346 ................................................................................... 12, 13, 14

18 U.S.C. § 3288 ................................................................................... 25, 31, 32

22 U.S.C. § 611 ................................................................................................. 6

22 U.S.C. § 613 ................................................................................................. 6

**Rules**

Fed. R. Crim. P. 7(c)(1) ............................................................... 16, 24, 37, 38

**Government Policies & Guidance**

Scope of Agency, DEP'T OF JUST. (May 2020), *available at* https://www.justice.gov/nsd-fara/page/file/1279836/dl .............................................................................. 6

## PRELIMINARY STATEMENT

Linda Sun respectfully submits this reply in further support of her motion to dismiss the S-2 (Dkts. 144–45),[1] which was renewed as to the S-3 (*see* Dkt. 160), and in response to both the government's opposition to her motion and its supplement to that opposition. (*See* Dkts. 161, 170.)

The government's submissions alternately seek to deny that the S-2 failed to allege essential elements, insist that the government is excused from pleading those elements, highlight how the S-3 supplied missing essential elements, but then minimize those substantial alterations. Along the way, the government dismisses as "purely formal," "minor," or "essentially technical" crucial offense elements that shape and limit criminal liability in this case. And sandwiched among those assertions are sweeping—and legally dubious—arguments, including that some essential elements are optional and any fraudulent intent requirement has been "[a]brogated" for federal fraud offenses. Apart from those extreme positions, the government largely offers no response to the serious legal deficiencies identified by Ms. Sun and inherited by the S-3.

For the reasons that follow, as well as those articulated in her prior submissions, none of the government's arguments have merit and the Court should grant Ms. Sun's motion.

## ARGUMENT

### I.    COUNT ONE REMAINS DEFECTIVE

As Ms. Sun's motion explained, those excepted from criminal liability by an affirmative legislative policy cannot be unindicted co-conspirators in a conspiracy with which they cannot be charged. (Dkt. 145 at 11–18.) The government advances several arguments in response, all of which are meritless.

---

[1]    For the Court's convenience, all names and abbreviations used in this reply are the same as in Ms. Sun's prior submissions. As before, case text quotations omit all internal alterations, citations, footnotes, and quotation marks unless otherwise indicated.

First, the government urges the Court not to consider Ms. Sun's arguments at all.  (*See* Dkt. 161 at 5–6.)  It argues that the Court "has already considered and rejected" Ms. Sun's position and "need not take up the identical argument again."  (*Id.* at 5.)  In doing so, the government both overstates and misstates the record.  The Court previously rejected Ms. Sun's arguments based on its conclusion that an inability to indict PRC consular officials for conspiracy "does not mean they could not be considered unindicted co-conspirators" in the absence of "cases which would prevent them from being considered unindicted co-conspirators for purposes of a conspiracy charge against [Ms.] Sun."  (Dkt. 100 at 17–18.)  The Court thus left open the possibility that it might be persuaded by cases addressing that particular issue, which had not been raised by either party.  (*See id.*)  Ms. Sun has now briefed that specific issue and provided additional cases that strongly support her position.[2]  In other words, she is not simply reiterating her prior arguments but responding to the basis for the Court's ruling, which was not addressed in prior briefing.  Under those circumstances, Ms. Sun respectfully submits that her arguments are properly advanced in this motion against a new charging instrument.

The government next urges the Court to ignore Ms. Sun's arguments because they "would still not result in pretrial dismissal because it would not result in all of the identified coconspirators being ineligible to support a conviction."  (Dkt. 161 at 6.)  But that fails to appreciate the legal import of a ruling that "Count One fails to state an offense to the extent that it alleges Ms. Sun conspired with PRC consular officials."  (Dkt. 145 at 11.)  On one hand, such a ruling would excise from the S-3 conduct that does not come within the charging statute.  *See United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012).  On another, the ruling would solve Count One's

---

[2]    The government, it should be noted, never addresses any differences between indicted or unindicted co-conspirators even when addressing the "merits."  (Dkt. 161 at 6–9.)

continued duplicity problem.  (*See* Dkt. 46 at 46.)  The count clearly alleges "multiple separate and distinct conspiracies in a single count,"[3] *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992), by claiming that Ms. Sun conspired with different people at different times—with one group being PRC consular officials.  A ruling that Count One fails to state an offense as to any conspiracy with PRC consular officials would remedy that defect.  It also would have significant implications for the upcoming trial, because the alleged conduct and time periods relevant to Count One's disparate conspiracies are very different.  (*Compare, e.g.*, S-3 ¶ 29 (alleging conduct beginning in 2016) *with id.* ¶ 31 (alleging conduct beginning in 2018).)  Should the Court rule that Count One fails to state an offense to the extent it alleges a conspiracy involving PRC consular officials, the universe of potentially relevant evidence may be significantly reduced.  As such, Ms. Sun respectfully submits that it is appropriate to rule on her motion.

Second, the government's substantive rejoinders to Ms. Sun's arguments merit little response.  (*See* Dkt. 161 at 6–9.)  Largely, those arguments boil down to the government's disagreement with the Court "that it is quite likely that PRC Officials-1 through -4 could not be charged with conspiracy to violate FARA" (Dkt. 100 at 17), and its further disagreement with the reasoning in *Gebardi v. United States*, 287 U.S. 112 (1932), and *United States v. Hoskins*, 902 F.3d 69 (2d Cir. 2018).  Neither quarrel provides any principled response to Ms. Sun's arguments, and the government does not engage with any of the cases she cited.  The balance of the government's response on Count One is unsupported exegesis of its subjective views on FARA's purposes and policy goals, bereft of any meaningful citation to authority.  (*See* Dkt. 161 at 7–8.)  It states the government's view of FARA—which, unsurprisingly, is very enforcement-friendly—but not the

---

[3]     Despite Ms. Sun raising this issue previously, the government has never denied that Count One charges multiple conspiracies.  (*See* Dkts. 46 at 46, 52, 161.)

law.  Accordingly, the Court should find that Count One fails to state an offense to the extent that it alleges Ms. Sun conspired with PRC consular officials.

## II.    THE GOVERNMENT'S ARGUMENTS UNDERSCORE CONSTITUTIONAL CONCERNS REQUIRING DISMISSAL OF THE FARA COUNTS

Ms. Sun repeatedly has raised concerns that the government's novel deployment of FARA in this case—the only case of which the defense is aware where such charges were brought against a state official based on policy and political advice consistent with federal and state foreign policy—treads dangerously on the First Amendment by infringing on political and policy discussions among state officials traditionally accorded robust constitutional protection.  (*See* Dkts. 46 at 33–38, 57 at 15–19.)  The risks to protected activity are all the more serious because the government has never identified any similar prosecutions, *cf. United States v. Brennan*, 183 F.3d 139, 150 (2d Cir. 1999) (reversing convictions in a case where "[t]he government ha[d] pointed to no precedent for criminal liability based on nondisclosures . . . in circumstances like those presented [in the case]" and "there was substantial reason for one in [the] defendants' position to conclude that" they had not violated the law), despite separately proposing testimony by an expert witness that "[t]he CCP has a long history of using its embassies and consulates to . . . influence politicians in foreign countries."  (Dkt. 102-1 at 2 ¶ 8.)  The Court previously dismissed Ms. Sun's concerns at this stage, but stated that "[i]f political and policy activities by state officials, with nothing more, was all that the superseding indictment sought to criminalize, th[e] Court would agree" that the application of FARA to this case "contravenes important constitutional principles." (Dkt. 100 at 19.)  The government's arguments make clear that its case will transgress those bounds.

For instance, the government opposed Ms. Sun's request to strike paragraph 29(g) from the S-2 (and now the S-3), arguing that "[i]ts inclusion in the indictment is proper" because, "just as a

private (and constitutionally protected) love letter might be relevant to a crime of passion, so too attendance at a protest can be relevant to a crime of foreign agency."[4]  (Dkt. 161 at 9 n.3.)  The government is only half right in claiming that "[i]t is common for innocent (and even constitutionally protected) conduct to be relevant to criminal charges."  (*Id.*)  Yes, crimes often are comprised of acts that on their own may be legal or protected in other contexts.  It is not "common," however, for constitutionally protected conduct to serve as the *basis* for criminal charges.  (*Id.*)  That is what the government is attempting to do here.  Premising accusations that a state political appointee acted as a foreign agent *based on the content of the political and policy advice* they allegedly offered is merely backdoor regulation of speech.  *But see Garrison v. State of Louisiana*, 379 U.S. 64, 74–75 (1964) ("[S]peech concerning public affairs is more than self-expression; it is the essence of self-government.").  Using FARA like that renders it "unconstitutionally overbroad" as applied to this case, because such enforcement "punishes a substantial amount of protected free speech, judged in relation to [its] plainly legitimate sweep."  *United States v. Farhane*, 634 F.3d 127, 136 (2d Cir. 2011).

The government's arguments crystallize that concern.  Even though paragraph 29(g) does not allege conduct undertaken in any official capacity or connected to any actions supposedly underlying the charged offenses, the government insists it is relevant to prove Ms. Sun's personal "ideology" as the government believes "it is intuitively obvious" that violations of FARA "may be

---

[4]     The government's analogy is flawed because it focuses only on whether conduct was constitutionally protected and conveniently ignores the second part of Ms. Sun's concern:  that "[t]he conduct alleged there is not claimed to have been undertaken in Ms. Sun's official capacity" and "is not otherwise connected to any conduct supposedly underlying the charged offenses." (Dkt. 145 at 11 n.10.)  A more apt comparison might be to weigh the relevance of a personal political donation to an unconnected accusation of failing to register as a lobbyist.

motivated in part by ideology."[5]  (Dkt. 161 at 9 n.3.)  But FARA imposes an obligation to register as a foreign agent on a person "who acts as an agent, representative, employee, or servant, or . . . in any other capacity *at the order, request, or under the direction or control*, of a foreign principal" or someone controlled or funded by a foreign principal.  22 U.S.C. § 611(c)(1) (emphasis added).  Actions undertaken consistent with a personal ideology, individual political or policy judgment, and or otherwise for purposes "not serving predominantly a foreign interest" do not require registration.  *Id.* § 613(d)(2); *see also* DOJ Guidance at 1 ("FARA does not require registration simply because a person expresses views that are favorable to or coincide with the interests of a foreign country . . . [a]nd the First Amendment protects the rights of U.S. persons to express such views.").

The Court previously concluded that "if the Government fails to prove at trial that [Ms.] Sun was acting as an agent of the Government of the PRC and the CCP, then all of her same 'political and policy choices' will not form the basis of criminal liability under FARA."  (Dkt. 100 at 19.)  The government's arguments, however, call that conclusion sharply into question.  It is clear from the S-3 and subsequent filings that the government does intend for Ms. Sun's alleged political and policy choices to form the basis of criminal liability, because it plans to argue that those political and policy choices—due to their content alone—are evidence that Ms. Sun acted as a foreign agent.  And the government is not concerned whether her political and policy choices

---

[5]      The government's argument is remarkably consistent with Ms. Sun's observation in her initial motion "the government eventually reached the conclusion that when a woman of Chinese heritage allegedly receives unreported gifts from other Chinese individuals, she must be bought and paid for by China."  (Dkt. 46 at 1.)  Except the government's assertion here is worse, because it further clarifies that "[n]either the law nor common sense requires that one's motive for acting on behalf of a foreign government be purely (or even principally) remunerative."  (Dkt. 161 at 9 n.3.)

were consistent with federal or state foreign policy,[6] "motivated in part by ideology," or lacked any "remunerative" motive.  (Dkt. 161 at 9 n.3.)  Putting those aside, as the government has and seeks to do, what remains is the content of political and policy advice.  At a minimum, the government's approach requires a more searching inquiry under the First Amendment.  *See, e.g.*, *Reed v. Town of Gilbert, Arizona*, 576 U.S. 155, 163–64 (2015) (explaining that strict scrutiny applies where laws "defin[e] regulated speech by particular subject matter" or "by its function or purpose" because "[b]oth are distinctions drawn based on the message a speaker conveys"); *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)) ("[T]he Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection.").  And such an inquiry makes clear that, as applied here, FARA's prohibitions are stretched well beyond their "plainly legitimate sweep."  *Farhane*, 634 F.3d at 136.

## III.  COUNTS EIGHT AND NINE REMAIN DEFECTIVE

Despite the government's last ditch effort to salvage them by amending the S-3, Counts Eight and Nine still fail to allege essential elements of honest services wire fraud.  For the reasons already discussed in Ms. Sun's motion (*see* Dkt. 145 at 18–42) and Mr. Hu's letter-motion in further support thereof (*see* Dkt. 146), as well as those that follow, the counts must be dismissed.

---

[6]    In fact, the government has gone so far as to seek *exclusion* of such evidence.  (*See* Dkt. 172 at 9–11.)  As will be explained in Ms. Sun's opposition to the government's motions *in limine*, that request is meritless, would exclude highly relevant evidence, and would amount to a directed verdict for the government on crucial factual issues.  Here, it suffices to note that the government's effort to exclude evidence of bases for Ms. Sun's alleged political and policy choices *other* than foreign influence dramatically increases the risk that such choices will "form the basis of criminal liability under FARA."  (Dkt. 100 at 19.)

## A. The S-3 fails to sufficiently allege fraudulent intent for purposes of honest services wire fraud.

The government's opposition reflects alarming misconceptions about the law governing federal fraud prosecutions, which are immediately apparent from an initial argument heading that asserts: "The Fraudulent Intent Element for Federal Fraud Statutes Has Been Abrogated." (Dkt. 161 at 13.) That is obviously incorrect. Courts have not abrogated the foundational *mens rea* requirement for federal fraud and the Second Circuit continues to recognize that "[t]o prove a scheme to defraud, the government must prove . . . that the defendant acted with fraudulent intent." *United States v. Runner*, 143 F.4th 146, 154 (2d Cir. 2025) (quoting *United States v. Weaver*, 860 F.3d 90, 94 (2d Cir. 2017)); *cf. United States v. Wynder*, 147 F.4th 200, 213 (2d Cir. 2025) (assessing whether the government had sufficiently proved "fraudulent intent"); *United States v. Hild*, 147 F.4th 103, 112 (2d Cir. 2025) (same). Similar errors pervade the substance of the government's arguments, which either mistakenly or intentionally reframe Ms. Sun's arguments in material ways. As a result of those errors, the government fails to grapple with Ms. Sun's actual arguments, overlooks controlling authority in this Circuit, and misapprehends the law governing the charged offenses.

As Ms. Sun explained at length, decades of Second Circuit precedent have refined the requirements that must be alleged and proved by the government in federal fraud prosecutions. (*See* Dkt. 145 at 19–26.) As relevant here, that includes three implicit elements distilled by the Second Circuit: (*i*) that defendants "*contemplated* some actual harm or injury to their victims," *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (quoting *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (emphasis in original)); (*ii*) that the contemplated harm was some deprivation tied to the "nature or quality of the services . . . that w[ere] the basis of the . . . bargain," *id.* at 157 (quoting *Starr*, 816 F.2d at 99–100); and (*iii*) separate and apart from the traditional elements of

wire fraud, that any "misrepresentation or omission at issue . . . must be 'material,' such that the misinformation or omission would naturally tend to lead or is capable of leading a reasonable employer to change its conduct." *United States v. Rybicki*, 354 F.3d 124, 145 (2d Cir. 2003) (en banc).

The government does not disagree with Ms. Sun's distillation of those precedents. Instead, it seeks to dispense with them wholesale by asserting that decades of well-reasoned Second Circuit precedent were instantly "[a]brogated" by the Supreme Court's decision in *Kousisis v. United States*, 145 S. Ct. 1382 (2025). (Dkt. 161 at 13.) The Second Circuit has a different view, however, having recently explained that "[i]n *Kousisis* . . . the Supreme Court held only that *actual economic loss* is not an element of a wire fraud offense." *United States v. Chastain*, 145 F.4th 282, 295 (2d Cir. 2025) (emphasis in original). That is quite different from the government's interpretation of *Kousisis*, and Ms. Sun has not argued that the Court should require allegations or proof of actual economic loss. As such, the government's arguments fail.

As understood by the Second Circuit—and indeed, by any fair reading of the Supreme Court's opinion—*Kousisis* did not abrogate precedents regarding fraudulent intent in this Circuit as they apply to honest services fraud. As a threshold matter, a decision that "held only that actual economic loss is not an element," *id.* (emphasis omitted), poses no legal or logical conflict with requirements previously identified by the Second Circuit. With respect to the first implicit element, whether some actual economic loss occurred is a separate and distinct inquiry from whether a defendant "*contemplated* some actual harm or injury" in connection with a scheme. *Novak*, 443 F.3d at 156 (quoting *Starr*, 816 F.2d at 98 (emphasis in original)). Indeed, the Second Circuit long ago clarified that fraudulent intent "does not require the government to prove that []

9

victims of the fraud were *actually* injured . . . ." *Id.* (emphasis in original).[7]   Crucially, in the context of honest services fraud, the harm contemplated by a defendant need not be "economic or pecuniary" at all.  *Rybicki*, 354 F.3d at 145.  So it does not matter in this case that "the wire fraud statute is agnostic about economic loss," *Kousisis*, 145 S. Ct. at 1392, because a defendant need only have "contemplated some actual harm or injury," *Novak*, 443 F.3d at 156 (quoting *Starr*, 816 F.2d at 98 (emphasis omitted)); whether such harm or injury resulted in actual economic loss is irrelevant.  And requiring some contemplation—but not actual infliction—of harm is consistent with *Kousisis*'s conclusion that "a defendant violates § 1343 by *scheming* to 'obtain' the victim's 'money or property,' regardless of whether he seeks to leave the victim *economically* worse off." 145 S. Ct. at 1392 (emphasis added).  An intent to obtain money or property *without* contemplation of *some* harm to a counterparty would not be a "scheme" but rather the normal course of business. *Cf. United States v. Von Barta*, 635 F.2d 999, 1005 n.12 (2d Cir. 1980) (quoting *Gregory v. United States*, 253 F.2d 104, 109 (5th Cir. 1958)) (contrasting a "scheme to defraud" with "moral uprightness, . . . fundamental honesty, fair play and right dealing in the general business life of members of society").

The second and third elements discussed above are likewise unaffected by *Kousisis*.  As to the former, requiring that a contemplated harm involve some deprivation tied to the "nature or quality of the services . . . that w[ere] the basis of the . . . bargain,'" *Novak*, 443 F.3d at 157 (quoting *Starr*, 816 F.2d at 99–100), does not require any actual economic loss.  That requirement concerns the nexus between a supposed deprivation and the services at issue, in order to avoid

---

[7]    Even the government acknowledges as much, observing that "the Second Circuit has previously held that economic harm is not a requirement for Section 1346 prosecutions."  (Dkt. 161 at 15.)  It is hard to see how the rejection in *Kousisis* of a requirement to prove actual economic loss would invalidate pre-*Kousisis* precedent that already rejected a need to prove economic harm.

overcriminalizing conduct "where the evidence merely indicates that the services . . . were dishonestly completed." *Novak*, 443 F.3d at 159.  It does not require or depend on any pecuniary deprivation.  And the latter requirement of specific materiality is not only divorced from any actual economic loss, but also analogous to a separate element of wire fraud that is "the principled basis for distinguishing everyday misstatements from actionable fraud."  *Runner*, 143 F.4th at 156 n.8 (quoting *Kousisis*, 145 S. Ct. at 1396, 1398).  It, too, does not require or depend on any economic deprivation.

     In short, the holding in *Kousisis*—including as interpreted by the Second Circuit—does not conflict with, let alone abrogate, decades of precedent that require allegations omitted from the S-3.  Those precedents did not simply "evaporate[]," and there is no justification for ignoring them (as the government openly seeks to do).  (Dkt. 161 at 15.)  The government does not dispute that Ms. Sun has correctly identified requirements that pre-dated *Kousisis*.  (*See* Dkt. 161 at 13–17.) Nor does it attempt to show that such requirements were satisfied here;[8] and rightly so, as they plainly were not.  (*See id.*)  Because the Second Circuit has instructed that *Kousisis* "held only that *actual economic loss* is not an element of a wire fraud offense," *Chastain*, 145 F.4th at 295, and the precedents catalogued by Ms. Sun do not require alleging or showing actual economic loss, those precedents persist and require dismissal of Counts Eight and Nine.

     But even if *Kousisis* did call those precedents into question—and it does not—that still would not be enough to dispense with them in this case.  As Ms. Sun pointed out (*see* Dkt. 145),

---

[8]     At most, the government argues that "[i]rrespective of the applicability of *Kousisis* to honest services wire fraud, Counts Eight and Nine are still sufficiently pled" because "[c]ourts in this Circuit have routinely rejected arguments that federal fraud charges should be dismissed absent use of the words 'fraudulent intent' in the charging instrument."  (Dkt. 161 at 17.)  That simplistic recasting of Ms. Sun's detailed arguments, which demonstrated how the S-3 fails to sufficiently allege fraudulent intent in form *or substance*, warrants little response.  Notably, the government does not identify any allegations that supposedly demonstrate sufficiency.  (*See id.* at 17–19.)

"until the Supreme Court rules otherwise, [a] district court would be obliged to follow [Second Circuit] precedent, even if that precedent might be overturned in the near future." *United States v. Wong*, 40 F.3d 1347, 1373 (2d Cir. 1994); *see also United States v. Jorquera*, No. 19-CR-479 (AMD), 2021 WL 5232587, at *6 (E.D.N.Y. Nov. 10, 2021) (quoting *Cartica Mgmt., LLC v. Corpbanca, S.A.*, 50 F. Supp. 3d 477, 486 (S.D.N.Y. 2014)) ("District courts . . . are bound by decisions of the Court of Appeals in the appropriate circuit unless overruled by an intervening Supreme Court decision or other change in law."). The Second Circuit has not jettisoned its fraudulent intent precedents and, for the reasons already discussed, *Kousisis* does not conflict with—let alone abrogate—the Second Circuit's requirements for honest services wire fraud. Moreover, even if there might be some theoretical conflict, *Kousisis* did not involve offenses charged under 18 U.S.C. § 1346 and so does not directly control here. *Cf. United States v. Lopez*, 143 F.4th 99, 110 (2d Cir. 2025) (distinguishing a case because "it addressed the scope of § 1343, not § 1346"). Under these circumstances, agreeing with the government that Second Circuit precedent "has been effectively rejected" would be "less an application of existing precedent than a prediction of what the Supreme Court will hold when it chooses to address this issue in the future." *United States v. Polouizzi*, 564 F.3d 142, 160 (2d Cir. 2009) (quoting *United States v. Greer*, 440 F.3d 1267, 1275 (11th Cir. 2006)). And the Second Circuit "ha[s] cautioned District Courts against preemptively declaring that [its] caselaw has been abrogated by intervening Supreme Court decisions."[9] *Packer on behalf of 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt.,*

---

[9]    Further underscoring the need to follow Second Circuit precedent is the rule of lenity. (*See* Dkt. 145 at 38.) Dispensing with the Second Circuit's precedents would loosen restrictions on what the government must allege and prove, which would obviously inure to the detriment of Ms. Sun. In a dispute over the legal interpretation of a criminal statute, "[t]he rule of lenity requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008).

LLC ("*1-800-Flowers.Com, Inc.*"), 105 F.4th 46, 54 (2d Cir.), *cert. denied sub nom. Raging Cap. Mgmt., LLC v. Packer*, 145 S. Ct. 550 (2024).

In any event, *Kousisis* does not undermine the relevant Second Circuit precedents.  The government insists that "it is simply not true" that *Kousisis* did not address the fraudulent intent required for § 1346 offenses, but that argument reduces to an assertion that any holding in *Kousisis* "applies to all federal fraud statutes . . . ." (Dkt. 161 at 15.)  Typically, however, the offense charged matters.  *Cf. Skilling v. United States*, 561 U.S. 358, 403–04 (2010) (holding that special concerns applicable to § 1346 required a limiting construction of that statute); *Lopez*, 143 F.4th at 110. Despite the government's huffing about general references to fraud, *Kousisis* did not involve § 1346 offenses or consider whether the law governing such offenses imports additional considerations given the text of § 1346, the unique nature of intangible rights, existing special principles or interpretations applicable to § 1346, or any other reason.  And the government never acknowledges the Second Circuit's interpretation of *Kousisis* or explains how it wipes the board clean of all other requirements.  In sum, *Kousisis* does not implicate, let alone abrogate, the Second Circuit's precedents specifying what the government must allege and prove in connection with honest services wire fraud.  The government was wrong to ignore categorically them and Counts Eight and Nine are legally deficient as a result.[10]

None of the government's other arguments are persuasive—or even, in some cases, germane.  For instance, the government suggests that Ms. Sun incorrectly "distinguishes" honest

---

[10]    The government goes on to say that "[t]here is no basis for [Ms.] Sun's specter of an unfettered honest services fraud statute resulting in broad criminalization of ethics violations" because "any violation must include a violation of a fiduciary relationship, a *quid pro quo* arrangement including bribes or kickback schemes, and an official act." (Dkt. 161 at 16.)  Clearly, however, the Second Circuit reasoned that more was required—that is how its prior precedents were established in the first place.

services wire fraud "as a standalone species of federal fraud pertaining solely to intangible rights." (Dkt. 161 at 14.) That is not accurate. Ms. Sun actually stated in her motion that "[a]lthough it concerns an 'intangible' interest . . . honest services wire fraud is merely 'a type of wire fraud prohibited under § 1343.'" (Dkt. 145 at 40 (quoting *United States v. Napout*, 963 F.3d 163, 180 (2d Cir. 2020).) And her extensive discussion of the Second Circuit's precedents in fraud cases proceeded with the understanding that honest services wire fraud is a species of wire fraud. (*See id.* at 19–26.) Ms. Sun did, however, distinguish honest services fraud—correctly—from other kinds of fraud on the grounds that honest services fraud concerns "intangible" rights and has been the particular focus of Supreme Court decisions that limit its scope based on special considerations. (*See id.*) The government's failure to appreciate those nuances contributes significantly to the legal flaws in its arguments.

Similarly, the government protests that "the harm encompassed in the fraudulent intent requirement for honest services wire fraud is the harm caused by the loss of honest services." (Dkt. 161 at 18.) But that tautology merely begs the question: what counts as a deprivation of honest services within the scope of § 1346? It cannot be *any* deprivation of so-called honest services, because "the fraud statutes do not vest a general power in 'the Federal Government to enforce (its view of) integrity in broad swaths of state and local policymaking,'" *Chastain*, 145 F.4th 282, 292 (2d Cir. 2025) (quoting *Ciminelli v. United States*, 598 U.S. 306, 312 (2023)), and courts generally have agreed that honest services fraud "does not encompass every instance of official misconduct that results in [an] official's personal gain." *United States v. Sawyer*, 85 F.3d 713, 725 (1st Cir. 1996) (collecting cases); *United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986), *aff'd*, 484 U.S. 19 (1987) (observing that "not every breach of an employee's fiduciary duty to his employer constitutes mail or wire fraud"); *accord Sorich v. United States*, 555 U.S. 1204, 1206

(2009) (Scalia, J., dissenting from denial of certiorari) ("It is practically gospel in the lower courts that the statute 'does not encompass every instance of official misconduct.'" (quoting *Sawyer*, 85 F.3d at 725)).  Under the government's erroneous reading, however, the requisite harm is inherent in any failure to provide fully honest (however defined) services.  That is not the view courts historically have taken, it is not the view in the Second Circuit, and it is not an approach in any way mandated by *Kousisis*.

### B.  The S-3 fails to sufficiently allege materiality.

The government's argument regarding materiality is most notable for what it does not say. Offering cursory references to handful of factual allegations, the government argues that "materiality is sufficiently pled for both honest services wire fraud charges" because the S-3 supposedly "alleges numerous misrepresentations" and "details acts in furtherance of the concealment scheme." (Dkt. 161 at 11.)  At no point, however, does the government ever articulate where such matters are alleged to be material or materiality might be inferred.  That is no accident. As Ms. Sun explained in her motion, the S-3 is void of allegations regarding materiality and it cannot be inferred here.  (*See* Dkt. 145 at 26–34.)  Instead, the government relies entirely on the brief opinion in *United States v. Klein*, 476 F.3d 113 (2d. Cir.), *as corrected* (Mar. 8, 2007), a case that found "an allegation of materiality c[ould] be inferred from use of the word fraud in the indictment." *Id.* at 113.  For multiple reasons, the government asks too much of *Klein*.

First, *Klein* was decided according to the extremely deferential "plain error" standard, as the appellant had never argued that the indictment failed to explicitly allege materiality.  *Id.*  That the Second Circuit found no error under that forgiving standard does not mean, as the government suggests, that going forward any fleeting reference to "fraud" in an indictment magically insulates

every fraud charge.[11]  *See, e.g.*, *United States v. Tillem*, 906 F.2d 814, 825 (2d Cir. 1990) (explaining that "[t]he plain error doctrine is used sparingly when necessary to redress a miscarriage of justice" and applies only to "an error so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object").  Plain error review does not determine whether something was legally "right" or "wrong."  *Namet v. United States*, 373 U.S. 179, 190–91 (1963).

Certainly the government cannot rely on *Klein* to disregard Rule 7, which requires "a plain, concise, and definite written statement of the essential facts constituting the offense charged," Fed. R. Crim. P. 7(c)(1), or Supreme Court authority that requires an indictment to "descend to particulars" because "it is not sufficient" to "charge [an] offence in the same generic terms as in the definition," *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *Russell v. United States*, 369 U.S. 749, 765 (1962)).  And "fraud" is a "generic" term that requires explication.  *See, e.g.*, *United States v. Thompson*, 141 F. Supp. 3d 188, 195 (E.D.N.Y. 2015), *aff'd*, 896 F.3d 155 (2d Cir. 2018) (quoting *United States v. Rosenblatt*, 554 F.2d 36, 41 (2d Cir. 1977)) (stating that "where the definition of an offense includes generic terms, *such as fraud*, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition" because "it must state the species, it must descend to particulars" (emphasis added)); *cf. United States v. Davis*, 588 U.S. 445, 456 (2019) (describing "fraud or theft in general" as "a generic crime").

---

[11]     Despite its reliance on *Klein* with respect to Counts Eight and Nine, the government did allege materiality in connection with Counts Three and Twelve—both of which also involve "fraud."  (*See* S-3 ¶¶ 137 (alleging "one or more false statements with respect to one or more material facts"), 150 (alleging "one or more materially false and fraudulent pretenses, representations and promises").)  Ms. Sun submits that is because *Klein* does not go nearly as far as the government now claims.

Indeed, "for an indictment to fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury, the indictment must state some fact specific enough to describe a particular criminal act, rather than a type of crime." *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000). While *Klein* may have found a bare invocation of "fraud" to be enough to survive plain error review, the government's extrapolation here cannot be reconciled with other cases concerning the sufficiency of indictments, obligations imposed by the Fifth and Sixth Amendments, the Federal Rules of Criminal Procedure, or fundamental tenets of fairness and notice.[12] In fact, the Second Circuit has long counseled the opposite approach. *See, e.g.*, *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) ("In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury."). The government's approach—subsuming essential elements in generic references to "fraud"—runs directly counter to the Second Circuit's admonition that "the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial." *Id.*

Second, as the government points out (*see* Dkt. 161 at 12), *Klein* post-dated the decision in *United States v. Pirro*, which held that an indictment must allege implicit elements—like

---

[12]    Consider the consequences of the government's view. If just saying "fraud" is enough, soon that is all indictments will say. But charging instruments must put defendants on notice "of the nature and cause of [an] accusation,'" *United States v. Benjamin*, 95 F.4th 60, 66 (2d Cir.), *cert. denied*, 145 S. Ct. 982 (2024) (quoting U.S. CONST., amend. VI), and provide a sufficient "amount of factual particularity to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury," *Pirro*, 212 F.3d at 92 (quoting *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999)). There may be few rules that govern the sufficiency of indictments, but that is not a reason to dilute the ones that exist—especially when they serve such important constitutional functions.

materiality—"explicitly" to state an offense.  212 F.3d at 93 (quoting *United States v. Foley*, 73 F.3d 484, 488 (2d Cir. 1996)).  *Klein* could not have diluted that admonition, because panels in the Second Circuit are "bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of [the] Court or by the Supreme Court."  *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004).  Neither has happened here, so the government's attempt to read *Klein* as repudiating or circumventing *Pirro* necessarily fails.  Similar reasoning applies to *United States v. Berlin*, 472 F.2d 1002 (2d Cir.), *cert. denied*, 412 U.S. 949 (1973), a case that long ago established that the essential element of falsity is not satisfied by allegations of "implie[d] knowledge" where it "is not necessarily implied" from conclusory language.  *Id.* at 1006–08.  *Klein* did not purport to—nor could it—obviate *Pirro* and *Berlin*.[13]  And it certainly could not overrule the obligation to provide more particularity for "generic" terms found in Supreme Court cases like *Russell*.  *See* 369 U.S. at 765.  As such, the government's repeated disregard of prior cases as "pre-*Klein*" undercuts, rather than helps, its position.  (Dkt. 161 at 12.)

*Third*, even *Klein* contemplated that an indictment would allege more than the S-3.  The decision specifically noted that "each of the counts on which appellant was convicted contained an allegation that he obtained money or credit 'by means of false or fraudulent representations.'"  476 F.3d at 114.  Not so in the S-3.  Indeed, the only reference the government musters is the single

---

[13]     It does not matter, as the government suggests, that *Pirro* and *Berlin* did not involve offenses charged under a "federal fraud statute."  (Dkt. 161 at 12.)  The constitutional principles undergirding their holdings do not somehow fall away in fraud cases.  Moreover, the requirement to allege falsity and knowledge discussed in *Berlin* is obviously analogous to this case.  And the Second Circuit has invoked *Pirro* in cases involving fraud.  *See, e.g.*, *Runner*, 143 F.4th at 156 (citing *Pirro* in a case involving mail and wire fraud charges).  The government makes the same specious objection to *United States v. Mittelstaedt*, 31 F.3d 1208 (2d Cir. 1994), which actually involved a charge of honest services wire fraud.  (*See* Dkt. 161 at 12.)  It never explains why *Klein* supposedly overrules that case, pivoting instead to a different argument that is irrelevant to whether materiality was sufficiently alleged.  (*See id.* at 12–13.)

use of the word "defraud." (*See* Dkt. 161 at 11; *see also* S-3 ¶¶ 141, 143.) And the cases cited by the government are not persuasive; if anything, they demonstrate that other indictments found to be sufficient in light of *Klein* possessed elements that are lacking here.

In *United States v. Peraire-Bueno*, No. 24-CR-293 (JGLC), 2025 WL 2062021 (S.D.N.Y. July 23, 2025), for example, the court cited *Klein* and found that an indictment sufficiently stated the elements of wire fraud. *See id.* at *8. But that indictment, unlike the S-3, specifically alleged that the "[d]efendants executed a scheme to defraud 'by means of false and fraudulent pretenses, representations, and promises'"; that they "made 'material misrepresentations, including, among other things . . .'" several specific examples; and alleged that "false information [alleged in the indictment] . . . 'was designed to, and did, trick the [victim] to prematurely release the full content of the proposed block [of stock]'" to the defendants. *Id.* The S-3 alleges nothing of the kind.

Likewise, the charging instrument in *United States v. Brewster*, No. 19-CR-833 (SHS), 2021 WL 3423521 (S.D.N.Y. Aug. 5, 2021), specifically alleged that the defendant "generated and sold leads . . . for use by [] telemarketing sales floors with the knowledge that the individuals they had identified as 'leads' would be defrauded by the other [p]articipants" in the scheme. *Id.* at *5. And it alleged that the defendants "sold alleged services purporting to make the management of Victims' businesses more efficient or profitable . . . but at no point did the defendants intend that the Victims would actually earn any of the promised return on their intended investment, nor did the Victims actually earn any such returns." *Id.* Again, the S-3 does not contain any similar allegations from which materiality could be inferred.[14]

---

[14] The government's remaining out-of-Circuit citations are equally unavailing. (*See* Dkt. 161 at 10–11.) Among other reasons, courts outside the Second Circuit are not bound by *Rybicki*, which imposes a separate requirement to allege materiality in honest services fraud cases on top of the traditional fraud elements. *See* 354 F.3d at 145–46.

Thus, even in the cases the government cites, "allegations sufficiently allege material misrepresentations" when "they explain the nature of the[] misrepresentations, how those misrepresentations were false and material, and where they were offered." *Peraire-Bueno*, 2025 WL 2062021 at *8. The S-3 does not come close to doing that here. Nor is it possible or appropriate to infer materiality, because it is not "*necessarily* implied by the specific allegations made" that any alleged misrepresentations were material, *Stavroulakis*, 952 F.2d at 693 (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1970)) (emphasis added). As Ms. Sun already explained, materiality is not presumed "merely because the [g]overnment designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment" or because "the [g]overnment would have the option to decline to pay if it knew of the defendant's noncompliance." *Universal Health Servs., Inc. v. United States*, 579 U.S. 176, 194 (2016). An undisclosed financial interest is not automatically material. *See, e.g.*, *Rybicki*, 354 F.3d at 145–46; *Mittelstaedt*, 31 F.3d at 1217. Courts do not assume that particular contract terms are material. *See Kousisis*, 145 S. Ct. at 1400–01 (Thomas, J., concurring) (quoting *Universal Health Servs., Inc.*, 579 U.S. at 194 n.5). And even the government implicitly acknowledges that no actual violation of any self-dealing provision related to PPE contracts can be inferred from the S-3. (*See* Dkt. 145 at 30 n.18.)

If materiality is "demanding," if it serves as "the principled basis for distinguishing everyday misstatements from actionable fraud," *Runner*, 143 F.4th at 156 n.8 (quoting *Kousisis*, 145 S. Ct. at 1396, 1398), and for it to "substantially narrow[] the universe of actionable misrepresentations," *Kousisis*, 145 S. Ct. at 1398, alleging materiality must require more than obliquely referencing "fraud." Because that is all the S-3 manages—and that is all the government offers—Counts Eight and Nine fail to allege materiality.

### C.  The S-3 fails to allege an offense against Chris Hu in light of *Percoco v. United States*.[15]

As to Chris Hu, Count Nine remains defective for the additional reason that it fails to allege a substantive honest services wire fraud violation under *Percoco v. United States*, 598 U.S. 319 (2023).  The government's arguments do not alter that conclusion; to the contrary, they reflect a misapprehension of Mr. Hu's argument and a misrepresentation of what the S-3 alleges.

The government contends that Mr. Hu is properly charged under "Counts *Eight* and Nine" because *Percoco* does not preclude liability with respect to "coconspirators or [] aiders and abettors."  (Dkt. 161 at 21–22 (emphasis added).)  But Mr. Hu plainly moved to dismiss only Count Nine—the substantive count—in connection with *Percoco*.  (*See* Dkt. 146; *cf., e.g.*, *id.* at 1 ("We independently seek dismissal of *Count Nine* as to Mr. Hu, alleging a *substantive* honest services wire fraud violation[.] (emphasis added)).)  Accordingly, whether an individual "may [] be charged as [a] coconspirator[]" under *Percoco* (Dkt. 161 at 22), as the government contends, is beside the point.

Also irrelevant is the fact that *Percoco* does not preclude aiding-and-abetting liability.  The only reference in the entire S-3 to aiding and abetting *any* crime is in Count Thirteen (*see* S-3 ¶ 152), which is unrelated to Count Nine.  No other allegations claim—or provide any factual particularity—regarding whether, what, or how Mr. Hu supposedly aided or abetted Count Nine.  And the S-3's bare citation to 18 U.S.C. § 2, without any actual factual allegations, is not enough to sufficiently allege that Mr. Hu aided and abetted the commission of Count Nine.  *See, e.g.*, *United States v. Gonzalez*, 686 F.3d 122, 128 (2d Cir. 2012) ("[I]t has long been the rule . . . that a deficiency in an indictment's factual allegations of the elements of an offense is not cured by the

---

[15]    Mr. Hu respectfully submits this argument in addition to those advanced throughout this submission.

fact that the relevant count cited the statute that the defendant is alleged to have violated." (quotation omitted)).

Put simply, on its face Count Nine charges Mr. Hu—a private person with no agency-based fiduciary duty to the public—with *substantively* violating the honest services fraud statute, which *Percoco* expressly prohibits. On this basis, and for those previously addressed, Count Nine must be dismissed as to Mr. Hu.

## IV.    COUNTS TEN AND ELEVEN REMAIN DEFECTIVE

Counts Ten and Eleven charge the defendants with federal program bribery and conspiring to commit similar offenses against the United States. (*See* S-3 ¶¶ 144–48.) As alleged in the S-2, both counts suffered from several legal deficiencies. (*See* S-2 ¶¶ 144–48; *see also* Dkt. 160.) After Ms. Sun's motion was filed, the government implicitly conceded its failure to allege the explicit quid pro quo central to any bribery charge by superseding to add identical charging language to both counts. (*Compare* S-3 ¶¶ 144–48, *with* S-2 ¶¶ 144–48; *see also* Dkt. 160.)[16]

### A.    The S-3 substantially amended the S-2 to supply a missing essential element.

"[F]or bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999) (emphasis in original). Because a quid pro quo is "essential to proving bribery," *United States v. Ganim*, 510 F.3d 134, 148 (2d Cir. 2007), its omission from the S-2 meant that Counts Ten and Eleven failed to allege an essential element of the offenses they charged. (*See* Dkt. 145 at 42–47.) The government maintains that Ms. Sun's "argument regarding sufficiency of allegations as to the Section 666 bribery counts has now been mooted" because the

---

[16]    Ms. Sun expressly incorporates in this briefing her September 5, 2025 letter regarding the S-3. (Dkt. 160.)

S-3 now alleges a "quid pro quo agreement, using the phrase 'in exchange for' approved by *Benjamin*."[17]   (Dkt. 161 at 23 n.5.)   Because the S-3 now contains language that *Benjamin* recognized as sufficiently alleging an explicit quid pro quo, Ms. Sun will address the government's addition of this essential element in connection with her arguments regarding the statute of limitations and the relation back doctrine.

### B. Count Eleven fails to allege an offense as to the first object of its conspiracy.

In her motion, Ms. Sun demonstrated how Count Eleven failed to sufficiently allege the first object of the conspiracy it charged.  (*See* Dkt. 145 at 47–49.)  Specifically, she showed how allegations applicable to that object failed to allege embezzlement, theft, fraud, or conversion of state funds.  (*See id.*)  The government does not meaningfully respond to those points.  (*See* Dkt. 161 at 25–27.)

Instead, the government now advances a new theory that this object actually "pleads misapplication of funds as a first object of the conspiracy."[18]   (*Id.* at 26.)  But that argument is refuted by the S-3's own allegations.  Nothing in the S-3 remotely alleges that Ms. Sun was able to select vendors, approve contracts, authorize payments, or exercise control over state funds.  In

---

[17]    The government actually says that "the Section 666 charges themselves *further* specify the *quid pro quo* agreement," but that formulation is both self-serving and inaccurate.  (Dkt. 161 at 23 n.5 (emphasis added).)  The S-2 contained no allegations recognized by federal courts as sufficiently alleging an explicit quid pro quo, the government does not seriously try to identify any such allegations in the prior indictment, and it would not have added the new allegations if it did not agree they were both missing and necessary.

[18]    The government stated in its motion that "[n]otably, [Ms.] Sun does not argue in her motion to dismiss that the misapplication theory is not adequately pled."  (Dkt. 161 at 26.)  True enough— the lack of any allegations whatsoever in the S-3 suggesting that Ms. Sun had any ability to select vendors, approve contracts, authorize payments, or take any other action evincing control over state funds led her to believe that a misapplication of funds theory was not relevant here.  If for no other reason, her complete lack of notice that the government intended to pursue a misapplication theory demonstrates that it is not adequately pled.

short, the S-3 never alleges that she had the *ability*—let alone that she did—misapply any state funds. *Compare United States v. Cornier-Ortiz*, 361 F.3d 29, 34 (1st Cir. 2004) (noting defendant was "in charge of administering bids for contracting services and obtaining [federal] funding"); *United States v. Urlacher*, 979 F.2d 935, 936 (2d Cir. 1992) (noting defendant was the "Police Chief of the City of Rochester" and actually controlled the allocation and spending of funds). At the same time, the S-3 affirmatively alleges that Ms. Sun *concealed* her actions from people who *did* have the authority to approve or direct funds—*i.e.* the very people with whom she would have had to agree in order to conspire. (*See, e.g.*, S-3 ¶ 148(a)–(b).)

That Count Eleven requires Ms. Sun to guess at what the government actually charged through a process of elimination demonstrates that the allegations applicable to that count fail to provide any "factual particularity" sufficient "to ensure that the prosecution will not fill in elements of its case with facts other than those considered by the grand jury." *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44). And the lack of any factual allegations disclosing Ms. Sun's supposed ability or agreement to direct—let alone misapply—state funds confirms that the S-3 does not contain the "essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).

## V.    COUNTS EIGHT THROUGH ELEVEN ARE BARRED BY THE STATUTE OF LIMITATIONS

Counts Eight through Eleven must be dismissed because their prosecution is barred by the statute of limitations. This is so for several reasons. Counts Eight, Nine, and the first object alleged in Count Eleven have always been untimely for the reasons explained in Ms. Sun's motion. (*See* Dkt. 145 at 41–42, 49–50.) Nothing in the government's opposition changes that. Moreover, because the S-3 was filed after the expiration of the statute of limitations and substantially amended charges in the S-2, Counts Eight through Eleven are all untimely.

"When an indictment is filed, the statute of limitations is tolled on the charges set forth in the indictment." *United States v. Gengo*, 808 F.2d 1, 3 (2d Cir. 1986) (citing *United States v. Grady*, 544 F.2d 598, 601 (2d Cir. 1976)). Later charges brought in a superseding indictment "relate[] back to the original pleading and inherit[] its timeliness as long as the later indictment does not materially broaden or substantially amend the original charges." *United States v. Salmonese*, 352 F.3d 608, 622 (2d Cir. 2003) (citing *Gengo*, 808 F.2d at 3); *accord United States v. Ben Zvi*, 168 F.3d 49, 54 (2d Cir. 1999) (quoting *Gengo*, 808 F.2d at 3) ("A superseding indictment will relate back to the date of the original indictment only if the superseding indictment does not broaden or substantially amend the original charges."). If an indictment is dismissed "after the period prescribed by the applicable statute of limitations has expired," the government gets a six-month grace period to obtain a new indictment unless "the reason for the dismissal was the failure to file the indictment or information within the period prescribed by the applicable statute of limitations, or some other reason that would bar a new prosecution." 18 U.S.C. § 3288.

"In assessing whether the superseding indictment impermissibly changed the charges," courts "must examine the two indictments carefully, . . . in view of the judicial policy favoring repose in close cases." *Grady*, 544 F.2d at 602; *see also Toussie v. United States*, 397 U.S. 112, 115 (1970) (quoting *United States v. Scharton*, 285 U.S. 518, 522 (1932)) (acknowledging "that criminal limitations statutes are to be liberally interpreted in favor of repose"). A superseding indictment will still relate back where amendments were purely "of form as opposed to substance," "trivial," or "innocuous." *Grady*, 544 F.2d at 602. However, a superseding indictment that adds missing essential elements that were not previously alleged "substantially amend[s] the original charges." *Ben Zvi*, 168 F.3d at 54; *cf. United States v. Sorcher*, 498 F. Supp. 2d 603, 611 (E.D.N.Y. 2007) (noting the relation back doctrine applies where "a change does not alter the essential

elements of the charge"); *United States v. O'Neill*, 463 F. Supp. 1205, 1208 (E.D. Pa. 1979) (finding count was time-barred where misrepresentations alleged in a superseding indictment "were not charged in . . . the original indictment, which alleged a single, different misrepresentation (albeit in aid of the same loan application)").

### A. Counts Eight through Eleven do not relate back to the prior indictment because they were substantially amended.

Assuming the relation back doctrine could be invoked here, Counts Eight through Eleven in the S-3 cannot relate back to corresponding charges in the S-2 because the government "substantially amend[ed]" the those charges in the S-3, *Ben Zvi*, 168 F.3d at 54, including by adding "essential elements of the charge[s]," *Sorcher*, 498 F. Supp. 2d at 611.

"[N]otice is the touchstone in deciding whether a superseding indictment substantially changes the original charges." *Gengo*, 808 F.2d at 3. Specifically, the question "whether the original indictment provided the defendant with timely notice of the charges that were later added by the superseding indictment," *Ben Zvi*, 168 F.3d at 55, and "fairly alerted the defendant to the subsequent charges against him and the time period at issue." *Salmonese*, 352 F.3d at 622. When it comes to indictments, adequate notice is governed by the Sixth Amendment. *See Benjamin*, 95 F.4th at 66 (quoting U.S. CONST., amend. VI) ("The Sixth Amendment guarantees that 'in all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation.'"). And "Rule 7 of the Federal Rules of Criminal Procedure puts this notice requirement into effect by instructing that an indictment 'be a plain, concise, and definite written statement of the essential facts constituting the offense charged.'"[19] *United States v. Hashmi*, No.

---

[19]    Similarly, in order to satisfy "due process," for each count an indictment also must provide "notice of 'the time, place, and essential elements of the crime.'" *Miller v. New York*, No. 15 Civ. 2741 (ENV) (LB), 2019 WL 1232085, at *4 (E.D.N.Y. Mar. 15, 2019) (quoting *Roman v. Napoli*, No. 08 Civ. 6561 (MAT), 2010 WL 4922627, at *8 (W.D.N.Y. Dec. 2, 2010)).

06-CR-442 (LAP), 2009 WL 4042841, at *3 (S.D.N.Y. Nov. 18, 2009) (quoting Fed. R. Crim. P. 7(c)). Thus, at a minimum, notice means that "[a] criminal defendant is entitled to an indictment that states the essential elements of the charge against h[er]." *Pirro,* 212 F.3d at 91 (citing *Jones v. United States*, 526 U.S. 227, 232 (1999)).

As explained in Ms. Sun's prior briefing, the S-2 failed to allege essential elements in connection with Counts Eight through Eleven. (*See* Dkt. 145 at 18–49.) When the government sought the S-3, it conspicuously sought to insert some of those missing elements. Most obviously, the government inserted new clauses in Counts Ten and Eleven, which were intended to supply the missing (and required) quid pro quo element that Ms. Sun had identified. (*Compare* S-3 ¶¶ 145, 147, *with* S-2 ¶¶ 145, 147.) And the government inserted new allegations regarding the use of interstate wires, which the S-2 had also omitted.[20] (*Compare* S-3 ¶¶ 141, 143, *with* S-2 ¶¶ 141, 143.) Both instances reflect the addition of essential elements for the respective offenses. *See, e.g.*, *Weaver*, 860 F.3d at 94 (identifying "use of the mails or wires to further the scheme" as one of the "essential elements" of wire fraud); *Ganim*, 510 F.3d at 148 (noting that a quid pro quo is "essential to proving bribery").

A superseding indictment that adds missing essential elements that previously were not alleged "substantially amend[s] the original charges." *Ben Zvi*, 168 F.3d at 54; *see also Sorcher*, 498 F. Supp. 2d at 611. As noted above, alleging all essential elements is necessary to provide constitutionally required notice to a defendant. *See Hashmi*, 2009 WL 4042841 at *3. The

---

[20]    The S-3 also "broaden[ed] . . . the original charges," *Ben Zvi*, 168 F.3d at 54, through new allegations in Count Nine seemingly intended to provide a foothold for materiality arguments (*see* S-3 ¶ 143), and the addition of more contracts and transactions to expand the scope of possible misrepresentation and potential losses (*see id.* ¶ 120). Ms. Sun focuses her arguments, however, on the most egregious examples:  substantial amendments that injected new essential elements omitted from the S-2.

presence or absence of those elements determines whether a count is legally valid. *See United States v. Ahmed*, 94 F. Supp. 3d 394, 422 (E.D.N.Y. 2015). And whether an indictment alleges all essential elements of charged offenses can mean the difference between the indictment being sustained or dismissed. Unsurprisingly, when evaluating "whether a superseding indictment materially broadens or amends the original charges," courts consider, among other factors, "whether the additional pleadings . . . contain different elements" and "rely on different evidence." *Salmonese*, 352 F.3d at 622 (citing *Ben Zvi*, 168 F.3d at 55). Inserting a missing essential element makes a meaningful legal change to a charged offense, which qualifies as a substantial amendment.

None of the government's attempts to explain away its amendments are successful. Although it later admits that essential elements of wire fraud and bribery were "mistakenly omitted" and "should have been but w[ere] not expressly alleged" (Dkt. 170 at 4), the government first tries to suggest those elements were "previously alleged in the speaking portion of the S-2 Indictment" but "not expressly re-stated in the charging language."[21] (Dkt. 170 at 2.) For support, the government gestures toward a handful of allegations (*see id.* (citing S-2 ¶¶ 20, 125, 118–27, 148)), from which it hopes the Court will *infer* the missing elements. But the missing essential elements are not "necessarily implied" by those allegations, *Stavroulakis*, 952 F.2d at 693 (quoting *Silverman*, 430 F.2d at 111), so inferring them here "would work the harm the Grand Jury Clause is intended to prevent—a federal prosecution begun by arms of the Government without the consent of fellow citizens." *United States v. Thomas*, 274 F.3d 655, 670 (2d Cir. 2001).

---

[21]    Those statements represent grudging concessions that the government indeed tried to add missing elements, but they are otherwise irrelevant. Statutory citations alone are insufficient to allege an offense, *see Gonzalez*, 686 F.3d at 128, and admitting that statutory language containing the missing element was not expressly alleged further concedes that the government failed to "track[] the language of the statute." *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488). Moreover, as discussed above, claiming that the missing elements were "previously alleged" is not accurate.

Regardless, even the inferences that the government stretches for cannot cure its failure to "explicitly" allege all essential elements. *Pirro*, 212 F.3d at 93 (quoting *Foley*, 73 F.3d at 488).

Moving on from that gambit, the government insists that none of its changes in the S-3 were significant enough to matter. (*See* Dkt. 170 at 2–3.)  But for the reasons already discussed, adding missing essential elements is never a trifling matter.  Such elements are not matters "of form as opposed to substance," "trivial," or "innocuous." *Grady*, 544 F.2d at 602.  And offense elements that the government must explicitly allege and prove are not fairly characterized as "purely formal," "minor," or "essentially technical" matters. (Dkt. 170 at 2–3.)

Here, the government's arguments again reflect significant misapprehensions about bribery.  For instance, the government urges that the S-2 "repeatedly allege[d] that [] payments were 'kickbacks' in connection with [Ms.] Sun's official activities in referring the Associate Company and the Cousin Company for PPE contracts with NYS," and that "[t]he word 'kickback' is defined in the *Meriam-Webster* [*sic*] dictionary" in a way that "implies the improper agreement." (Dkt. 161 at 24.)  Ms. Sun has already detailed how kickbacks and bribes are different legal concepts that are not interchangeable. (*See* Dkt. 145 at 45–46.)  Yet despite those recognized legal differences, the government seems to suggest that because kickbacks sometimes can include bribes, it was legally sufficient to label any supposedly illicit payments a kickback.  But kickbacks also include things that are *not* bribes—including, significantly, gratuities that do not require a quid pro quo and are no longer encompassed by 18 U.S.C. § 666—so the government could not just pick the broader category.[22] *See, e.g.*, *United States v. Yaron*, No. S2 10-CR-363 (GBD), 2011

---

[22]    An analogous example would be charging a defendant with distributing narcotics, but alleging only that the offense involved selling white powder.  The powder *could* be a controlled substance within the scope of the statute, or it could be something completely benign.  It is up to the indictment charging that defendant to properly allege—based on evidence actually presented

WL 3279054, at *4 (S.D.N.Y. July 28, 2011) (observing that "gratuities" are "well within the definition of kickback as cited by the U.S. Supreme Court and the Second Circuit"). And until the government added new language to Counts Ten and Eleven in the S-3, nothing in the S-2 actually alleged a quid pro quo—let alone an "explicit" quid pro quo as required under Second Circuit law.[23] *Benjamin*, 95 F.4th at 74 (assessing whether the indictment "sufficiently alleged an explicit quid pro quo").

Next, the government argues that its changes in the S-3 "do not materially broaden or substantially amend the charges." (Dkt. 170 at 3.) On this score, the government focuses heavily on assuring the Court that the S-3 did not broaden the scope of the offenses alleged in the S-2. (*See, e.g.*, *id.* at 4 (arguing "the addition of greater specificity clearly does not 'expand the scope of' conduct within the ambit of a charged offense").) Courts, however, consider both whether a superseding indictment "materially broaden[s] *or* substantially amend[s] the original charges." *Salmonese*, 352 F.3d at 622 (emphasis added). And it is the latter inquiry that matters here.

The only real argument the government offers regarding substantial amendment is an assertion that "the elements of the crime charged are not altered by adding an express recitation of a statutory element that had been mistakenly omitted from the charging language . . . ." (Dkt. 170 at 4.) That is unpersuasive; adding new elements obviously alters what elements are alleged. Moreover, the real issue is "whether the original indictment provided the defendant with timely

---

to the grand jury—the nature of the substance, or it would not sufficiently state an offense. So too, here. A kickback *might* be a bribe if it was an exchange defined by a quid pro quo, but the indictment allege as much; calling something a kickback does not mean it is also a bribe.

[23]     The government also complains that "the defendants cannot and do not claim to have been previously unaware . . . that the kickback payments constitute the *quid pro quo* for the bribery scheme." (Dkt. 170 at 2.) But that was *precisely* Ms. Sun's complaint in her motion. Kickbacks are legally distinct from bribes, only the latter entails a quid pro quo, no quid pro quo was alleged, and no factual allegations in the S-2 (or the S-3, for that matter) ever mention any "bribe."

notice of the charges that were later added by the superseding indictment," *Ben Zvi*, 168 F.3d at 55, and "fairly alerted" Ms. Sun "to the subsequent charges . . . ." *Salmonese*, 352 F.3d at 622. Thus, "the elements of the crime[s] charged" *are* "altered" in the sense that matters: elements "mistakenly omitted" from the prior indictment, of which Ms. Sun had no notice (because they were omitted), are newly added. (Dkt. 170 at 3.) The government's effort to reframe the question as whether it "add[ed] an element to charge a *different* crime" (*id.* at 4 (emphasis added)), is just a pivot back to asking whether changes "materially broaden[ed]" the charges. *Salmonese*, 352 F.3d at 622. A substantial amendment is not limited only to when prior charges become entirely new offenses.

Lastly, the government dismisses its repeated failures to allege essential elements as "at worst a curable formal defect," for which "the cure is superseding." (Dkt. 170 at 4.) The government then turns to 18 U.S.C. § 3288, arguing that because that statute allows additional time to file new charges after an indictment is dismissed, the government should get at least equal treatment here. (*See* Dkt. 170 at 4 (asserting that "the government would be statutorily entitled to an additional six months from the date of [a] dismissal to return to the grand jury to cure the issue" and should be permitted "to make the same correction on its own initiative").) That argument fails for multiple reasons.

First, "[s]uch cases as *United States v. Grady* . . . persuasively teach that Section 3288 applies only to new indictments brought *after* an earlier indictment has been *dismissed* because of flaws affecting the original grand jury," and not "by contrast, [where] the second indictment was truly a superseding indictment, brought *before* any such dismissal had been ordered." *United States v. Gillespie*, 666 F. Supp. 1137, 1140 (N.D. Ill. 1987) (citing, *inter alia*, *Grady*, 544 F.2d at 601–02) (emphasis in original). Section 3288 therefore has no application in the context of a

31

superseding indictment, since "[t]he term 'superseding indictment' refers to a second indictment issued in the absence of a dismissal of the first." *United States v. Rojas-Contreras*, 474 U.S. 231, 237 (1985) (Blackmun, J., concurring). And since § 3288 is inapplicable, the government's attempt to analogize to that statute or its underlying policies is fruitless. Congress could have written a different or broader saving statute, but it did not.

Second, the government's supposed absurdity is nothing of the sort. (*See* Dkt. 170 at 4.) The government dismisses the "defendants' interpretation of the relation-back doctrine" because supposedly it "would mean the government could not return to the grand jury while the indictment is pending to make the same correction on its own initiative" that could be permitted under § 3288. (*Id.*) That is not quite true. Nothing that Ms. Sun has argued would prevent the government from returning to the grand jury to fix a flawed indictment before the statute of limitations expired. As the Supreme Court has observed, "[s]uch a time limit may [] have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity." *Toussie*, 397 U.S. at 115. It may also encourage prosecutors to prepare and seek indictments free from legal errors.

Moreover, the government finds an "absurd result" only because it considers things entirely from its own perspective—disregarding defendants' interests, the burdens entailed by multiple superseders, and legitimate concerns that warrant limits on drawn out prosecutions. The government's interpretation of the relation back doctrine, which treats even the presence or absence of essential elements as inconsequential, permits slipshod pleading that tolls statutes of limitations while failing to provide defendants with the notice and due process to which they are constitutionally (and statutorily) entitled. The government's view seemingly would permit endless superseders that correct error after error, potentially extending the government's window to prosecute a defendant significantly beyond what Congress allowed. "The purpose of a statute of

limitations," however, "is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie*, 397 U.S. at 114. That purpose is served by requiring the government at least to properly allege the essential elements of a crime when it is charged—or, failing in that, to promptly correct its mistakes and return a proper indictment before a statute of limitations expires, or obtain a new indictment within six months of any dismissal. Contrary to the government's claim, that is not "absurd" but rather respectful of legislative determinations, society's interest in finality, concerns about "the danger of official punishment because of acts in the far-distant past," and defendants' constitutional interests—while still giving the government several bites at the apple. *Toussie*, 397 U.S. at 114–15.

### B. Counts Eight through Eleven cannot relate back because their predecessors were not validly pending when the S-3 was filed.

The relation back doctrine only applies if a superseding indictment is filed "while the first indictment is still *validly* pending . . . ." *Grady*, 544 F.2d at 602 (emphasis added). For charges in an indictment to be "validly pending," they must be both "valid" and "pending" (otherwise, the test would simply be whether prior charges were "pending").[24] Because Counts Eight through Eleven were not properly alleged in the S-2, they were not validly pending for purposes of that analysis.

"Rules Six and Seven of the Federal Rules of Criminal Procedure govern grand jury proceedings and the components of a valid indictment." *United States v. Philippeaux*, No. 13-CR-

---

[24]     In *United States v. Rutkoske*, 394 F. Supp. 2d 641 (S.D.N.Y. 2005), the court concluded instead that "[a] close reading of *Grady* reveals that an indictment is validly pending until it is dismissed." *Id.* at 645 (citing *Grady* 544 F.2d at 601). That interpretation only gives effect to part of *Grady*'s precondition, and in almost 20 years no court has cited or relied on *Rutkoske*'s statute of limitations analysis. In any event, *Rutkoske* concerned a "latent defect" and not an absence of essential elements apparent from the face of the indictment. *Id.* at 646.

277 (RA), 2021 WL 1842195, at *1 (S.D.N.Y. May 7, 2021).  And "[a]n indictment is facially valid if it . . . contains the elements of the offense charged[,] . . . fairly informs a defendant of the charge against which he must defend[,] and . . . enables a defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Ahmed*, 94 F. Supp. 3d at 422 (quoting *United States v. Resendiz-Ponce,* 549 U.S. 102, 108 (2007)); *cf. United States v. Triumph Cap. Grp., Inc.*, 260 F. Supp. 2d 470, 472 (D. Conn. 2003) ("The validity of an indictment is tested by its allegations . . . ."); *United States v. Black*, 291 F. Supp. 262, 264 (S.D.N.Y. 1968) (same).  Ms. Sun does not dispute that the S-2 had been filed and therefore was "pending" for purposes of the relation back doctrine.

Here, Counts Eight through Eleven contained numerous fatal legal deficiencies, including multiple failures to sufficiently allege essential elements of the charged offenses.  Most significantly, Counts Eight and Nine failed to allege fraudulent intent and materiality (*see* Dkt. 145 at 18–42), and Counts Ten and Eleven failed to allege an explicit quid pro quo (*see id.* at 42–49).  As Ms. Sun explained, those omissions meant that the S-2 failed to state essential elements as to those counts.  Indeed, the government's decision to seek a third superseding indictment to try to correct some of those errors reflects a tacit agreement that the S-2's failures were significant.  And as Ms. Sun also demonstrated, Counts Eight, Nine, and part of Eleven were already barred by the statute of limitations.  (*See id.* at 41–42, 49–50.)  Given those serious legal deficiencies, Counts Eight through Eleven as alleged in the S-2 were not "validly pending" for purposes of the relation back doctrine when the S-3 was filed.  Thus, there is nothing to which the corresponding counts now alleged in the S-3 can properly relate back.

### C.  The substantially amended versions of Counts Eight, Nine, and the first object of Eleven remain barred regardless.

Even were the Court to determine that Counts Eight through Eleven as alleged in the S-3 relate back to the S-2, any prosecution of Counts Eight, Nine, and part of Eleven remains barred by the statute of limitations for the reasons already discussed in Ms. Sun's motion.  (*See* Dkt. 145 at 41–42, 49–50.)  The government urges otherwise, but none of its responses have merit.

First, the government argues that it "has not offered a full proffer of its evidence, and all relevant facts are not 'clear from the face of the indictment.'"  (Dkt. 161 at 20 (quoting *United States v. Sampson*, 898 F.3d 270, 279 (2d Cir. 2018)).)  In its view, "[n]othing more is needed" because "the grand jury has alleged that the honest services fraud schemes continued into approximately August 2020."  (*Id.*)  But the government is wrong.  The facts relevant to determining when "every element in the crime occur[red]," *Sampson*, 898 F.3d at 277, are "clear from the face of the indictment," *id.* at 279.  The government identifies no missing facts relevant to the determination of when the alleged crimes were complete, nor does it meaningfully dispute Ms. Sun's prior observation that nothing relevant to Counts Eight and Nine alleges conduct after June 18, 2020, that could toll the statute of limitations as to those offenses.[25]  (Dkt. 145 at 41–42.)

Second, the government claims that "according to the allegations of the Second Superseding Indictment, [Ms.] Sun and her family received kickbacks 'totaling approximately \$2.3

---

[25]    The government offers only the conclusory remark that "the grand jury has alleged that the honest services fraud schemes continued into approximately August 2020."  (Dkt. 161 at 20.)  As the S-3 indicates, that date is only "approximate."  (S-2 ¶¶ 143, 145.)  And Ms. Sun has already explained (*see* Dkt. 145 at 41–42) that detailed factual allegations throughout the S-2 establishing that the charged offenses would have been legally complete by June 18, 2020 (*see* S-2 ¶ 120), overcome equivocal boilerplate positing that the scheme could have continued to approximately August 2020.  *See, e.g.*, *United States v. Gabriel*, 920 F. Supp. 498, 506 (S.D.N.Y. 1996), *aff'd*, 125 F.3d 89 (2d Cir. 1997) ("It is one thing to accept a facially sufficient indictment at face value; but it would be quite another to allow broad conclusory allegations to override more particularized allegations of the same pleading . . . .").  The government does not dispute that point.

million during 2020 and 2021.'"   (Dkt. 161 at 20 (quoting S-2 ¶ 126).)   But that is not quite

accurate, as the government's partial quotation suggests.   Paragraph 126 actually alleges that:

> In connection with the Cousin Company contracts with the NYS government, *a spreadsheet maintained on SUN and HU's personal computer indicated that the Cousin provided payments to HU (and SUN) totaling approximately $2.3 million during 2020 and 2021*.   These kickbacks from the Cousin Company represented taxable income.   HU did not report these payments as income to the U.S. government, as required, or pay taxes on this income in Forms 1040 for 2020 and 2021 that he filed on behalf of himself and SUN.

(S-2 ¶ 126 (emphasis added).)   The S-2 (and now the S-3) did not allege that the defendants

*received* kickback payments related to any charged scheme in 2021; it alleged only that a

spreadsheet lists payments supposedly provided in 2020 and 2021.   And though the paragraph

refers to "kickbacks," it does not specify whether that reference is to payments in 2020 or 2021.

Proving those differences are not semantics, the S-3 later makes clear that Counts Eight and Nine

do *not* allege that kickback payments were made in 2021 in connection with the charged schemes.

For all their flaws, both counts clearly indicate that the period of the charged scheme did not extend

past 2020.   (S-3 ¶¶ 143, 145.)

## VI.   COUNT FOURTEEN MUST BE DISMISSED

Count Fourteen provides no factual particularity regarding Ms. Sun's supposed

involvement in an international money laundering conspiracy.   (*See* S-3 ¶¶ 153–54.) In connection

with Ms. Sun's last motion to dismiss, the Court salvaged similar bare bones allegations by citing

specific language that it viewed as linking the money laundering conspiracy to Ms. Sun's alleged

activity in violation of FARA.[26]  (*See* Dkt. 100 at 28 (quoting S-1 ¶ 11).)  The government then superseded and removed that very language.[27]

The government maintains that removing the language on which the Court relied does not matter.  (*See* Dkt. 161 at 28.)  But there is simply nothing else alleged in connection with Count Fourteen, and its threadbare recitals practically require the government to "fill in [the] elements of its case" at trial "with facts other than those considered by the grand jury."  *Pirro*, 212 F.3d at 92 (quoting *Walsh*, 194 F.3d at 44).  The government also suggests that "the lengthy and detailed indictment is replete with allegations about violations of the law from which [Ms. Sun] derived substantial proceeds over a period of years."[28]  (Dkt. 161 at 28.)  But that misses the point.  Alleging that Ms. Sun committed other crimes that supposedly generated criminal proceeds merely alleges that she committed other crimes; it does not allege "essential facts constituting the offense charged" in Count Fourteen, Fed. R. Crim. P. 7(c)(1), which is not concerned with how alleged proceeds were *derived* but rather whether they were *concealed* through international monetary transactions.  In any event, because neither honest services wire fraud nor federal bribery are listed as SUAs in Count Fourteen (*see* S-3 ¶ 154), allegations related to those offenses—the purported source of almost all the proceeds alleged in the S-3—are irrelevant to Count Fourteen.

---

[26]    Ms. Sun's view, of course, remains that Count Fourteen has always been deficient given its utter lack of any meaningful allegations regarding her alleged conduct.

[27]    The government protests that there are "still . . . several express references to financial benefits that [Ms. Sun] received directly or indirectly 'in return for' specified acts . . . ."  (Dkt. 161 at 28 (citing S-2 ¶¶ 29, 45, 78, 90).)  But as Ms. Sun already explained (and the government does not dispute), none of the referenced benefits were allegedly concealed pursuant to an international money laundering conspiracy.  (*See* Dkt. 145 at 51 n.27.)

[28]    It is hardly fair notice to churn out 80 pages of allegations and then force Ms. Sun to guess blindly which ones might be relevant to Count Fourteen.  It certainly is not sufficient to "fairly inform[] [her] of the charge against which [she] must defend . . . ."  *Hamling v. United States*, 418 U.S. 87, 117 (1974).

Finally, the government argues that Ms. Sun "is charged with money laundering *conspiracy*—that is, with the agreement—and not with substantive money laundering through particular transactions." (Dkt. 161 at 27 (emphasis in original).) So what? A conspiracy charge is not exempt from the requirement that an indictment provide "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). And Count Fourteen never alleges who, what, when, where, or how Ms. Sun supposedly agreed to "pursue the same criminal objective" as others, *Salinas v. United States*, 522 U.S. 52, 63–64 (1997), with "a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense,'" *Ocasio v. United States*, 578 U.S. 282, 287 (2016) (quoting *Salinas*, 522 U.S. at 65). In other words, Count Fourteen also provides none of the factual particularity required to allege any money laundering conspiracy.

## CONCLUSION

For the foregoing reasons, Ms. Sun respectfully asks that Court to grant her motion.

Dated:  September 24, 2025
        New York, New York

Respectfully submitted,

ABELL ESKEW LANDAU LLP

/s/ *Jarrod L. Schaeffer*

Kenneth M. Abell
Jarrod L. Schaeffer
Scott Glicksman

(646) 970-7341 / -7339 / -7338

kabell@aellaw.com
jschaeffer@aellaw.com
sglicksman@aellaw.com

*Counsel for Linda Sun*

38

## **<u>CERTIFICATE OF SERVICE</u>**

I certify that, on September 24, 2025, this document was electronically filed with the Clerk of Court using the Court's CM/ECF system, which will then serve notification of the filing to all registered parties of record.

/s/ *Jarrod L. Schaeffer*

Jarrod L. Schaeffer