

JARROD L. SCHAEFFER
646-970-7339 (direct dial)
jschaeffer@aellaw.com
aellaw.com

256 Fifth Avenue, 5th Floor
New York, New York 10001

November 23, 2025

**By ECF**

Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:    *United States v. Linda Sun, a/k/a "Wen Sun," "Ling Da Sun," and "Linda Hu," and Chris Hu*, S4 24 Cr. 346 (BMC) (TAM)

Your Honor:

      We represent Linda Sun in the above-referenced matter and, on behalf of both defendants, respectfully submit this reply to the government's opposition to defendants' motion to admit into evidence the report of the *Brady* Interview conducted by CBP in May 2025.[1] (*See* Dkt. 288.) The Court should reject the government's arguments and permit the defendants to introduce relevant portions of the *Brady* Interview report as fair response to the government's expected introduction of other communications with CC-1.

## DISCUSSION

      The government urges several reasons that it believes justify keeping the jury in the dark about clearly material and exculpatory evidence. At bottom, those arguments are moving targets affecting a sort of evidentiary shell game—the effect of which will be severe and unconstitutional prejudice to the defendants. That outcome would be unfair, misleading, and unjust.

      *First*, the government complains that the "defendants have not identified any particular statements of CC-1 that they expect the government to offer and that they wish to impeach with an inconsistent statement of CC-1." (Dkt. 288 at 1.) This is a curious argument given that the government has not identified for the defendants what statements it intends to offer. It is neither reasonable nor fair to condition relief for the defendants on them providing specific responses to information that the government has withheld as a matter of trial strategy.

      At present, the defendants know only that the government has marked a number of exhibits that either contain or describe hearsay statements of CC-1 that it claims show actions at the

---

[1]     For convenience, this reply uses the same terms and abbreviations as in the defendants' prior submission.

direction of the PRC and/or coordination with Ms. Sun to further the PRC's interests. *See, e.g.*, GX-108.26; GX-108.28; GX-108.30; GX-108.31; GX-108.32; GX-108.33; GX-108.34; GX-108.35; GX-108.36; GX-108.38; GX-108.39; GX-108.41.[2] Depending on which statements the government intends to offer, different statements in the *Brady* Interview report either impeach or provide essential context. The Court can easily police the particular statements as they come in.

In all cases, however, the *Brady* Interview report provides essential evidence that the jury must hear. For instance, the government has repeatedly asserted that Ms. Sun "engaged in political activities at the request of CC-1 and CC-2, whose activities were supervised, directed, and controlled by PRC government officials." (S-4 ¶ 43.) Among other things, however, the *Brady* Interview report makes clear that CC-1's organization was not controlled or funded by the PRC. *See, e.g.*, EDNY_145291 ("When asked who does financially supports [*sic*] [Association-1], subject stated that is through donations of the members of the association. Subject denied that New York City, New York State or Chinese government provides any financial support. Subject stated that there is no financial support from anyone that lives in China."). The *Brady* Interview report also refutes the government's accusations that CC-1's actions or communications with the PRC show direction or control by a foreign principal. *See, e.g.*, EDNY_145291 ("Q. How have you assisted the government of China? A. I never assisted Chinese government financially, the only assistance I ever done for any Chinese government official is when they came to visit New York as a president of [Association-1], I organized the airport pick-up, hotel reservations, lunch and dinner reservations. Last time I assisted with the above, it was in 2019. In January 2020 the Henan Province organized a dinner reception for him as the president of [Association-1]. It was their way of thanking me and [Association-1] for our hospitality when they visited New York."). And the *Brady* Interview report directly undermines the government's repeated claims that CC-1 assisted Mr. Hu's business activities on behalf of the PRC. *See, e.g.*, EDNY_145290–91 ("Q. How have you assisted SUN or her husband HU with business ventures in China? A. I tried to assist them to find business opportunities in Henan Province. They wanted to open up a lobster business in Henan Province. There was no success in this venture. I assisted them as the President of [Association-1].").

Notably, as to that last example, the defendants have repeatedly objected to the introduction of such evidence because the government has not—and cannot—prove any real link between Ms. Sun's alleged actions and any financial benefit to Mr. Hu's businesses. In each instance, the Court has permitted the government to make its arguments while noting that the defendants have substantial rebuttals. The government is now attempting to preclude defendants from presenting a potent rejoinder—a direct refutation of the government's allegations by the person who supposedly provided the alleged assistance. The defense should be afforded at least as much leeway as the government to respond to those arguments.

*Second*, for the first time the government suggests that "many of the statements by CC-1 that the government intends to offer into evidence . . . will not be offered for their truth." (Dkt. 288 at 1.) It is hard to see how that could be the case, as the ostensible relevance of such statements necessarily depends on their content being true. For example, the government has explicitly

---

[2] While marking those exhibits potentially might indicate statements that the government *may* offer, it does not identify which statements the government actually *intends* to offer. The government has marked over 1,500 exhibits and has not offered everything that it marked.

alleged that "in written communications with [Ms. Sun], CC-1 made clear that he was acting on behalf of the PRC government." (S-4 at ¶ 44.) It is not clear how the government could substantiate that claim *without* offering the alleged statements for their truth, so the government's representation is hard to credit. Even if it were accurate, the extraordinary unfair prejudice entailed by improper consideration of the statements' content will require—at a minimum—that each statement be accompanied by a strong corrective instruction whenever it is introduced.

Regardless, whether or not the government seeks to offer CC-1's statements for their truth, the fact that CC-1 also made the statements contained in the *Brady* Interview report invariably would impeach or rebut the purpose for which the government would offer them. Because that would not be offering the statements in the *Brady* Interview report for their truth, the defense can introduce them for reasons similar to those the government likely plans to invoke. *See United States v. Graham*, 858 F.2d 986, 990 n.5 (5th Cir. 1988) (observing that an inconsistent statement is not offered for its truth but rather to impeach by showing that a witness has said unreliable things); *see also United States v. Mejia-Velez*, 855 F. Supp. 607, 616 (E.D.N.Y. 1994) (citing *Graham*).

*Third*, the government argues that the *Brady* Interview report contains "the statements of the CBP personnel who wrote the report" and not CC-1. (Dkt. 288 at 2.) If true, as the defense already noted (*see* Dkt. 287 at 3 n.2), then the statements it contains would be admissible against the government as the statement of a party-opponent. *See* Fed. R. Evid. 801(d)(2)(D); *cf. Davis v. City of New York*, 959 F. Supp. 2d 427, 437 (S.D.N.Y. 2013) (finding that arresting officers' statements were admissible as party-opponent admissions under Rule 801(d)(2) against New York City). The government did not dispute that point.

In any event, however, for the reasons already articulated in the defendants' prior letter, the *Brady* Interview report is dissimilar to FBI 302s and fairly viewed as containing accurate notations of CC-1's statements. *Cf. United States v. Strother*, 49 F.3d 869, 875 (2d Cir. 1995) ("The fact that Wollschleager herself did not prepare the Probation Memorandum should not have precluded its admission as a prior inconsistent statement."). The government has conceded "that otherwise inadmissible extrinsic evidence . . . might be admissible under Rule 806 to impeach an absent hearsay declarant, where it would be 'the only means of presenting such evidence to the jury.'" (Dkt. 288 at 3 n.2 (quoting *United States v. Uvino*, 590 F. Supp. 2d 372, 374 (E.D.N.Y. 2008), *as amended* (Dec. 19, 2008)).) And thanks to the government's decisions to name CC-1 in the S-4 and to later withhold immunity, that is the situation here. *Cf. Uvino*, 590 F. Supp. 2d at 375 ("The government also had the option to make these witnesses available by granting them immunity.").

*Fourth*, even if the CBP Report were not admissible pursuant to Rule 806, portions should be admitted under Rule 106 and the common law rule of completeness. "If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of . . . any other statement . . . that in fairness ought to be considered at the same time" and "may do so over a hearsay objection." Fed. R. Evid. 106. Those principles apply where additional context is "necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure the fair and impartial understanding of the admitted portion.'" *United States v. Romanello*, No. 22-CR-194 (EK), 2023 WL 8480071, at *2 (E.D.N.Y. Dec. 6, 2023) (quoting *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007)). To the extent the

Court views the statements in the *Brady* Interview report not as inconsistent statements but as context for CC-1's other statements, fairness requires the application of Rule 106 here.

In *Romanello*, for instance, the court held that inadmissible hearsay portions of an FBI 302 summarizing the defendant's oral statements to law enforcement were admissible because the government had introduced evidence related to one part of the defendant's statements during that interview. 2023 WL 8480071 at *2. The same reasoning applies in this case. Whatever its theory of admission, the government obviously intends to offer evidence of communications between CC-1 and Ms. Sun (and others) in support of a narrative holding that CC-1 was working at the direction of the PRC and coordinated with Ms. Sun to further the PRC's interests. Despite the government's confident assertions of what CC-1's communications show, the Court was correct last week when it noted that the government's assertions are really its *inferences* from the communications and not their actual contents. And as noted in the examples above, the *Brady* Interview report clearly provides important context to those statements that is helpful to the defense and that the jury, in fairness, should also be permitted to consider.

Insisting otherwise, the government has repeatedly suggested that "CC-1's invocation of his Fifth Amendment rights is a clear indication that his truthful testimony would be incriminating," as presumably "he would need no immunity to testify if [he] were truthful." (Dkt. 288 at 4 n.3.) That is overly simplistic and the government knows it (or should). Invoking the Fifth Amendment does not mean that one is guilty of a crime. "The privilege afforded not only extends to answers that would in themselves support a conviction under a federal criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). CC-1 certainly "has reasonable cause to apprehend danger from a direct answer," *id.*, because the government has directly accused him of participating in federal crimes based on its view of the facts. To invoke the privilege, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Id.* at 486–87. That is obviously the case for CC-1.

Yet invoking the Fifth Amendment does not mean that a witness committed a crime—just that there is reasonable cause to believe that *the government* will think, based on his or testimony, that the witness has done so. Here, the government has a very specific view of the facts. And there is little doubt that the government would consider any testimony contrary to its narrative to be untruthful and potentially perjurious. While that may be sufficient jeopardy to permit CC-1 to invoke the Fifth Amendment, it does not mean that the government is *right* on either score. It just means that the government may punish CC-1 for testimony with which it disagrees.

For the foregoing reasons, the defense must be permitted to introduce portions of the *Brady* Interview report at trial. We thank the Court for its attention to this matter.

Respectfully submitted,

*Jarrod L. Schaeffer*

Jarrod L. Schaeffer

ABELL ESKEW LANDAU LLP
256 Fifth Avenue, 5th Floor
New York, NY 10001
(646) 970-7339
jschaeffer@aellaw.com

cc:   Counsel of Record (via ECF)